No. 17-1967

# United States Court of Appeals

*for the*

# Fourth Circuit

---

AUGUSTA THOMAS, JR.,

*Plaintiff-Appellant,*

– v. –

DELMARVA POWER & LIGHT COMPANY,

*Defendant-Appellee.*

_____

*On Appeal from the United States District Court for the District of Maryland
at Baltimore in Case No. 1:15-CV-00433-RDB
Honorable Richard D. Bennett, U.S. District Court Judge*

## BRIEF OF PLAINTIFF-APPELLANT

JANICE WILLIAMS-JONES
LAW OFFICE OF JANICE WILLIAMS-JONES
3545 Ellicott Mills Drive, Suite 308
Ellicott City, Maryland 21043
(410) 203-1246
Lawofficeofjwjones@gmail.com

*Counsel for Plaintiff-Appellant*

OCTOBER 12, 2017

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
<u>DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS</u>

No. <u>17-1967</u> Caption: <u>Augusta Thomas, Jr. v. Delmarva Power & Light Company</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Augusta Thomas, Jr.</u> who is <u>Appellant</u>, makes the following disclosure:
   (name of party/amicus)       (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?
        ( ) YES                    ( X ) NO
2.    Does party/amicus have any parent corporations?
        (   )   YES                ( X ) NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
        ( ) YES                    ( X ) NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
        ( ) YES                    ( X ) NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association (amici curiae do not complete this question)?
        ( ) YES                    ( X ) NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?
        ( ) YES                    ( X ) NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: */s/ Janice Williams-Jones*                Date: October 12, 2017
                Counsel for Appellant

i

# **TABLE OF CONTENTS**

*Page*

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER
INTERESTS...........................................................................................i

TABLE OF CONTENTS..........................................................................ii

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF JURISDICTION.......................................................... 1

STATEMENT OF ISSUES ....................................................................... 1

STATEMENT OF THE CASE................................................................... 2

STATEMENT OF FACTS ......................................................................... 2

    A. Thomas' Employment History. ...................................................... 2

    B. Delmarva's Policies for Investigations and Discipline. ............... 3

    C. Thomas' 2013 Suspension for an Alleged Customer Complaint. ... 6

    D. Lewis, Simon and Bennett Interview Bednar............................... 9

    E. Simon's Alleged Investigation of Employee Complaints Against
       Thomas........................................................................................ 10

    F. Lewis and Youngbar's Involvement in Thomas' Investigation. ... 11

    G. The Written Statement from M.S. ............................................... 14

    H. Simon's False Investigative Summary. ...................................... 16

    I.   Simon's Discharge Letter to Thomas........................................... 17

    J.   Investigations/Disciplinary Actions against Caucasian Employees
       Accused of Work-Related Misconduct. ...................................... 19

SUMMARY OF ARGUMENT ............................................................... 23

ARGUMENT ....................................................................................... 24

   A. Standard of Review.................................................................... 24

   B. Standards for Disparate Treatment Claims................................ 25

   C. Thomas Presented Enough Circumstantial Proof of Discrimination to Withstand Summary Judgment....................................................... 27

      1. Discriminatory Bednar Investigation. .................................... 28

      2. Discriminatory Investigations of Employee Complaint......................... 30

      3. Circumstantial Evidence Shows that Caucasian Males and Females were Investigated in Accordance with Policy, but Thomas was Not. ................................................................................. 34

      4. Evidence of Discriminatory Discipline. ................................. 36

   D. Thomas Prove Discrimination under *McDonnell Douglas.* ........................ 38

   E. The Alleged Reasons for Thomas' Discharge were False and Pretextual. ................................................................................ 44

   F. The Cat's Paw Theory Applies in this Case ............................... 46

CONCLUSION ................................................................................... 48

STATUTORY ADDENDUM ....................................................... Add. 1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Anderson v Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................25, 43

*Anthony v. South Carolina Dept. of Corrections,*
    2007 WL 1032440 (D.S.C. Mar. 30, 2007)..................................30

*Barnes v. ISG Sparrows Point, LLC,*
    WL 4596058 (D. Md. Sept. 30 2011)............................................26

*Blasic v. Chugach Support Servs., Inc.,*
    673 F. Supp. 389 (D. Md. 2009)...........................................41, 45

*Cook v CSX Trans. Corp.,*
    988 F. 2d 507 (4th Cir. 1993) ...............................................27, 39

*Christian v. S.C. Dep't of Labor Licensing and Regs.,*
    651 Fed. Appx. 158 (4th Cir. 2016) ......................................26, 27

*Christian v. Wal–Mart Stores, Inc.,*
    252 F.3d 862 (6th Cir. 2001) ........................................................47

*Diamond v. Colonial Life & Acc. Ins. Co.,*
    416 F.3d 310 (4th Cir. 2005) ........................................................27

*Foster v. Univ. of Maryland-E Shore,*
    787 F.3d 243 (4th Cir. 2015) ........................................... 24, 37-38

*Guessous v. Fairview Prop. Investments, LLC,*
    828 F.3d 208 (4th Cir. 2016) ........................................................46

*Heiko v. Colombo Sav. Bank, F.S.B.,*
    434 F. 3d 249 (4th Cir. 2006) ......................................................44

*Holland v. Wash. Homes, Inc.,*
    487 F.3d 208 (4th Cir. 2007) ........................................................39

*Hoyle v. Freightliner, LLC,*
    650 F.3d 321 (4th Cir. 2011) ........................................................38

*International Woodworkers of America, AFL-CIO, CLC v.*
    *Chesapeake Bay Plywood Corp.,*
    659 F. 2d 1259 (4th Cir. 1981) ....................................................46

iv

*Jacobs v. N.C. Administrative Office of the Courts*,
  780 F.3d 562 (4th Cir. 2015) ...................................................25, 45

*Mandengue v. ADT Sec. Sys., Inc.*,
  2012 WL 892621 (D. Md. Mar. 14, 2012) ...................................39

*Mercantile Peninsula Bank v. French (In re French)*,
  499 F.3d 345 (4th Cir. 2007) ........................................................25

*Mastro v. Potomac Elec. Power Co.*,
  447 F. 3d 843 (D.C. Cir. 2006)..............................................35, 45

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 729 (1973).................................................................26, 38

*Moore v. City of Charlotte, NC*,
  754 F. 2d 1100 (4th Cir. 1985) ...............................................38, 39

*Ray v. CSX Transp., Inc.*,
  189 F. App'x 154 (4th Cir. 2006)............................................ 38-39

*Reeves v. Sanderson Plumbing Prods., Inc.*
  530 U.S. 133 (2000)......................................................27, 38, 44

*Sledge v. J.P. Stevens & Co.*,
  585 F.2d 625 (4th Cir. 1978) .......................................................46

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993).....................................................................43

*Staub v. Proctor Hosp.*,
  562 U.S. 411 (2011).....................................................................47

*Sylvester v. SOS Children's Villages Ill., Inc.*,
  453 F. 3d 900 (7th Cir. 2006) ......................................................27

*Texas Dep't of Community Affairs v. Burdine*,
  450 U.S. 248 (1981).....................................................................38

*Tolan v. Cotton*,
  ⸻ U.S. ⸻, 134 S. Ct. 1861, 1868, 188 L.Ed.2d 895 (2014) .................25

*Tshibaka v. Sernulka*,
  WL 7229820 (4th Cir. Dec. 13, 2016) ......................................38

*U.S. Postal Serv. Bd. Of Governors v. Aikens*,
  460 U.S. 711 (1983).................................................................27, 38

*Williams v. Cerberonics, Inc.*,
  871 F.2d 452 (4th Cir.1989) .......................................................38

**Statutes:**

28 U.S.C. § 1291 .............................................................................1

28 U.S.C. § 1331 .............................................................................1

28 U.S.C. § 1367 .............................................................................1

42 U.S.C. § 1981 ..........................................................................1, 26

42 U.S.C. § 2000e *et seq.*...............................................................1

42 U.S.C. § 2000e–2(a)(1) ............................................................26

42 U.S.C. § 2000e–2(m) ...............................................................26

Md. Code Ann., State Government Art. § 20-101 *et seq.*...........................1

**Court Rules:**

Fed. R. App. P. 4 .............................................................................1

Fed. R. App. P. 4(a)(1)(A) .............................................................1

Fed. R. Civ. Proc. 56 Advisory Committee Notes (1963).......................25

**Treatise:**

10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure*
§ 2728 (3d ed.1998).......................................................25

## STATEMENT OF JURISDICTION

This matter raises federal questions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Civil Rights Act of 1991, 42 U.S.C. § 1981, *et seq.* and state law pursuant to Title 20 of the State Government Article. Md. Code Ann., State Gov't § 20–101, *et seq.* The Fourth Circuit has subject matter jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

This Court has jurisdiction over this appeal from a final order in the District Court of Maryland pursuant to 28 U.S.C. § 1291. Plaintiff-Appellant filed a Notice of Appeal on August 18, 2017 as required by Rule 4(a)(1)(A). Fed. R. App. P. 4. JA 846.

## STATEMENT OF ISSUES

I.  Whether Delmarva established, as a matter of law, that Thomas failed to produce sufficient circumstantial evidence to show that the investigation of his alleged workplace misconduct and discipline imposed in connection therewith was based on race and sex discrimination?

II. Whether Delmarva established, as a matter of law, that Thomas failed to prove a *prima facie* case of race and sex discrimination despite evidence that Thomas was disciplined more harshly than employees outside his protected classes who engaged in comparable or more serious workplace misconduct?

1

III.    Whether Delmarva established, as a matter of law, that Thomas failed to demonstrate that the reasons given for his discharge were a pretext for discrimination given unrebutted proof that the alleged decision-maker's report contained false accusations against Thomas?

IV.    Whether Delmarva established, as a matter of law, that Thomas failed to prove liability under the cat's paw theory despite evidence that a supervisor and employees with racial animus influenced the decision-maker's investigation and decisions in Thomas' case?

## STATEMENT OF THE CASE

Plaintiff-Appellant Augusta Thomas, Jr. ("Thomas"), a Trouble and Serviceman for Defendant-Appellee Delmarva Power & Light Co. ("Delmarva"), filed this action on February 13, 2015, asserting claims for violation of Title VII. Thomas amended his Complaint on February 1, 2016, adding claims under the Civil Rights Act of 1991 and Maryland's state anti-discrimination statute. JA 11.

Defendant-Appellee Delmarva filed a Motion for Summary Judgment on November 15, 2016. On July 28, 2017, the District Court entered an Order granting summary judgment and dismissing the action with prejudice. Thomas timely filed his Notice of Appeal on August 18, 2017. JA 846.

## STATEMENT OF FACTS

### A.  Thomas' Employment History.

Thomas is a 59 year-old (he was 55 at the time of his dismissal) black male who began his career with Delmarva over 30 years ago. JA 13. During

2

his employment with Delmarva, Thomas has been promoted several times, but he worked as a Trouble and Serviceman during the period at issue in this appeal. JA 553-554.

At the time of his June 12, 2014 discharge, Thomas had a clean personnel record, no current disciplinary actions in his file and was described as the best, most productive and most knowledgeable employee in his unit. JA 875, 888, 957. In addition, the year before his discharge, a customer nominated Thomas for a customer service award and his name and photograph appeared in a local newspaper. JA 566-569.

**B. Delmarva's Policies for Investigations and Discipline.**

During Thomas' employment, there were specific procedures in place for investigating employee misconduct in the workplace, imposing discipline on bargaining unit employees like Thomas and for reporting violations of discrimination and sexual harassment in the workplace[1]. Relevant here, the policies provided that investigations were to be conducted by Delmarva's HR employees and they were to interview the complaining employee and any witnesses identified in support of the complainant and also interview the

---

[1] Although Delmarva has had various names over the years, the employment policies have essentially been the same. JA 878. The progressive discipline policy is collectively bargained for and supposedly applied to all bargaining unit employees evenhandedly. JA 607.

3

accused employee and any witnesses he or she could provide[2]. JA 591-593, 606. Next, HR employees were to define the scope of the investigation, develop a witness list consisting of persons with knowledge of the complaint and elicit facts rather than opinion from witnesses to ensure a fair and balanced depiction of the complaint. JA 590-592, 603. After collecting information from both sides, the HR employees discussed the investigation with the HR supervisor and Director and drafted a report of their findings, which included a recommendation for the type of discipline to be imposed. JA 603-605.

For bargaining unit employees like Thomas, discipline was imposed using progressive discipline steps – *i.e.*, counseling, oral and written warning, suspension and discharge – with notice of each disciplinary step being noted in writing in the employee's file. JA 27 at General Rule Violation, 893-896. After three years, the disciplinary action was removed from the employee's file and could no longer be used under the progressive discipline step system. JA 894.

---

[2] Cherie McCoy ("McCoy"), the then HR Director, who had worked for Delmarva's HR department since 1995, provided the steps for the investigation process. JA 587. McCoy also testified that she could not recall an instance in which an accused employee was not interviewed during a workplace investigation in all the years she worked for Delmarva. JA 593.

To apply progressive discipline, HR employees were to make disciplinary recommendations based on a system Delmarva called "likes and similar" actions. JA 890-891. This meant that HR employees were to review past disciplinary actions previously imposed on other employees for similar misconduct and to recommend discipline across-the-board for certain types of misconduct. *Id*. For example, in 2013, Delmarva's "likes and similar" policy recommended something less than a suspension for employees for making inappropriate verbal comments. JA 584 (Conclusion(s)/Recommendation(s)). For physical altercations or threats, however, the likes and similar policy recommended suspension for an employee at a minimum. *Id*.

Finally, Delmarva's workplace policies included a "harassment" policy that purportedly prohibited sexual harassment in the workplace and a anti-discrimination policy. JA 880-881. Reportedly, these policies prohibited employees from using epithets, such as ni---- or honky, in the workplace and/or from discussing another employee's breasts at work. JA 594-597. However, the policies were not actually enforced and were frequently violated by employees. JA 612, 850, 854-855, 993. In fact, John Everett ("Everett"), a former employee and supervisor for 20 years, and Robert Gregory ("Gregory"), a former union representative, testified that Delmarva's workplace was permeated with both sexually offensive and racially offensive comments, and it was not uncommon for employees to post semi-nude

5

pictures of women, discuss buttocks and breasts in the front of management or use racial slurs, including ni---- or camel jockey, in Delmarva's workplace. JA 612, 850-855.

Not surprisingly, however, the harassment policy did not cover misconduct that occurred after work or outside of Delmarva's premises unless the conduct occurred during business hours. JA 921. The policy also did not prohibit employees from flirting, complimenting co-workers on their clothing, asking co-workers for dates or inquiring about an employee's relationship status, *i.e.*, asking: Are you married? JA 601-602, 609, 857-859.

### C. Thomas' 2013 Suspension for an Alleged Customer Complaint.

On or about April 11, 2013, Thomas was called to a meeting with his supervisor Charles Lewis ("Lewis"), his manager Edward Bennett ("Bennett"), an HR employee named Paul Simon ("Simon") and a union representative. JA 578-579, 864. During the meeting, they asked Thomas whether he had asked a woman if she had a boyfriend and stated he was available. *Id*. Thomas admitted he had. *Id*[3]. He also volunteered that he had

---

[3] Although Thomas was not asked, the woman in question was not his customer that day. Instead, she was a property maintenance person for the building called to escort Thomas to the boiler room for the customer he was servicing. JA 901. This distinction is relevant because Thomas was discharged for an alleged customer complaint when the woman was not a customer. JA 492, 901.

returned to the same building that day to check on a woman who had complained earlier about electrical service in her office. JA 579. After that, Delmarva immediately suspended Thomas without pay. JA 864, 897, 942, 959. In addition, his badge and truck were taken and he was escorted off Delmarva's premises and told not to return. JA 382, 864. Thomas then filed a grievance about his suspension. JA 897.

Prior to suspending Thomas, Delmarva did not give an oral or written warning pursuant to the progressive discipline policy. JA 897, 942. Furthermore, Delmarva suspended Thomas before the completion of the investigation of his alleged misconduct. *Id*. According to Everett, Thomas was treated this way because he is black since Delmarva's black employees were not afforded progressive discipline like Caucasian employees. JA 611-612, 942. In addition, Delmarva did not suspend Caucasian employees before their workplace investigations had been completed, like it did to Thomas, because doing so was not consistent with its policy or practice. JA 613, 864.

In Thomas' case, a completed investigation would have shown that the woman to whom he made the comments – Shelia Bednar ("Bednar") (Caucasian) – had not filed a complaint against him or reported him to Delmarva. JA 904, 964. Instead, Bednar told a friend (M.S., Caucasian

female[4]), whom she saw at a sporting event, about her encounter with Thomas because M.S. was wearing her Delmarva jacket that day. JA 962-964. Bednar told M.S. that a skinny black serviceman asked her whether she "had a boyfriend." JA 964. However, she did not ask M.S. to file a complaint against the serviceman or indicate she intended to do so on her own. JA 904, 964.

Nevertheless, M.S. went to work the next day, searched Delmarva's records and discovered the serviceman in question was Thomas. JA 966. Without consulting Bednar to determine whether *she* wanted to file a complaint, M.S. reported Thomas to his supervisor Lewis, who, along with Bennett (Lewis' supervisor), reported it to Delmarva's HR department. JA 964, 966-968.

Upon receiving the complaint, HR Director McCoy assigned the case to Simon, allegedly as a customer sexual harassment complaint against Thomas. JA 898. As discussed above, Simon then suspended Thomas before the alleged complaint had ever been discussed with Bednar or the investigation completed. JA 899.

---

[4] Pursuant to a magistrate judge's order, certain documents were filed under seal and the parties were ordered to use pseudonyms for certain employees. JA 497-501.

### D. Lewis, Simon and Bennett Interview Bednar.

Simon, Lewis and Bennett met with Bednar after suspending Thomas. JA 902. At that time, Bednar stated that Thomas' comments were not unusual and she could handle it. JA 889, 935. Rather than leave it there, Simon asked Bednar to write a statement. JA 902. At Simon's urging, Bednar submitted a written statement indicating she was not the customer that day, but was called to escort Thomas to the boiler room. JA 580. She also wrote essentially that Thomas noticed she had a cold, asked if she had a boyfriend to take care of her cold, stated that he was available and left the building. *Id.*

After requesting Bednar's statement, Simon interviewed the woman Thomas said he had gone to check on during his suspension meeting that day. JA 909-910. She believed Thomas had provided good customer service to her and was completely satisfied with his work. JA 910. As a result, Simon did not request a statement from her because he did not believe it was relevant to his investigation. *Id.*

Simon then reviewed Thomas' old personnel file and saw a 2011 e-mail from a man stating that Thomas had flirted with his wife by asking whether she was married. JA 907. However, Carroll Mills ("Mills"), Thomas' supervisor at the time, determined that the accusation was false. JA 957-958, 983-984. As a result, Mills did not refer the e-mail to Delmarva's HR

9

department for investigation, nor did he counsel or discipline Thomas about the e-mail. *Id*. Instead, Mills told Thomas and Bennett (Mills' supervisor) that he personally knew the people involved with sending the e-mail and they were not credible people. JA 958, 984. However, Simon did not interview Thomas about the e-mail. JA 958.

After Simon concluded his investigation of the Bednar incident, he intended to recommend reinstatement for Thomas. JA 945. However, he did not inform Thomas of his decision or tell Thomas the investigation had ended as required by HR policy. JA 908, 945. Simon instead opened a new investigation against Thomas for alleged "employee complaints" before any employee complaints had been filed against Thomas.

### E. Simon's Alleged Investigation of Employee Complaints Against Thomas.

Thomas knew nothing about the second investigation and was not interviewed by Simon or asked to provide a written statement for it. JA 940, 959-960. However, Simon did interview two Caucasian males — S.C.[5] and D.H. — who had no firsthand knowledge of Thomas' misconduct or any alleged employee complaints against Thomas. JA 624-626, 937. Instead, they

---

[5] While S.C. was disparaging Thomas, he was in violation of Delmarva's sexual harassment policy because he had a posting of a semi-nude woman at his cubicle. JA 598, 627, 850-852, 959.

told Simon that Thomas "predominately hit on white women," he was a "crazy mother------ in high school and he had made comments about their Caucasian daughters in the distant past (*i.e.*, allegedly asking one of them fifteen years ago: "What would you do if your daughter brought a black man home some day?") *Id.* At his deposition, Simon claimed S.C. and D.H.'s statement were not relevant to his second investigation. JA 937. However, Simon interviewed S.C. and D.H., took copious notes of their interviews and kept those notes in his investigation file concerning Thomas. JA 624-626.

### F.  Lewis and Youngbar's Involvement in Thomas' Investigation.

While Simon was interviewing S.C. and D.H., Lewis (a supervisor) and a Caucasian employee named Darlene Youngbar ("Youngbar") were also conducting an investigation. Neither Lewis nor Youngbar worked for HR and they should not have been involved in Thomas' investigation because Youngbar had spread false rumors about Thomas at work[6] and Lewis had admittedly used racial epithets, like ni---- and camel jockey, in Delmarva's workplace. JA 855-856, 887.

---

[6] Specifically, although Youngbar told Simon that she did not see Thomas engage in misconduct, (JA 932), she disparaged Thomas' name by falsely telling a co-worker *in 2013* that Thomas had shot someone when she knew that it was not true. JA 1007-1008. When asked why she would spread such a vicious rumor about Thomas, she replied, "they" told her the rumor when she started with Delmarva in 2007. *Id.*

In addition, Lewis did things to taint Simon's investigation, such as informing Simon that his cousin (a local sheriff) told him (Lewis) Thomas had unlawfully discharged a weapon several years earlier at his home, which even, if true, did not violate Delmarva's policy[7]. JA 921, 951-952. Although Simon did not do anything to independently verify Lewis' statement, such as speak to Thomas or request a police report, he testified that he believed the rumor was true. JA 951-953.

Lewis and Youngbar also played crucial roles in Thomas' investigation because they gathered witnesses against Thomas by asking their friends to file old, unreported and uninvestigated complaints against Thomas. JA 1014-1015, 1027. When their friends hesitated, Youngbar used "cute little" flirtatious comments and Lewis used endearments, such as "dear" and "sweetheart," to coax them to talk to Simon. JA 724-726, 922-923, 1020, 1042-1044. As a result of their actions, three Caucasian women submitted written statements against Thomas for flirting with them between six and 12 years earlier. JA 635-637, 924, 1034. Significantly, Thomas had not spoken to these women in five or six years, and one of them had not seen Thomas in more than a decade. JA 918, 1013, 1016, 1035.

---

[7] Notably, while Lewis was spreading rumors about Thomas, Lewis had a criminal record, but Thomas did not. JA 849.

12

For the most part, they stated that Thomas had asked them to go out on a date more than once or flirted with them[8]. JA 1018, 1053-1054. However, none of them claimed Thomas had touched them in the workplace, made sexually inappropriate or offensive remarks to them or threatened them in any way. JA 950, 1013, 1016, 1031, 1050-1051. In addition, no one of them informed Simon that they had asked Thomas to stop flirting with them and none of them reported Thomas to his supervisor or HR – although they admittedly did not believe they would suffer retaliation for doing so. JA 1012, 1022-1023, 1047.

Still, Simon did nothing to independently investigate the women's accusations, such as ask them why they had not reported Thomas, ask him to stop or even if they had flirted back or dated Thomas. JA 913-915, 918-920, 927, 928-930. During his investigation, Simon also did not ask them whether Thomas had touched them or used sexually explicit or profane language in their presence or if Thomas had engaged in any misconduct that actually violated Delmarva's harassment policy[9]. *Id.*

---

[8] Thomas did not supervise or have authority over these women and none of them had ever previously complained about his alleged misconduct. JA 959.

[9] If Simon had asked the women if they were offended by Thomas' comments, at least one of them would have stated that she was not offended. JA 1054.

13

Rather than independently investigate their claims, Simon and/or Lewis asked them one opinion/race-based question (according to M.L.): "Would you have Thomas come into the home of a single white female?" (JA 1029) or "If your electrical power was out, would you want Mr. Thomas to come to your home to fix it?" JA 916-917. Aside from being impermissibly based on race, this question was improper under Delmarva's policy since it elicited opinion, rather than fact. JA 603.

After collecting the statements from Lewis' and Youngbar's friends, Simon did not call Thomas on the telephone, interview him in person or request a response to their accusations in writing. JA 939-940. Instead, Simon submitted the statements to his management to support his recommendation to discharge Thomas. JA 926-927. When Simon's management told him the accusations were too old to be used for anything other than supporting information, Simon then went to M.S. (the employee who reported Thomas for the Bednar remarks) and asked her to write a statement against Thomas. JA 924-925, 927, 968.

## G. The Written Statement from M.S.

In the pre-typed statement M.S. presented to Simon before he met with her, she claimed that Thomas asked her whether she was married about three years ago (in 2010) because she was not wearing a wedding band and replied,

14

"That's a shame" when she said, "Yes." JA 628. She also wrote that in the last three – years, Thomas sometimes complimented her on her clothing in the "wrong tone." *Id*. Finally, M.S. claimed Thomas put his chin on her shoulder and asked her if she wanted to share his ice cream when she ran into him at the mall one day[10]. *Id*.

After obtaining M.S.' pre-typed statement, Simon again failed to interview Thomas about her accusations in accordance with HR policy. JA 591-593, 939-940, 944. Instead, Simon took M.S.' statement and those collected from Lewis' and Youngbar's friends and drafted a report (the "Summary"), which he submitted to HR management without ever having interviewed Thomas. JA 939-940, 944. While writing his Summary, Simon must have realized that M.S.' accusations against Thomas (which were the only recent accusations) were insufficient to warrant Thomas' dismissal, because Simon included false accusations against Thomas in his Summary and attributed them to M.S.

---

[10] During her deposition, M.S. was asked about this incident and testified under oath that she was alone when she saw Thomas at the mall that day. JA 969. However, M.S.' deposition testimony was false since M.S. had already informed Simon that her sons were with her when she saw Thomas at the mall. JA 931. This discrepancy is relevant because it supports Thomas' testimony that M.S.' sons were there, as was his own grandson, and both he and his grandson were eating ice cream that day. JA 561. To think that Thomas would behave in the way M.S. claimed in front of all those children is less believable, which is probably why M.S. decided to lie about the incident during her deposition.

15

### H. Simon's False Investigative Summary.

Rather than recount M.S.' actual accusations in his Summary as described in the pre-typed statement, Simon's Summary falsely stated that M.S. accused Thomas of always wanting to touch her, he did touch her between six and 12 times and he repeatedly asked her, "When are we going out? When are you getting rid of your man?" JA 633-634. However, none of these allegations were in M.S.' pre-typed statement about Thomas (JA 628-629) and Simon testified that he relied only on M.S.' written statement to frame her accusations against Thomas. JA 913-914. Moreover, M.S. testified, contrary to Simon's Summary, that except for the one time Thomas allegedly put his chin on her shoulder at the mall, Thomas never touched her again. JA 969-971:

Q.    Did Mr. Thomas ever touch you again?

A.    No, not to my recollection, no. JA 971.

M.S. also denied that she told Simon several of the comments he attributed to her in his Summary. JA 972. In other words, she testified that the statements Simon's Summary attributed to her were false:

Q.    Did you tell Mr. Simon that Mr. Thomas would ask you, when are you going to get rid of your man?

A.    No. I didn't give Mr. Thomas the opportunity to have those kind of conversations with me.

16

Q.   Did you tell Mr. Simon that Mr. Thomas said to you, when are we going out?

A.   No. As I stated, I eluded him.

JA 972.

Additionally, Simon's Summary gave the false impression that Thomas' co-workers explicitly accused Thomas of following or threatening them (JA 634-635) when they had not. JA 948-950, 1024, 1039. The Summary also contained an allegation that Simon knew was likely untrue because he had tried to corroborate it with the witness the accuser provided, but could not. Specifically, one of the women claimed Thomas had blocked her car to talk to her and only allowed her to leave Delmarva's parking lot because Youngbar intervened. JA 636-637, 1040. When Simon asked Youngbar about the alleged incident, she told him that it did not happen. JA 620. Even without her corroboration, Simon still included the unfounded allegation in his Summary recommending Thomas' dismissal. JA 636-637. Also, he did so without giving Thomas the opportunity to defend himself or prove the accusation to be false. JA 940.

### I.   Simon's Discharge Letter to Thomas.

Based on Simon's Summary, his HR management approved his recommendation to discharge Thomas. JA 638, 926. Simon then drafted a letter explaining the reasons for Thomas' discharge as "for inappropriate

17

comments to customers" and "improper conduct towards co-workers."[11] JA 640.

When Thomas received the discharge letter, he had already been suspended for about eight weeks, but still did not know that he had been investigated for employee misconduct, the names of his accusers or the nature of the accusations against him. JA 959. Eight months after his discharge, Thomas still did not know his accuser's names when he met with Simon, McCoy and his union representatives to discuss his grievance. JA 958-960. Therefore, Thomas could not respond to the accusations against him at the grievance meeting because he did not know who had accused him of misconduct. JA 959-960. Without this information, he could not disprove their accusations and his discharge was upheld[12]. *Id.*

---

[11] After Thomas was discharged, Simon interfered with Thomas' ability to receive unemployment benefits. Specifically, Simon gave the unemployment commission more serious reasons for Thomas' discharge than he wrote in his discharge letter to Thomas. Rather than give the reasons for discharge given to Thomas, Simon stated the reasons were: "for making inappropriate comments to customers about their marital and relationship status and for violation of company's policy against sexual harassment in his dealings with his co-workers." Compare JA 640 and JA 980-981. When asked why he gave different reasons than those stated in the discharge letter, Simon claimed that it was an error.  JA 981

[12] Fourteen months after his discharge, Thomas was reinstated following arbitration. JA 18. At arbitration in 2014, Thomas learned the accusers' names for the first time. JA 959.

Ultimately, Thomas was only discharged for making verbal remarks because he is a black man, according to Everett. JA 612-613. In fact, in the 39 years that Everett worked for Delmarva, he noticed that black employees were disciplined more severely than Caucasian employees.  JA 611.  Everett and others also stated that no other employee had been discharged for violating Delmarva's harassment policy. JA 611-613, 854, 993.

### J.  Investigations/Disciplinary Actions against Caucasian Employees Accused of Work-Related Misconduct.

Within four or fewer years of the 13-year period upon which Simon relied to justify Thomas' dismissal (*i.e.*, 2000-2013), Delmarva received actual (rather than solicited) customer and co-worker complaints for misconduct against Caucasian male and female employees while on duty or in the workplace. JA 611-613, 959. Each time, the Caucasian employees and women were investigated in accordance with Delmarva's policy, which meant HR interviewed them before taking disciplinary actions, told them the names of the employees who had complained about them and allowed them to respond to their accusations and/or produce witnesses or other evidence to support their positions as follows:[13]

_____

[13] H.S., E.R., G.F., D.A., K.B., J.A., R.B., G.R., and B.B. are all Caucasian individuals. JA 611-612, 959.

## H.I. - 1996-2003

In 1996, two customers reported H.I. for repeatedly engaging in sexual relations with prostitutes in Delmarva's vehicle near their homes. JA 693-694. In accordance with policy, HR interviewed H.I., who admitted the customers' complaints were true. JA 686,696. Although H.I.'s conduct was criminal, HR did not discharge him. JA 698. Instead, H.I. was given a 10-day suspension and referred to Delmarva's Employment Assistance Program (EAP) for counseling. JA 686, 697.

In 2000, H.I. was suspended again for having sex in the parking lot at Delmarva's workplace. JA 612-613. Although it was his second offense he was not discharged.

Finally, in 2003, H.I. was suspended a third time after Delmarva's investigation proved that he had violated Delmarva's internet policy. JA 680. Even with this serious disciplinary record, H.I. was still not discharged and he even received a satisfactory rating on his 2003 performance evaluation. JA 681-683.

## G.F. - 2000

In 2000, (the same year of one of the accusations made against Thomas), a female security guard filed a sexual harassment complaint against G.F. and provided witnesses who heard G.F. remark to her in the workplace: (i) If I got stung on my d ---, would you take care of it?, (ii) "Did you have sex over the weekend?, (iii) What's the matter with him, too much sex last night, or, (according to the witness) did he get some pu--- last night? and (iv) "My wife says my d--- is small, only seven inches." JA 647-650.

After receiving the complaint against G.F., McCoy interviewed G.F. and his witnesses during HR's investigation. JA 651-652. After completing the investigation, McCoy found that G.F. had violated "company policy and procedure." JA 643. Despite the seriousness of these allegations and evidence in his file that G.F. had received a written warning about one year earlier for similar misconduct, McCoy recommended a 10-day suspension for G.F. rather than discharge. *Id.*

20

### D.A. - 2000

Also, in 2000, Delmarva received a customer complaint against D.A. for exposing his genitals in a store while on duty. JA 611-612, 997-998. During the investigation of the complaint, D.A. was interviewed and he admitted the complaint was true. JA 997-998. Delmarva then suspended D.A. rather than discharge him. JA 612.

### K.B. - 2000

In 2000, a customer filed a complaint against K.B. for using profanity towards the customer during a service call. JA 612-613. Following an investigation, K.B. was suspended, but not discharged. *Id.*

### J.A. - 2002

In 2002, J.A. was involved in a confrontation in the workplace that included bullying and extreme profanity. JA 656-657. Delmarva's HR interviewed J.A. and witnesses he provided during its investigation. JA 657-658. After HR completed its investigation, J.A was suspended for one day and ordered to attend EAP because his behavior "continue[d] to be a problem" in the workplace. JA 653.

### R.B. - 2003

In 2003, a co-worker reported R.B. for excessive profanity in the workplace. JA 1058. It was R.B.'s third complaint in 2003 for offensive language and he had been counseled and given a written warning by HR less than a year earlier. JA 1057, 1059. Despite the pending discipline, HR interviewed RB during its investigation. JA 1057. For the third complaint, R.B. was given a written warning, rather than suspension. JA 1055.

21

## Noose Incident 2008

In 2008, Thomas reported that employees had tied and hung a noose on a classroom door on Delmarva's premises. JA 799, 801-802. As part of its investigation, Delmarva interviewed the teacher in the class and two employees suspected of tying and hanging the noose. JA 799, 810-812. The teacher stated that the rope was tied like a noose so he took it down. JA 799. However, the accused employees claimed it was a "boat knot." JA 802-803. After interviewing the employees and completing its investigation, Delmarva referred the employees to "sensitivity training." JA 14.

## G.R. - 2013

In 2013, (the year Thomas was discharged) G. R. was reported for referring to a co-worker as a  ni---- and asking his supervisor "why [are you] always fuc---- bugging me." JA 1063. G.R. had previously been suspended in 2010 and given a written warning in 2012 for workplace misconduct. JA 1061. However, HR still interviewed G.R. during its investigation of the 2013 complaints and allowed him to provide witnesses to support his position. JA 1065-1066. After the investigation, G.R. was then discharged pursuant to the progressive discipline policy. JA 1068.

## E.R. - 2013

In 2013, E.R. (Caucasian, female) was found to have committed multiple violations of Delmarva's time and attendance policy over several months after Delmarva's Geospatial Positioning System (GPS) audit showed that E.R. was at her home for long periods of time when she should have been at work. JA 673-677. Even with the GPS results, Delmarva interviewed E.R. during its investigation and allowed her to dispute the GPS audit. JA 674-676. After her interview, E.R. was discharged because HR could not corroborate her alleged medical reason for her actions. JA 677.

## B.B. - 2015

In 2015 (two years after Thomas' discharge), the police department reported B.B. for using Delmarva's vehicle to attempt to run his former girlfriend off the road. JA 1085-1086. During HR's investigation, B.B. was interviewed and allowed to provide a defense. JA 1087-1089. After the investigation was over, Delmarva's HR found that B.B. was guilty of the conduct that was reported and had provided false information to HR during his interview. JA 1084. Nonetheless, HR recommended a ten-day suspension for B.B., rather than discharge. JA 1084.

During his deposition, Simon could provide no legitimate reason why Thomas was not interviewed during his investigation like the Caucasian and female employees. JA 939-940.

## SUMMARY OF ARGUMENT

Following an investigation that violated Delmarva's policies and practices and resulted in Thomas being subjected to less favorable terms and conditions of employment than Caucasians and females, Thomas was found to have engaged in workplace misconduct. During the investigation, Delmarva did not afford Thomas the opportunity to respond to anonymous employee accusations against him or to have witnesses interviewed on his behalf, while Caucasian employees accused of misconduct were afforded these opportunities. Delmarva then disciplined Thomas more severely than Caucasians after the alleged decision-maker manufactured false accusations against him. These circumstances raise questions of fact regarding whether

23

Delmarva discriminated against Thomas and discharged him on account of his race since he was treated less favorably than non-minorities.

The District Court erred in granting summary judgment in this case and by disregarding evidence and crediting facts in the light most favorable to Delmarva, rather than Thomas, the nonmovant. The District Court also failed to address the circumstantial evidence that Thomas produced to demonstrate that the investigation of his alleged misconduct was racially motivated and the discipline imposed on him was a pretext for intentional discrimination. These are significant questions of fact to be determined by a jury, and summary judgment should therefore have been denied.

## **ARGUMENT**

### A. Standard of Review.

This Court reviews a district court's grant of summary judgment de novo. *Foster v. Univ. of Maryland-E Shore*, 787 F.3d 243, 248 (4th Cir. 2015). Summary judgment may be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (citations omitted). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id*. (citation omitted) "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id*. (citations omitted).

24

In considering a motion for summary judgment, the district court must "view the evidence 'in the light most favorable to the'" nonmoving party. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015), citing *Tolan v. Cotton*, —— U.S. ——, 134 S. Ct. 1861, 1868, 188 L. Ed. 2d 895 (2014) (per curiam) (citation omitted). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs*, 780 F.3d at 568-69, quoting, 10A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice & Procedure* § 2728 (3d ed. 1998). "The court therefore cannot weigh the evidence or make credibility determinations." *Id*. at 569, citing *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also* Fed. R. Civ. P. 56 Advisory Committee's Note (1963) ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate.").

Under these standards, summary judgment should have been denied.

## B. Standards for Disparate Treatment Claims.

Title VII prohibits employers from discriminating against any individual based on race or sex with respect to terms, conditions or privileges

25

of employment. 42 U.S.C. § 2000e–2(a)(1). A plaintiff can prevail on a Title VII claim by demonstrating that his race or sex was a motivating factor for an adverse employment decision, even if the employer was motivated by other, legitimate, factors. 42 U.S.C. § 2000e–2(m).

Further, a plaintiff may avoid summary judgment on a discrimination claim through two avenues of proof: by "presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision," or by relying on the *McDonnell Douglas* burden-shifting framework [14] . *Christian v. S.C. Dept. of Labor Licensing & Regulation*, 651 Fed. Appx. 158, 162 (4th Cir. 2016) (citations omitted). Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case. *Id*. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action taken against the plaintiff. *Id*. Once the employer meets this burden, "the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Id*. The plaintiff must then present evidence that "demonstrates that the employer's proffered

---

[14] The elements of a *prima facie* case of discrimination are the same under Title VII, 42 U.S. § 1981 and Title 20. *Barnes v. ISG Sparrows Point, LLC*, WL 4596058, at *6 (D. Md. Sept. 30, 2011).

permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Id*.[15]

### C. Thomas Presented Enough Circumstantial Proof of Discrimination to Withstand Summary Judgment.

In opposing summary judgment, a plaintiff may establish a claim for discrimination through circumstantial facts, "which in the absence of a legitimate non-discriminatory explanation, leads one to conclude with reasonable probability that the action taken against him was the product of discrimination." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993); *Christian*, 651 Fed. Appx. at 162-163 (same); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 317 (4th Cir. 2005) (Circumstantial evidence may be used to establish discrimination under Title VII and in criminal cases and other civil cases); *see also*, *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (under the convincing mosaic approach, discrimination can be proven by assembling a number of pieces of circumstantial evidence none meaningful in itself, which,

---

[15] "Notwithstanding the intricacies of the proof schemes, the core of every Title VII case remains resolution of the ultimate question of discrimination *vel non*." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000) (the ultimate question is whether the plaintiff was the victim of intentional discrimination).

when taken as a whole, provide strong support if all point in the same direction. This is not a new circumstantial evidence standard).

### 1. Discriminatory Bednar Investigation.

From the outset, Thomas proved circumstantially that the Bednar investigation was handled contrary to Delmarva's policies because Bednar did not file a complaint against Thomas or ask M.S. to do so. JA 904, 964. In fact, Bednar would not have filed a complaint herself, but for Simon's request to her and she was not Thomas' customer on the day in question as Delmarva claims. JA 889, 901-902, 904, 964. This evidence is relevant because it shows that there was no customer complaint against Thomas when Delmarva suspended him and, therefore, one of the alleged reasons for his discharge – customer complaint – was false. JA 603.

Instead, Delmarva suspended Thomas and confiscated his truck and badge before asking Bednar if she wanted to file a complaint and before HR's alleged investigation had been completed. JA 864, 906. This was a departure from HR's investigation policies and from the way Delmarva treated Caucasian employees when voluntary (rather than solicited) complaints were filed against them. JA 613, 864-865. In fact, when customers actually reported Caucasian employees for misconduct, Delmarva did not discipline them until after the completion of HR's investigations. Also, Caucasian employees

received less severe discipline than Thomas. JA 611-612, 686-687, 690, 1084-1086. For instance, after HR's investigation was over, Delmarva suspended Caucasian employees for ten days following customer complaints against them for having intercourse with prostitutes (several times) in Delmarva's vehicle and using Delmarva's vehicle to run an individual off the road while on duty. JA 693-694, 686, 697, 1084-1086. However, Delmarva immediately suspended Thomas for eight weeks for making flirtatious remarks before the investigation had ended-which was uncommon at Delmarva. JA 864-865, 899, 908, 959. Furthermore, Thomas' suspension was far greater than the suggested punishment under Delmarva's likes and similar policy, which recommended less than suspension for making verbal comments. JA 584 (Conclusion(s)/Recommendation(s)). This raises the question of why Delmarva did not give Thomas a verbal or written warning under the progressive discipline policy for the Bednar remarks even though he had no current discipline in his record, while Caucasian employees were treated more favorably. JA 643, 651-652, 1061-1063. According to Everett, the answer is simple: Delmarva disciplines black employees like Thomas more severely and denies progressive discipline to black employees on the same terms as Caucasian employees. JA 611-612. Thus, there is circumstantial evidence of disparate treatment based on timing (before investigation ended) and length

of Thomas' suspension as compared to Caucasian employees (ten days as compared to eight weeks). *Anthony v. South Carolina Dept. of Corrections,* 2007 WL 1032440, at *4 (D.S.C. Mar. 30, 2007) (Plaintiff's alleged violation of policy was, at minimum, comparable in seriousness to the misconduct by white wardens, yet the disciplinary action enforced against him was more severe). In every case, the same decision maker (HR) was involved and the same policies were supposedly applied to Thomas and the Caucasian employees (*i.e.*, likes and similar and progressive discipline). JA 586, 591-593, 890-891.

### 2. Discriminatory Investigations of Employee Complaint.

Thomas' evidence also proved that Simon's investigation of alleged employee complaints against him commenced and ended discriminatorily. For one thing, Simon began his alleged second investigation without first informing Thomas that the investigation concerning Bednar had been completed, that he planned to reinstate Thomas or that a second investigation had begun. JA 908, 945, 959. This was a violation of Delmarva's HR policy. JA 908.

Rather than follow policy, Simon commenced a new investigation against Thomas for alleged workplace misconduct based partly on statements from two Caucasian employees, S.C. and D.H., who had not seen Thomas do

30

anything wrong in the workplace. JA 624-626, 959. Instead, their chief complaints against Thomas were that he had a reputation for predominately hitting on white women or had made remarks about interracial dating 15 years ago. JA 624-626. Because S.C. and D.H. told Simon they had not seen Thomas engaged in workplace misconduct, Simon's decision to interview them violated Delmarva's policy. JA 937. Nevertheless, Simon still interviewed them, took notes of their scurrilous accusations against Thomas (*i.e.*, including that Thomas was a crazy mother----- in high school) and maintained these notes in an investigation file for Thomas. JA 624-626. However, Simon chose not to interview Thomas or allow him to respond to their outrageous claims. JA 939-940.

In violation of Delmarva's policy, Simon also allowed Lewis and Youngbar, neither of whom worked in HR, to lead the alleged investigation of employee complaint against Thomas when both had animus toward him. JA 855-856, 887. Specifically, Lewis had racial animus and had admittedly used racial slurs, including ni---- and camel jockey in Delmarva's workplace, while Youngbar had spread lies about Thomas at work. JA 856, 887, 1007-1008. Moreover, Lewis tainted the workplace investigation against Thomas with rumors about Thomas' alleged misconduct at Thomas' own home, even though Delmarva's policies did not apply to after hours, off-site conduct. JA

31

921, 951-955. Nonetheless, Simon believed these rumors without any investigation or input from Thomas and then relied on them to portray Thomas as a threat to the workplace. JA 638, 953.

During their "investigation," Lewis and Youngbar also did something much more manipulative to solicit complaints against Thomas: namely, they used "cute little" comments and endearments, like "dear" and "sweetheart," to enlist their Caucasian friends to accuse him of flirting with them or asking them for dates six to twelve years earlier. JA 635-636, 724-726, 922-924, 1020, 1034, 1042-1044. Lewis and Simon also injected race into their alleged workplace investigation by asking one of the women whether she "would have Thomas come into the home of a single white female?" JA 1029.

Without first interviewing Thomas, Simon then tried to use these old statements to discharge Thomas, but his management told him the accusations were too old. JA 926-927, 939-940. After being rejected, Simon then went back to M.S. – the person who reported the Bednar incident – and asked her for a statement in the hopes that he could obtain more recent accusations against Thomas. JA 924-925, 927, 968. However, once Simon reviewed M.S.'s pre-typed statement against Thomas, and evidently realized that her claims that Thomas complimented her clothing and asked if she was married three years earlier, did not violate policy, (JA 601-602, 609, 628, 857-859),

32

he decided to embellish and falsify M.S.' accusations and others to justify Thomas' dismissal. JA 628, 630-638, 969-972.

Specifically, Simon falsely stated M.S. had accused Thomas of touching her six to twelve times and asking her: When she was going to get rid of her man? (JA 633-634), when she had not. JA 628-629, 969-972. Simon also falsely suggested in his Summary that Thomas had actually followed employees or threatened them, when he had not. Compare JA 636,638 and JA 931, 948-950, 959, 1024, 1039. Finally, Simon's Summary included an uncorroborated accusation against Thomas that he knew, or should have known, could not be true because the crucial witness to the alleged incident did not support it. JA 620, 636-637, 1040. Also, Simon formally accused Thomas of the misconduct without affording him the opportunity to address the accusations against him. JA 939-940. Caucasian employees accused of tying and hanging a noose in the workplace, indecent exposure, using vulgar, unseemly and racists language, using Delmarva's vehicle for prostitution and for an attempted assault were given the chance to respond to their accusers, however. JA 686, 693-694, 647-652, 799, 801-803, 997-998, 1057-1058, 1063, 1065-1066.

In the end, Simon relied on a collection of false, unreported and uninvestigated incidents from six to twelve years old to justify Thomas'

discharge because Thomas was accused of either looking at or trying to date white women[16]. JA 624-626, 633-636, 995-996.  When his first attempt was unsuccessful, Simon embellished and falsified accusations against Thomas because the things Thomas had been accused of doing did not violate policy (JA 601-602, 609, 857-859) and were far less egregious than remarks made in Delmarva's workplace every day. JA 612, 647-650, 850-855, 857, 1057-1059, 1063. In sum, Delmarva discharged Thomas on the basis of a discriminatory investigation, rather than an unbiased investigation like the investigations HR completed for Caucasian employees as discussed below.

### 3. Circumstantial Evidence Shows that Caucasian Males and Females were Investigated in Accordance with Policy, but Thomas was Not.

As shown, HR investigated misconduct complaints against Caucasian employees in accordance with policy, but failed to accord Thomas the same treatment. JA 647-652, 674-676, 801-803, 997-998, 1063-1066, 1084-1086. In fact, within five years of the timeframe Simon relied on to justify Thomas' discharge (2000 through 2013), Delmarva's HR employees investigated several misconduct complaints against Caucasian male employees and a female for: multiple violations of Delmarva's time and attendance policy,

---

[16] Notably Thomas did not supervise or manage any of the women at issue and he had no power over their jobs. JA 958.  In addition, none of the women believed that Delmarva would retaliate against them for reporting Thomas when the alleged incidents occurred, but they chose not to report him. JA 1012, 1022-1023, 1047.

34

using Delmarva's vehicle to commit a crime, excessive profanity, making threatening and sexually explicit remarks and for using racial slurs. JA 643, 647-650, 656-658, 674-677, 686, 693-694, 696, 1057-1058, 1063, 1065-1066, 1084-1086. Each time, the Caucasian males and female employees were interviewed during HR's investigation and permitted to identify witnesses or evidence to support their positions, even when they had current disciplinary actions in their files for similar offenses. JA 643, 1057-1059. Interviewing the accused was required by policy and Delmarva's HR Director could not recall a single case in which HR did not interview an accused employee during the investigation in the twenty plus years she worked for Delmarva. JA 591-593, 606. However, Simon refused to follow this longstanding policy during Thomas' investigation and chose to deny Thomas the opportunity to refute the claims against him. JA 939-940. Thus, Thomas proved circumstantially that the investigation against him was discriminatory as compared to Caucasian employees and a woman because they were interviewed during HR's investigation of complaints against them, but he was not interviewed. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855-856 (D.C. Cir. 2006) (an investigation including interviews with everyone except non-minority accused of misconduct was discriminatory). Thomas also proved that he was treated less favorably during his investigation than Caucasian employees, who had current active discipline in their files, when he did not. Compare, JA 630

(at Current Discipline) 957 and JA 643, 646, 1055-1057, 1059, 1061-1063, 1065-1066.

### 4. Evidence of Discriminatory Discipline.

Delmarva also disciplined Thomas more harshly than Caucasian employees for alleged workplace misconduct. Again, during the time period Simon used to discharge Thomas, Caucasian employees, who were disciplined following several complaints for excessive profanity and for inappropriate comments (discussed, *supra* at section 3), were disciplined within the progressive discipline guidelines, despite having current disciplinary actions in their files (in writing as required by policy) for the same or similar misconduct. JA 27, 643, 646, 1056-1057, 1059, 1061-1063, 1065-1066.

For example, a Caucasian employee with a past written warning for improper conduct one year earlier, received a ten-day suspension under the progressive discipline policy for a second incident. JA643. Another, who had been counseled twice and given a written warning for repeatedly using profanity to the point of being a disruption in the workplace, was not even suspended. JA 1057-1059. Despite a pattern of misconduct by these Caucasian employees, HR disciplined them in accordance with or arguably less severely than Delmarva's likes and similar and/or progressive discipline policies recommended. JA 27, 643, 1055. However, even though Thomas had

received a customer service award and had a clean disciplinary record the year before these events, he was discharged based on false, unreported, uninvestigated alleged verbal remarks purportedly made back in 2000 and 2006. JA 630-638, 875, 888, 957. This disparity in discipline was a pattern at Delmarva and resulted in black employees being denied progressive discipline on the same terms as Caucasian employees. JA 611-612.

Other undisputed circumstantial evidence of discrimination proffered below established that Delmarva's workplace was full of employees who used racial epithets, made sexual comments and displayed pictures of semi-nude women in front of management, but Delmarva did not discipline them. JA 612, 850-854. This is because Delmarva did not have a zero-tolerance policy for such conduct in its workplace and no employee had ever been discharged for making discriminatory or even sexual remarks. JA 611-612, 854, 993. Further, Mr. Thomas was not accused of making sexual remarks or using profanity or of touching any of his alleged accusers in this workplace. JA 950, 1013, 1016, 1031, 1050-1051. A reasonable jury might conclude that Thomas was treated so harshly not because he asked women for dates or if they were married many years earlier, but because he was black and his accusers were Caucasian. JA 611-613, 854, 993. Accordingly, viewing the totality of evidence in a light most favorable to Thomas, the nonmovant, summary judgment was inappropriate because Thomas created a genuine issue of fact

37

that his investigation and discharge were discriminatory. *Foster*, 787 F.3d at 248 (courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment).

### D. Thomas Prove Discrimination under *McDonnell Douglas*.

Two bedrock principles in Title VII discrimination cases are: (1) the ultimate issue in each case is whether discrimination occurred (*Aikens*, 460 U.S. at 714; *Reeves*, 530 U.S. at 153); and (2) the burden of proving discrimination is not onerous. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989) (same). In granting summary judgment, the District Court disregarded these principles.

To establish discriminatory discipline, Thomas needed to prove that: (1) he is a member of a protected class; (2) the conduct in which he engaged was comparable in seriousness to misconduct of employees outside his protected classes; and (3) he suffered more severe discipline for his misconduct as compared to those employees outside the protected class[17].

---

[17] *See also*, *Tshibaka v. Sernulka*, WL 7229820 at *6, fn. 7 (4th Cir. 2016), citing *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-1106 (4th Cir. 1985) (In the disciplinary context, the most likely sources of discriminatory treatment are the nature of the offenses committed and the nature of the punishments imposed. Thus, the purpose of the *prima facie* requirement is served upon showing that: (1) plaintiff engaged in prohibited conduct similar to that of a person of another race or sex and (2) disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person).

*Hoyle v. Freightliner, LLC*, 650 F.3d at 321 (4th Cir. 2011); *Ray v. CSX Transp., Inc.*, 189 F. App'x 154, 160 (4th Cir. 2006) (in a discriminatory discharge case, a valid comparator must have engaged in conduct of comparable seriousness). In other words, Thomas did not need to prove exact similarity with the comparators for a discriminatory discipline case, because comparison between employees will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances. *Cook*, 988 F.2d at 511; *Moore v.* 754 F.2d at 1107 (precise equivalence in employees is not the ultimate question). Ignoring these standards, the District Court held Thomas to the most onerous standard possible[18].

Applying the correct standards, Thomas is a member of two protected classes – black and male – and the misconduct in which he allegedly engaged

---

[18] Below, the District Court incorrectly applied the heightened *prima facie* case standard in *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) to Thomas' discriminatory discipline case and required Thomas to show exact similarity with his comparators during the exact same time frame. JA 839. This was error because *Holland* stands for the proposition that it is a common practice of the Fourth Circuit to assume, without deciding, that the plaintiff has established a *prima facie* case in cases where – as in this case – the employer has proffered evidence of a legitimate reason for its adverse action in its motion for summary judgment. *Mandengue v. ADT Sec. Sys., Inc.*, 2012 WL 892621, at *16 (D. Md. Mar. 14, 2012) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). For this reason, the district court in *Holland* assumed the *prima facie* case had been met. Thus, in this case, the District Court improperly relied on *Holland* to analyze Thomas' burden of proof.

(*i.e.*, asking women for dates, flirting or complimenting their clothing), was comparably less serious than the misconduct in which Caucasian males and a female were found to have engaged during the same period ( *i.e.*, solicitation of prostitution, indecent exposure, repeated violations of the attendance policy, attempted vehicular assault, use of excessive profanity, repeated sexualized remarks and using racial slurs). Compare JA 628, 673-677, 1018, 1053-1054 and JA 611-613, 693-694, 647-650, 1058, 1063, 1085-1086. Because of a prejudiced and a one-sided investigation, however, Thomas received worse treatment than the Caucasian employees during his investigation because they were interviewed and permitted to provide witnesses, but he was denied this privilege of employment. Compare JA 939-940 and JA 651-652, 657-658, 674-676, 686, 696, 802-803, 1065-1066, 1084-1085, 1090. Thomas was then disciplined more severely than his Caucasian comparators since they were disciplined within the progressive discipline guidelines, but he was not. JA 612-613, 643, 686, 6901057-1059, 1084. Only discrimination could account for this disparity in discipline because the same decision-makers were involved in each case (HR) and Delmarva applied the same procedures (investigation procedures) and policies (likes and similar and progressive discipline). JA 584, 591-593, 603, 606, 890-891, 893-896.

Given that all things were purportedly equal, Thomas should not have been suspended for eight weeks for making verbal remarks or discharged for alleged comments made over ten years ago in one instance when Caucasian males were suspended for ten days or less for: repeatedly soliciting prostitutes, attempted assault with Delmarva's vehicle, making sexually explicit remarks repeatedly (while having pending discipline) and using excessive profanity in the workplace. JA 643, 647-650, 693-694, 686, 697, 1084-1085. A reasonable jury might conclude that Simon violated Delmarva's investigation policy, the likes and similar policy and the progressive discipline policy in Thomas' case without affording him the same terms and conditions provided to Caucasian employees for discriminatory reasons, specifically, his race. *Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 400 (D. Md. 2009) (a reasonable jury might infer that the employer was motivated by retaliation and not acting pursuant to the progressive discipline policy when it fired Blasic).

Despite this evidence, the District Court impermissibly weighed facts and viewed the evidence more favorable to Delmarva to find that Thomas had violated Delmarva's sexual harassment policy and engaged in a "pattern of conduct" involving two customers and four co-workers. JA 841. Evidence viewed in a light most favorable to Thomas disprove the District Court's factual findings because:

41

First, Thomas did not have two customer complaints because Bednar was not a customer; she did not file a complaint or ask M.S. to do so and only did so after Simon asked her to. JA 580, 902, 904, 964. In addition, Mills determined the alleged 2011 complaint was false and the people involved were not credible people. JA 957, 983. In other words, Thomas presented counter facts to show that the e-mail was a false complaint and it should not have been held against him especially since Simon did not interview Thomas about it or hear his side of the story pursuant to policy. JA 952, 958

Second, Thomas proved that he was not discharged for violating Delmarva's sexual harassment policy as the District Court incorrectly found. JA 841. Even Simon's own discharge letter stated the reasons for Thomas' discharge was "improper comments" and "improper conduct," not sexual harassment. JA 640. Moreover, Simon testified that he made an error when he advised the unemployment commission that Thomas was discharged for sexual harassment. JA 981. Thus, the District Court's finding was erroneous.

Third, Thomas established that, even if true, the conduct in which he purportedly engaged did not violate Delmarva's sexual harassment policy. JA 601-602, 609, 857-859. In other words, it was not a violation of policy for Thomas to ask another employee on a date or compliment her clothing, or flirt or ask whether she was married. *Id.* For the District Court to conclude

42

otherwise is against the weight of the evidence given unrebutted evidence that Caucasian employees were not discharged for using racial epithets and an attempted assault on duty and that Delmarva's workplace was a cesspool in which employees used racial slurs and sexually explicit language in front of management on a regular basis without consequence. JA 611-612, 854, 993, 1063, 1084-1086.

Fourth, Thomas proved that the main reasons given for his discharge were false and Simon manufactured them after apparently realizing that M.S.' allegations (which were the only recent allegations against Thomas) were too innocent to support his dismissal. JA 628-629, 969-972. The falsity of Simon's Summary supports an interference of intentional discrimination *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)(The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination").

Given the nature and quality of these facts and their direct correlation to the alleged grounds for Thomas' discharge, summary judgment simply was inappropriate. *Liberty Lobby*, 477 U.S. at 248-49. The only way that the District Court could have reached a contrary conclusion was to weigh disputed evidence in Delmarva's favor impermissibly.

43

### E. The Alleged Reasons for Thomas' Discharge were False and Pretextual.

A plaintiff may establish pretext "by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B*., 434 F. 3d 249, 259 (4th Cir. 2006); *Reeves*, 530 U.S. at 147-48 (the trier of fact may "reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

To prove the reasons given for his discharge were pretextual, Thomas presented evidence that Simon falsified his Summary to indicate that M.S. had accused Thomas of touching her six or twelve times and of making certain comments, when she had not. Compare JA 633-634 and JA 628-629, 969-972. Thomas also proved that Simon's Summary erroneously included allegations that Simon knew were likely false because he tried to corroborate them and could not. Compare JA 636-638 and JA 620, 931, 948-950, 959, 1024-1025, 1039. Moreover, Simon violated Delmarva's policy and refused to afford Thomas the same opportunity afforded to Caucasian employees, namely, to be informed of the accusations against him, interviewed in connection with the complaint and given the chance to prove that the allegations were false. JA 591-593, 606, 939-940. A reasonable factfinder might conclude Simon falsified his Summary and declined to give Thomas a chance to disprove the

44

allegations against him for discriminatory reasons. *Mastro,* 447 F.3d at 855-856 (investigation that excluded input from the nonminority accused of misconduct was discriminatory).

Simon also violated Delmarva's employment policies while investigating Thomas' alleged workplace misconduct in other ways. In particular, he allowed employees with racial animus and who did not work for HR to have crucial roles in Thomas' investigation. JA 590-593, 855-856, 887. He also interviewed employees with no knowledge of Thomas' alleged workplace misconduct, who only wanted to vilify Thomas for his alleged attraction to Caucasian women. JA 624-626, 937. Moreover, Simon relied on unsubstantiated rumors concerning Thomas' alleged misconduct at his own home without conducting any independent investigation or allowing Thomas to respond to the claims. JA 921, 951-953. This evidence is also indicative of pretext. *Blasic*, 673 F. Supp. 2d at 399 (When an employer relies on its internal procedures to justify a termination decision, evidence that these procedures were violated may indicate pretext.)

In its Opinion, the District Court inexplicably overlooked or discredited Thomas' evidence establishing pretext and case law cited in support thereof. JA 842-844. This omission was reversible error. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (reversing a district

court for failing "to credit evidence that contradicted some of its key factual conclusions," and resolving disputed issues in favor of the moving party).

Ultimately, to survive summary judgment, Thomas did not need to squarely rebut Delmarva's explanation. *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 643 (4th Cir. 1978) (the plaintiff is not required to "exclude every hypothetical reason for the defendant's action toward him."). Instead, he only needed to cast sufficient doubt upon the genuineness of Delmarva's explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for his firing. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 217-218 (4th Cir. 2016); *International Woodworkers of America, AFL-CIO, CLC v. Chesapeake Bay Plywood Corp.*, 659 F. 2d 1259, 1272 (4th Cir. 1981)(summary judgment is seldom, proper where no nondiscriminatory explanation has been offered by the employer, and the plaintiff's credible assertions of unlawful discrimination stand unrebutted). Thomas accomplished this below, but the District Court disregarded his evidence.

### F. The Cat's Paw Theory Applies in this Case

Finally, under the cat's paw theory, if a supervisor performs an act motivated by discriminatory animus that is *intended* by the supervisor to cause an adverse employment action, and is a proximate cause of the ultimate

employment action, then the employer is liable. *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011).

Below, Thomas provided proof that Simon's investigation and decision-making was influenced by racial bias that ultimately prevented Thomas from being treated the same as Caucasian employees with respect to his investigation and discipline. JA 855-856, 887, 939-940. Specifically, Simon permitted Lewis, a supervisor, who used racial epithets in Delmarva's workplace to be intimately involved in and indeed to taint the investigation against Thomas by using impermissible tactics to encourage his friends to file complaints against Thomas.[19] Lewis further tainted the investigation by spreading rumors about Thomas' conduct at home and Simon relied on these rumors without investigating them. JA 921, 951-953. A reasonable trier of fact might believe that Lewis was the actual decision-maker and Simon was his cat's paw. *Staub*, 562 U.S. at 421 (an employer is liable for supervisor's intended acts if motivated by discriminatory animus that cause an adverse employment action, even if the supervisor is not the actual decision-maker); *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 878 (6th Cir. 2001) (an employer is liable under the cat's paw theory when the decision-maker fails

---

[19] Complaints that Simon's management deemed disqualified as too old to sustain disciplinary action against Thomas. JA 926-927.

to independently investigate and the employee's influence "may well have been decisive").

## **<u>CONCLUSION</u>**

For the reasons stated above, the District Court's decision should be reversed.

Respectfully submitted,

Law Office of Janice Williams-Jones

By: */s/ Janice Williams-Jones*
    Janice Williams-Jones
    Attorney for Plaintiff
    3545 Ellicott Mills Drive, Suite 308
    Ellicott City, Maryland 21043
    (410) 203-1246 (phone)
    (410) 203-2301 (fax)
    lawofficeofjwjones@gmail.com

    *Counsel for Plaintiff-Appellant*

# STATUTORY ADDENDUM

## <u>STATUTORY ADDENDUM TABLE OF CONTENTS</u>

*Page*

Civil Rights Act of 1991, 42 U.S.C. § 1981, *et seq.*...............................Add. 1

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ..Add. 6

Md. Code Ann. State Government Article § 20-101
    Definitions ...................................................................................Add. 45

Md. Code Ann. State Government Article § 20-606
    Unlawful Employment Practices................................................Add. 48

Fed. R. Civ. Proc. 56...........................................................................Add. 51

i



Sec.
2000h–3.   Construction of provisions not to affect authority of Attorney General, etc., to institute or intervene in actions or proceedings.
2000h–4.   Construction of provisions not to exclude operation of State laws and not to invalidate consistent State laws.
2000h–5.   Authorization of appropriations.
2000h–6.   Separability.

### CHAPTER REFERRED TO IN OTHER SECTIONS

This chapter is referred to in section 11111 of this title.

## SUBCHAPTER I—GENERALLY

### § 1981. Equal rights under the law

**(a) Statement of equal rights**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment**

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

(R.S. § 1977; Pub. L. 102–166, title I, § 101, Nov. 21, 1991, 105 Stat. 1071.)

#### CODIFICATION

R.S. § 1977 derived from act May 31, 1870, ch. 114, § 16, 16 Stat. 144.

Section was formerly classified to section 41 of Title 8, Aliens and Nationality.

#### AMENDMENTS

1991—Pub. L. 102–166 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

#### EFFECTIVE DATE OF 1991 AMENDMENT

Section 402 of Pub. L. 102–166 provided that:

"(a) IN GENERAL.—Except as otherwise specifically provided, this Act [see Short Title of 1991 Amendment note below] and the amendments made by this Act shall take effect upon enactment [Nov. 21, 1991].

"(b) CERTAIN DISPARATE IMPACT CASES.—Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983."

#### SHORT TITLE OF 1991 AMENDMENT

Section 1 of Pub. L. 102–166 provided that: "This Act [enacting section 1981a of this title and sections 60l and 1201 to 1224 of Title 2, The Congress, amending this section and sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, 12112, and 12209 of this title, and

section 626 of Title 29, Labor, and enacting provisions set out as notes under this section and sections 2000e and 2000e–4 of this title, and section 1a–5 of Title 16, Conservation] may be cited as the 'Civil Rights Act of 1991'.''

#### SHORT TITLE OF 1976 AMENDMENT

Pub. L. 94–559, which amended section 1988 of this title, is known as "The Civil Rights Attorney's Fees Awards Act of 1976", see note set out under section 1988 of this title.

#### SEVERABILITY

Section 401 of Pub. L. 102–166 provided that: "If any provision of this Act [see Short Title of 1991 Amendment note above], or an amendment made by this Act, or the application of such provision to any person or circumstance is held to be invalid, the remainder of this Act and the amendments made by this Act, and the application of such provision to other persons and circumstances, shall not be affected."

#### CONGRESSIONAL FINDINGS

Section 2 of Pub. L. 102–166 provided that: "The Congress finds that—

"(1) additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace;

"(2) the decision of the Supreme Court in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) has weakened the scope and effectiveness of Federal civil rights protections; and

"(3) legislation is necessary to provide additional protections against unlawful discrimination in employment."

#### PURPOSES OF 1991 AMENDMENT

Section 3 of Pub. L. 102–166 provided that: "The purposes of this Act [see Short Title of 1991 Amendment note above] are—

"(1) to provide appropriate remedies for intentional discrimination and unlawful harassment in the workplace;

"(2) to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989);

"(3) to confirm statutory authority and provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); and

"(4) to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination."

#### LEGISLATIVE HISTORY FOR 1991 AMENDMENT

Section 105(b) of Pub. L. 102–166 provided that: "No statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S 15276 (daily ed. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act [see Short Title of 1991 Amendment note above] that relates to Wards Cove—Business necessity/cumulation/alternative business practice."

#### CONSTRUCTION OF 1991 AMENDMENT

Section 116 of title I of Pub. L. 102–166 provided that: "Nothing in the amendments made by this title [enacting section 1981a of this title and amending this section, sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, and 12112 of this title, and section 626 of Title 29, Labor] shall be construed to affect court-ordered remedies, affirmative action, or conciliation agreements, that are in accordance with the law."

#### ALTERNATIVE MEANS OF DISPUTE RESOLUTION

Section 118 of title I of Pub. L. 102–166 provided that: "Where appropriate and to the extent authorized by

law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title [enacting section 1981a of this title and amending this section, sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, and 12112 of this title, and section 626 of Title 29, Labor].''

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1981a, 1988 of this title; title 2 sections 1202, 1311; title 3 section 411.

## § 1981a. Damages in cases of intentional discrimination in employment

### (a) Right of recovery

#### (1) Civil rights

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C. 2000e–2, 2000e–3, 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

#### (2) Disability

In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)), and section 794a(a)(1) of title 29, respectively) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under section 791 of title 29 and the regulations implementing section 791 of title 29, or who violated the requirements of section 791 of title 29 or the regulations implementing section 791 of title 29 concerning the provision of a reasonable accommodation, or section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act, against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

#### (3) Reasonable accommodation and good faith effort

In cases where a discriminatory practice involves the provision of a reasonable accommodation pursuant to section 102(b)(5) of the Americans with Disabilities Act of 1990 [42 U.S.C. 12112(b)(5)] or regulations implementing section 791 of title 29, damages may not be awarded under this section where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

### (b) Compensatory and punitive damages

#### (1) Determination of punitive damages

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

#### (2) Exclusions from compensatory damages

Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5(g)].

#### (3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

(B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and

(C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

#### (4) Construction

Nothing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title.

### (c) Jury trial

If a complaining party seeks compensatory or punitive damages under this section—

(1) any party may demand a trial by jury; and

(2) the court shall not inform the jury of the limitations described in subsection (b)(3) of this section.

### (d) Definitions

As used in this section:

#### (1) Complaining party

The term "complaining party" means—

(A) in the case of a person seeking to bring an action under subsection (a)(1) of this section, the Equal Employment Opportunity Commission, the Attorney General, or a person who may bring an action or proceeding under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); or

(B) in the case of a person seeking to bring an action under subsection (a)(2) of this section, the Equal Employment Opportunity Commission, the Attorney General, a person who may bring an action or proceeding under section 794a(a)(1) of title 29, or a person who may bring an action or proceeding under title I of the Americans with Disabilities Act of 1990 [42 U.S.C. 12111 et seq.].

**(2) Discriminatory practice**

The term ''discriminatory practice'' means the discrimination described in paragraph (1), or the discrimination or the violation described in paragraph (2), of subsection (a) of this section.

(R.S. §1977A, as added Pub. L. 102–166, title I, §102, Nov. 21, 1991, 105 Stat. 1072.)

REFERENCES IN TEXT

The Civil Rights Act of 1964, referred to in subsec. (d)(1)(A), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended. Title VII of the Act is classified generally to subchapter VI (§2000e et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

The Americans with Disabilities Act of 1990, referred to in subsec. (d)(1)(B) is Pub. L. 101–336, July 26, 1990, 104 Stat. 327, as amended. Title I of the Act is classified generally to subchapter I (§12111 et seq.) of chapter 126 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

EFFECTIVE DATE

Section effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as an Effective Date of 1991 Amendment note under section 1981 of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1988 of this title; title 2 sections 1202, 1311; title 3 section 411.

## § 1988. Proceedings in vindication of civil rights

### (a) Applicability of statutory and common law

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

### (b) Attorney's fees

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 13981 of this title,[1] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

### (c) Expert fees

In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to

---

[1] So in original.

enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.

(R.S. §722; Pub. L. 94–559, §2, Oct. 19, 1976, 90 Stat. 2641; Pub. L. 96–481, title II, §205(c), Oct. 21, 1980, 94 Stat. 2330; Pub. L. 102–166, title I, §§103, 113(a), Nov. 21, 1991, 105 Stat. 1079; Pub. L. 103–141, §4(a), Nov. 16, 1993, 107 Stat. 1489; Pub. L. 103–322, title IV, §40303, Sept. 13, 1994, 108 Stat. 1942; Pub. L. 104–317, title III, §309(b), Oct. 19, 1996, 110 Stat. 3853.)

#### REFERENCES IN TEXT

Title 13 of the Revised Statutes, referred to in subsec. (a), was in the original "this Title" meaning title 13 of the Revised Statutes, consisting of R.S. §§530 to 1093. For complete classification of R.S. §§530 to 1093 to the Code, see Tables.

Title 24 of the Revised Statutes, referred to in subsec. (a), was in the original "Title 'CIVIL RIGHTS,'" meaning title 24 of the Revised Statutes, consisting of R.S. §§1977 to 1991, which are classified to sections 1981 to 1983, 1985 to 1987, and 1989 to 1994 of this title. For complete classification of R.S. §§1977 to 1991 to the Code, see Tables.

Title 70 of the Revised Statutes, referred to in subsec. (a), was in the original "Title 'CRIMES,'" meaning title 70 of the Revised Statutes, consisting of R.S. §§5323 to 5550. For complete classification of R.S. §§5323 to 5550, see Tables.

Title IX of Public Law 92–318, referred to in subsec. (b), is title IX of Pub. L. 92–318, June 23, 1972, 86 Stat. 373, as amended, popularly known as the Education Amendments of 1972, which is classified principally to chapter 38 (§1681 et seq.) of Title 20, Education. For complete classification of this Act to the Code, see Tables.

The Religious Freedom Restoration Act of 1993, referred to in subsec. (b), is Pub. L. 103–141, Nov. 16, 1993, 107 Stat. 1488, which is classified principally to chapter 21B (§2000bb et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2000bb of this title and Tables.

The Civil Rights Act of 1964, referred to in subsec. (b), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended. Title VI of the Civil Rights Act of 1964 is classified generally to subchapter V (§2000d et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

#### CODIFICATION

R.S. §722 derived from acts Apr. 9, 1866, ch. 31, §3, 14 Stat. 27; May 31, 1870, ch. 114, §18, 16 Stat. 144.

Section was formerly classified to section 729 of Title 28 prior to the general revision and enactment of Title 28, Judiciary and Judicial Procedure, by act June 25, 1948, ch. 646, §1, 62 Stat. 869.

#### AMENDMENTS

1996—Subsec. (b). Pub. L. 104–317 inserted before period at end ", except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction".

1994—Subsec. (b). Pub. L. 103–322, which directed the amendment of the last sentence of this section by striking "or" after "92–318," and by inserting ", or section 13981 of this title," after "1964", was executed to subsec. (b) of this section by striking "or" after "Act of 1993," and by inserting ", or section 13981 of this title," after "1964", to reflect the probable intent of Congress and amendments by Pub. L. 102–166 and Pub. L. 103–141. See 1993 and 1991 Amendment notes below.

1993—Subsec. (b). Pub. L. 103–141 inserted "the Religious Freedom Restoration Act of 1993," before "or title VI".

1991—Subsec. (a). Pub. L. 102–166, §113(a)(1), designated first sentence of existing provisions as subsec. (a).

Subsec. (b). Pub. L. 102–166, §§103, 113(a)(1), designated second sentence of existing provisions as subsec. (b) and inserted "1981a," after "1981,".

Subsec. (c). Pub. L. 102–166, §113(a)(2), added subsec. (c).

1980—Pub. L. 96–481 struck out "or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code,".

1976—Pub. L. 94–559 authorized the court, in its discretion, to allow a reasonable attorney's fee as part of the prevailing party's costs.

#### EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

#### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–481 effective Oct. 1, 1981, and applicable to adversary adjudication as defined in section 504(b)(1)(C) of Title 5, Government Organization and Employees, and to civil actions and adversary adjudications described in section 2412 of Title 28, Judiciary and Judicial Procedure, which are pending on, or commenced on or after Oct. 1, 1981, see section 208 of Pub. L. 96–481, set out as an Effective Date note under section 2412 of Title 28.

#### SHORT TITLE OF 1976 AMENDMENT

Pub. L. 94–559, §1, Oct. 19, 1976, 90 Stat. 2641, provided: "That this Act [amending this section] may be cited as 'The Civil Rights Attorney's Fees Awards Act of 1976'."

#### FEDERAL RULES OF CIVIL PROCEDURE

Effect of Rule 69 on this section, see note by Advisory Committee under said Rule, Title 28, Appendix, Judiciary and Judicial Procedure.

Execution, see Rule 69.

#### FEDERAL RULES OF CRIMINAL PROCEDURE

Scope and application, see Rules 1 and 54, Title 18, Appendix, Crimes and Criminal Procedure.

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1981a, 1997e, 3602 of this title.

(Pub. L. 99–506, title X, § 1003, Oct. 21, 1986, 100 Stat. 1845.)

REFERENCES IN TEXT

The Education Amendments of 1972, referred to in subsec. (a)(1), is Pub. L. 92–318, June 23, 1972, 86 Stat. 235, as amended. Title IX of the Act, known as the Patsy Takemoto Mink Equal Opportunity in Education Act, is classified principally to chapter 38 (§ 1681 et seq.) of Title 20, Education. For complete classification of title IX to the Code, see Short Title note set out under section 1681 of Title 20 and Tables.

The Age Discrimination Act of 1975, referred to in subsec. (a)(1), is title III of Pub. L. 94–135, Nov. 28, 1975, 89 Stat. 728, as amended, which is classified generally to chapter 76 (§ 6101 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6101 of this title and Tables.

The Civil Rights Act of 1964, referred to in subsec. (a)(1), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended. Title VI of the Civil Rights Act of 1964 is classified generally to this subchapter (§ 2000d et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

CODIFICATION

Section was enacted as part of the Rehabilitation Act Amendments of 1986, and not as part of the Civil Rights Act of 1964, title VI of which comprises this subchapter.

SUBCHAPTER VI—EQUAL EMPLOYMENT OPPORTUNITIES

§ 2000e. Definitions

For the purposes of this subchapter—

(a) The term ''person'' includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11, or receivers.

(b) The term ''employer'' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

(c) The term ''employment agency'' means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

(d) The term ''labor organization'' means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representa-

tion committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

(e) A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization—

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C. 151 et seq.], or the Railway Labor Act, as amended [45 U.S.C. 151 et seq.];

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

(f) The term ''employee'' means an individual employed by an employer, except that the term ''employee'' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

Appeal: 17-1967    Doc: 12    Filed: 10/12/2017    Pg: 63 of 122


(g) The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

(h) The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [29 U.S.C. 401 et seq.], and further includes any governmental industry, business, or activity.

(i) The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act [43 U.S.C. 1331 et seq.].

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

(*l*) The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

(m) The term "demonstrates" means meets the burdens of production and persuasion.

(n) The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e–16 of this title.

(Pub. L. 88–352, title VII, §701, July 2, 1964, 78 Stat. 253; Pub. L. 89–554, §8(a), Sept. 6, 1966, 80 Stat. 662; Pub. L. 92–261, §2, Mar. 24, 1972, 86 Stat. 103; Pub. L. 95–555, §1, Oct. 31, 1978, 92 Stat. 2076; Pub. L. 95–598, title III, §330, Nov. 6, 1978, 92

Stat. 2679; Pub. L. 99–514, §2, Oct. 22, 1986, 100 Stat. 2095; Pub. L. 102–166, title I, §§104, 109(a), Nov. 21, 1991, 105 Stat. 1074, 1077.)

### REFERENCES IN TEXT

The National Labor Relations Act, as amended, referred to in subsec. (e)(1), is act July 5, 1935, ch. 372, 49 Stat. 449, which is classified generally to subchapter II (§151 et seq.) of chapter 7 of Title 29, Labor. For complete classification of this Act to the Code, see section 167 of Title 29 and Tables.

The Railway Labor Act, referred to in subsec. (e)(1), is act May 20, 1926, ch. 347, 44 Stat. 577, which is classified principally to chapter 8 (§151 et seq.) of Title 45, Railroads. For complete classification of this Act to the Code, see section 151 of Title 45 and Tables.

The Labor-Management Reporting and Disclosure Act of 1959, referred to in subsec. (h), is Pub. L. 86–257, Sept. 14, 1959, 73 Stat. 519, which is classified principally to chapter 11 (§401 et seq.) of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 401 of Title 29 and Tables.

For definition of Canal Zone, referred to in subsec. (i), see section 3602(b) of Title 22, Foreign Relations and Intercourse.

The Outer Continental Shelf Lands Act, referred to in subsec. (i), is act Aug. 7, 1953, ch. 345, 67 Stat. 462, which is classified generally to subchapter III (§1331 et seq.) of chapter 29 of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1301 of Title 43 and Tables.

### AMENDMENTS

1991—Subsec. (f). Pub. L. 102–166, §109(a), inserted at end "With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States."

Subsecs. (*l*) to (n). Pub. L. 102–166, §104, added subsecs. (*l*) to (n).

1986—Subsec. (b). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

1978—Subsec. (a). Pub. L. 95–598 substituted "trustees in cases under title 11" for "trustees in bankruptcy".

Subsec. (k). Pub. L. 95–555 added subsec. (k).

1972—Subsec. (a). Pub. L. 92–261, §2(1), included within "person" governments, governmental agencies, and political subdivisions.

Subsec. (b). Pub. L. 92–261, §2(2), substituted "fifteen or more employees" for "twenty-five or more employees", extended coverage to include State and local governments, excepted from coverage any department or agency of the District of Columbia subject by statute to procedures of the competitive service, as defined in section 2102 of title 5, and substituted provisions under which persons having fewer than twenty-five employees during the first year after March 24, 1972, were not to be considered employers, for provisions under which persons having fewer than a specified number of employees during the first year after the effective date of this section, and the second and third years after such date were not to be considered employers.

Subsec. (c). Pub. L. 92–261, §2(3), struck out from term "employment agency" exemption from coverage for agencies of the United States, States or political subdivisions of States, other than the United States Employment Service and the system of State and local employment services receiving Federal assistance.

Subsec. (e). Pub. L. 92–261, §2(4), substituted provisions which set forth the number of members for a labor organization to be deemed to be engaged in an industry affecting commerce as twenty-five or more during the first year after March 24, 1972, and fifteen or more thereafter, for provisions which set forth the number of members for a labor organization to be deemed to be engaged in an industry affecting commerce as one hundred or more during the first year

after the effective date of this section, seventy-five or more during the second year after such date, fifty or more during the third year after such date, and twenty-five or more thereafter.

Subsec. (f). Pub. L. 92–261, § 2(5), inserted provisions enumerating persons excepted from term "employee".

Subsec. (h). Pub. L. 92–261, § 2(6), inserted ", and further includes any governmental industry, business, or activity" after "Labor-Management Reporting and Disclosure Act of 1959".

Subsec. (j). Pub. L. 92–261, § 2(7), added subsec. (j).

1966—Subsec. (b). Pub. L. 89–554 struck out proviso which stated that it shall be the policy of the United States to insure equal employment opportunities for Federal employees without discrimination because of race, color, religion, sex, or national origin and directed the President to utilize his existing authority to effectuate this policy.

### EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by section 104 of Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

Pub. L. 102–166, title I, § 109(c) Nov. 21, 1991, 105 Stat. 1078, provided that: "The amendments made by this section [amending this section and sections 2000e–1, 12111, and 12112 of this title] shall not apply with respect to conduct occurring before the date of the enactment of this Act [Nov. 21, 1991]."

### EFFECTIVE DATE OF 1978 AMENDMENT

Amendment by Pub. L. 95–598 effective Oct. 1, 1979, see section 402(a) of Pub. L. 95–598, set out as Effective Date note preceding section 101 of Title 11, Bankruptcy.

### EFFECTIVE DATE OF 1972 AMENDMENT; EXCEPTIONS TO APPLICATION

Pub. L. 95–555, § 2, Oct. 31, 1978, 92 Stat. 2076, provided that:

"(a) Except as provided in subsection (b), the amendment made by this Act [amending this section] shall be effective on the date of enactment [Oct. 31, 1978].

"(b) The provisions of the amendment made by the first section of this Act [amending this section] shall not apply to any fringe benefit program or fund, or insurance program which is in effect on the date of enactment of this Act [Oct. 31, 1978] until 180 days after enactment of this Act."

### EFFECTIVE DATE

Pub. L. 88–352, title VII, § 716(a), (b), July 2, 1964, 78 Stat. 266, provided that:

"(a) This title [enacting this section and sections 2000e–1, 2000e–4, 2000e–7 to 2000e–15 of this title, and amending sections 2204 and 2205(a)(45) of former Title 5, Executive Departments and Government Officers and Employees] shall become effective one year after the date of its enactment [July 2, 1964].

"(b) Notwithstanding subsection (a), sections of this title other than sections 703, 704, 706, and 707 [sections 2000e–2, 2000e–3, 2000e–5, and 2000e–6 of this title] shall become effective immediately [July 2, 1964]."

### GLASS CEILING

Pub. L. 102–166, title II, Nov. 21, 1991, 105 Stat. 1081–1087, entitled the "Glass Ceiling Act of 1991", established a Glass Ceiling Commission which was to submit to Congress, no later than 15 months after Nov. 21, 1991, study and recommendations concerning eliminating artificial barriers to advancement of women and minorities in the workplace and increasing opportunities and developmental experiences of women and minorities to foster advancement to management and decisionmaking positions in businesses, authorized creation of a National Award for Diversity and Excellence in American Executive Management which was to be awarded annually by the Commission to a qualified business concern which promoted more diverse skilled

work force at management and decisionmaking levels in business, and further provided for composition of Commission, powers, staff and consultants, confidentiality of information, appropriations, and termination of Commission and authority to make awards 4 years after Nov. 21, 1991.

### READJUSTMENT OF BENEFITS

Pub. L. 95–555, § 3, Oct. 31, 1978, 92 Stat. 2076, provided that: "Until the expiration of a period of one year from the date of enactment of this Act [Oct. 31, 1978] or, if there is an applicable collective-bargaining agreement in effect on the date of enactment of this Act, until the termination of that agreement, no person who, on the date of enactment of this Act is providing either by direct payment or by making contributions to a fringe benefit fund or insurance program, benefits in violation with this Act [amending this section and enacting provisions set out above] shall, in order to come into compliance with this Act, reduce the benefits or the compensation provided any employee on the date of enactment of this Act, either directly or by failing to provide sufficient contributions to a fringe benefit fund or insurance program: *Provided*, That where the costs of such benefits on the date of enactment of this Act are apportioned between employers and employees, the payments or contributions required to comply with this Act may be made by employers and employees in the same proportion: *And provided further*, That nothing in this section shall prevent the readjustment of benefits or compensation for reasons unrelated to compliance with this Act."

### EXECUTIVE ORDER NO. 11126

Ex. Ord. No. 11126, Nov. 1, 1963, 28 F.R. 11717, as amended by Ex. Ord. No. 11221, May 6, 1965, 30 F.R. 6427; Ex. Ord. No. 12007, Aug. 22, 1977, 42 F.R. 42839, which related to the Interdepartmental Committee on the Status of Women and the Citizens' Advisory Council on the Status of Women, was revoked by Ex. Ord. No. 12050, Apr. 4, 1978, 43 F.R. 14431, formerly set out below.

### EX. ORD. NO. 11246. EQUAL OPPORTUNITY IN FEDERAL EMPLOYMENT

Ex. Ord. No. 11246, Sept. 24, 1965, 30 F.R. 12319, as amended by Ex. Ord. No. 11375, Oct. 13, 1967, 32 F.R. 14303; Ex. Ord. No. 11478, Aug. 8, 1969, 34 F.R. 12985; Ex. Ord. No. 12086, Oct. 5, 1978, 43 F.R. 46501; Ex. Ord. No. 13279, § 4, Dec. 12, 2002, 67 F.R. 77143; Ex. Ord. No. 13665, § 2, Apr. 8, 2014, 79 F.R. 20749; Ex. Ord. No. 13672, § 2, July 21, 2014, 79 F.R. 42971, provided:

Under and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States, it is ordered as follows:

### PART I—NONDISCRIMINATION IN GOVERNMENT EMPLOYMENT

[Superseded. Ex. Ord. No. 11478, eff. Aug. 8, 1969, 34 F.R. 12985.]

### PART II—NONDISCRIMINATION IN EMPLOYMENT BY GOVERNMENT CONTRACTORS AND SUBCONTRACTORS

#### SUBPART A—DUTIES OF THE SECRETARY OF LABOR

SEC. 201. The Secretary of Labor shall be responsible for the administration and enforcement of Parts II and III of this Order. The Secretary shall adopt such rules and regulations and issue such orders as are deemed necessary and appropriate to achieve the purposes of Parts II and III of this Order.

#### SUBPART B—CONTRACTORS' AGREEMENTS

SEC. 202. Except in contracts exempted in accordance with Section 204 of this Order, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"During the performance of this contract, the contractor agrees as follows:

''(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

''(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin.

''[(3)] The contractor will not discharge or in any other manner discriminate against any employee or applicant for employment because such employee or applicant has inquired about, discussed, or disclosed the compensation of the employee or applicant or another employee or applicant. This provision shall not apply to instances in which an employee who has access to the compensation information of other employees or applicants as a part of such employee's essential job functions discloses the compensation of such other employees or applicants to individuals who do not otherwise have access to such information, unless such disclosure is in response to a formal complaint or charge, in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or is consistent with the contractor's legal duty to furnish information.

''(4) The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

''(5) The contractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

''(6) The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

''(7) In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

''(8) The contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965 [section 204 of this Order] so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however*, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States.''

SEC. 203. (a) Each contractor having a contract containing the provisions prescribed in Section 202 shall file, and shall cause each of his subcontractors to file, Compliance Reports with the contracting agency or the Secretary of Labor as may be directed. Compliance Reports shall be filed within such times and shall contain such information as to the practices, policies, programs, and employment policies, programs, and employment statistics of the contractor and each subcontractor, and shall be in such form, as the Secretary of Labor may prescribe.

(b) Bidders or prospective contractors or subcontractors may be required to state whether they have participated in any previous contract subject to the provisions of this Order, or any preceding similar Executive order, and in that event to submit, on behalf of themselves and their proposed subcontractors, Compliance Reports prior to or as an initial part of their bid or negotiation of a contract.

(c) Whenever the contractor or subcontractor has a collective bargaining agreement or other contract or understanding with a labor union or an agency referring workers or providing or supervising apprenticeship or training for such workers, the Compliance Report shall include such information as to such labor union's or agency's practices and policies affecting compliance as the Secretary of Labor may prescribe: *Provided*, That to the extent such information is within the exclusive possession of a labor union or any agency referring workers or providing or supervising apprenticeship or training and such labor union or agency shall refuse to furnish such information to the contractor, the contractor shall so certify to the Secretary of Labor as part of its Compliance Report and shall set forth what efforts he has made to obtain such information.

(d) The Secretary of Labor may direct that any bidder or prospective contractor or subcontractor shall submit, as part of his Compliance Report, a statement in writing, signed by an authorized officer or agent on behalf of any labor union or any agency referring workers or providing or supervising apprenticeship or other training, with which the bidder or prospective contractor deals, with supporting information, to the effect that the signer's practices and policies do not discriminate on the grounds of race, color, religion, sex, sexual orientation, gender identity, or national origin, and that the signer either will affirmatively cooperate in the implementation of the policy and provisions of this order or that it consents and agrees that recruitment, employment, and the terms and conditions of employment under the proposed contract shall be in accordance with the purposes and provisions of the order. In the event that the union, or the agency shall refuse to execute such a statement, the Compliance Report shall so certify and set forth what efforts have been made to secure such a statement and such additional factual material as the Secretary of Labor may require.

SEC. 204. (a) The Secretary of Labor may, when the Secretary deems that special circumstances in the national interest so require, exempt a contracting agency from the requirement of including any or all of the provisions of Section 202 of this Order in any specific contract, subcontract, or purchase order.

(b) The Secretary of Labor may, by rule or regulation, exempt certain classes of contracts, subcontracts, or purchase orders (1) whenever work is to be or has been performed outside the United States and no recruitment of workers within the limits of the United States is involved; (2) for standard commercial supplies

or raw materials; (3) involving less than specified amounts of money or specified numbers of workers; or (4) to the extent that they involve subcontracts below a specified tier.

(c) Section 202 of this Order shall not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities. Such contractors and subcontractors are not exempted or excused from complying with the other requirements contained in this Order.

(d) The Secretary of Labor may provide, by rule, regulation, or order, for the exemption of facilities of a contractor that are in all respects separate and distinct from activities of the contractor related to the performance of the contract: *provided*, that such an exemption will not interfere with or impede the effectuation of the purposes of this Order: *and provided further*, that in the absence of such an exemption all facilities shall be covered by the provisions of this Order.

SUBPART C—POWERS AND DUTIES OF THE SECRETARY OF LABOR AND THE CONTRACTING AGENCIES

SEC. 205. The Secretary of Labor shall be responsible for securing compliance by all Government contractors and subcontractors with this Order and any implementing rules or regulations. All contracting agencies shall comply with the terms of this Order and any implementing rules, regulations, or orders of the Secretary of Labor. Contracting agencies shall cooperate with the Secretary of Labor and shall furnish such information and assistance as the Secretary may require.

SEC. 206. (a) The Secretary of Labor may investigate the employment practices of any Government contractor or subcontractor to determine whether or not the contractual provisions specified in Section 202 of this Order have been violated. Such investigation shall be conducted in accordance with the procedures established by the Secretary of Labor.

(b) The Secretary of Labor may receive and investigate complaints by employees or prospective employees of a Government contractor or subcontractor which allege discrimination contrary to the contractual provisions specified in Section 202 of this Order.

SEC. 207. The Secretary of Labor shall use his best efforts, directly and through interested Federal, State, and local agencies, contractors, and all other available instrumentalities to cause any labor union engaged in work under Government contracts or any agency referring workers or providing or supervising apprenticeship or training for or in the course of such work to cooperate in the implementation of the purposes of this Order. The Secretary of Labor shall, in appropriate cases, notify the Equal Employment Opportunity Commission, the Department of Justice, or other appropriate Federal agencies whenever it has reason to believe that the practices of any such labor organization or agency violate Title VI or Title VII of the Civil Rights Act of 1964 [sections 2000d to 2000d–4 of this title and this subchapter] or other provision of Federal law.

SEC. 208. (a) The Secretary of Labor, or any agency, officer, or employee in the executive branch of the Government designated by rule, regulation, or order of the Secretary, may hold such hearings, public or private, as the Secretary may deem advisable for compliance, enforcement, or educational purposes.

(b) The Secretary of Labor may hold, or cause to be held, hearings in accordance with Subsection (a) of this Section prior to imposing, ordering, or recommending the imposition of penalties and sanctions under this Order. No order for debarment of any contractor from further Government contracts under Section 209(a)(6) shall be made without affording the contractor an opportunity for a hearing.

SUBPART D—SANCTIONS AND PENALTIES

SEC. 209. (a) In accordance with such rules, regulations, or orders as the Secretary of Labor may issue or adopt, the Secretary may:

(1) Publish, or cause to be published, the names of contractors or unions which it has concluded have complied or have failed to comply with the provisions of this Order or of the rules, regulations, and orders of the Secretary of Labor.

(2) Recommend to the Department of Justice that, in cases in which there is substantial or material violation or the threat of substantial or material violation of the contractual provisions set forth in Section 202 of this Order, appropriate proceedings be brought to enforce those provisions, including the enjoining, within the limitations of applicable law, of organizations, individuals, or groups who prevent directly or indirectly, or seek to prevent directly or indirectly, compliance with the provisions of this Order.

(3) Recommend to the Equal Employment Opportunity Commission or the Department of Justice that appropriate proceedings be instituted under Title VII of the Civil Rights Act of 1964 [this subchapter].

(4) Recommend to the Department of Justice that criminal proceedings be brought for the furnishing of false information to any contracting agency or to the Secretary of Labor as the case may be.

(5) After consulting with the contracting agency, direct the contracting agency to cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended, any contract, or any portion or portions thereof, for failure of the contractor or subcontractor to comply with equal employment opportunity provisions of the contract. Contracts may be cancelled, terminated, or suspended absolutely or continuance of contracts may be conditioned upon a program for future compliance approved by the Secretary of Labor.

(6) Provide that any contracting agency shall refrain from entering into further contracts, or extensions or other modifications of existing contracts, with any noncomplying contractor, until such contractor has satisfied the Secretary of Labor that such contractor has established and will carry out personnel and employment policies in compliance with the provisions of this Order.

(b) Pursuant to rules and regulations prescribed by the Secretary of Labor, the Secretary shall make reasonable efforts, within a reasonable time limitation, to secure compliance with the contract provisions of this Order by methods of conference, conciliation, mediation, and persuasion before proceedings shall be instituted under subsection (a)(2) of this Section, or before a contract shall be cancelled or terminated in whole or in part under subsection (a)(5) of this Section.

SEC. 210. Whenever the Secretary of Labor makes a determination under Section 209, the Secretary shall promptly notify the appropriate agency. The agency shall take the action directed by the Secretary and shall report the results of the action it has taken to the Secretary of Labor within such time as the Secretary shall specify. If the contracting agency fails to take the action directed within thirty days, the Secretary may take the action directly.

SEC. 211. If the Secretary of Labor shall so direct, contracting agencies shall not enter into contracts with any bidder or prospective contractor unless the bidder or prospective contractor has satisfactorily complied with the provisions of this Order or submits a program for compliance acceptable to the Secretary of Labor.

SEC. 212. When a contract has been cancelled or terminated under Section 209(a)(5) or a contractor has been debarred from further Government contracts under Section 209(a)(6) of this Order, because of noncompliance with the contract provisions specified in Section 202 of this Order, the Secretary of Labor shall promptly notify the Comptroller General of the United States.

SUBPART E—CERTIFICATES OF MERIT

SEC. 213. The Secretary of Labor may provide for issuance of a United States Government Certificate of Merit to employers or labor unions, or other agencies which are or may hereafter be engaged in work under Government contracts, if the Secretary is satisfied that the personnel and employment practices of the employer, or that the personnel, training, apprenticeship, membership, grievance and representation, upgrading, and other practices, and policies of the labor union or other agency conform to the purposes and provisions of this Order.

SEC. 214. Any Certificate of Merit may at any time be suspended or revoked by the Secretary of Labor if the holder thereof, in the judgment of the Secretary, has failed to comply with the provisions of this Order.

SEC. 215. The Secretary of Labor may provide for the exemption of any employer, labor union, or other agency from any reporting requirements imposed under or pursuant to this Order if such employer, labor union, or other agency has been awarded a Certificate of Merit which has not been suspended or revoked.

PART III—NONDISCRIMINATION PROVISIONS IN FEDERALLY ASSISTED CONSTRUCTION CONTRACTS

SEC. 301. Each executive department and agency which administers a program involving Federal financial assistance shall require as a condition for the approval of any grant, contract, loan, insurance, or guarantee thereunder, which may involve a construction contract, that the applicant for Federal assistance undertake and agree to incorporate, or cause to be incorporated, into all construction contracts paid for in whole or in part with funds obtained from the Federal Government or borrowed on the credit of the Federal Government pursuant to such grant, contract, loan, insurance, or guarantee, or undertaken pursuant to any Federal program involving such grant, contract, loan, insurance, or guarantee, the provisions prescribed for Government contracts by Section 202 of this Order or such modification thereof, preserving in substance the contractor's obligations thereunder, as may be approved by the Secretary of Labor; together with such additional provisions as the Secretary deems appropriate to establish and protect the interest of the United States in the enforcement of those obligations. Each such applicant shall also undertake and agree (1) to assist and cooperate actively with the Secretary of Labor in obtaining the compliance of contractors and subcontractors with those contract provisions and with the rules, regulations and relevant orders of the Secretary, (2) to obtain and to furnish to the Secretary of Labor such information as the Secretary may require for the supervision of such compliance, (3) to carry out sanctions and penalties for violation of such obligations imposed upon contractors and subcontractors by the Secretary of Labor pursuant to Part II, Subpart D, of this Order, and (4) to refrain from entering into any contract subject to this Order, or extension or other modification of such a contract with a contractor debarred from Government contracts under Part II, Subpart D, of this Order.

SEC. 302. (a) "Construction contract," as used in this Order means any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property.

(b) The provisions of Part II of this Order shall apply to such construction contracts, and for purposes of such application the administering department or agency shall be considered the contracting agency referred to therein.

(c) The term "applicant" as used in this Order means an applicant for Federal assistance or, as determined by agency regulation, other program participant, with respect to whom an application for any grant, contract, loan, insurance, or guarantee is not finally acted upon prior to the effective date of this Part, and it includes such an applicant after he becomes a recipient of such Federal assistance.

SEC. 303(a). The Secretary of Labor shall be responsible for obtaining the compliance of such applicants with their undertakings under this Order. Each administering department and agency is directed to cooperate with the Secretary of Labor and to furnish the Secretary such information and assistance as the Secretary may require in the performance of the Secretary's functions under this Order.

(b) In the event an applicant fails and refuses to comply with the applicant's undertakings pursuant to this Order, the Secretary of Labor may, after consulting with the administering department or agency, take any or all of the following actions: (1) direct any administering department or agency to cancel, terminate, or suspend in whole or in part the agreement, contract or other arrangement with such applicant with respect to which the failure or refusal occurred; (2) direct any administering department or agency to refrain from extending any further assistance to the applicant under the program with respect to which the failure or refusal occurred until satisfactory assurance of future compliance has been received by the Secretary of Labor from such applicant; and (3) refer the case to the Department of Justice or the Equal Employment Opportunity Commission for appropriate law enforcement or other proceedings.

(c) In no case shall action be taken with respect to an applicant pursuant to clause (1) or (2) of subsection (b) without notice and opportunity for hearing.

SEC. 304. Any executive department or agency which imposes by rule, regulation, or order requirements of nondiscrimination in employment, other than requirements imposed pursuant to this Order, may delegate to the Secretary of Labor by agreement such responsibilities with respect to compliance standards, reports, and procedures as would tend to bring the administration of such requirements into conformity with the administration of requirements imposed under this Order: *Provided*, That actions to effect compliance by recipients of Federal financial assistance with requirements imposed pursuant to Title VI of the Civil Rights Act of 1964 [sections 2000d to 2000d–4 of this title] shall be taken in conformity with the procedures and limitations prescribed in Section 602 thereof [section 2000d–1 of this title] and the regulations of the administering department or agency issued thereunder.

PART IV—MISCELLANEOUS

SEC. 401. The Secretary of Labor may delegate to any officer, agency, or employee in the Executive branch of the Government, any function or duty of the Secretary under Parts II and III of this Order.

SEC. 402. The Secretary of Labor shall provide administrative support for the execution of the program known as the "Plans for Progress."

SEC. 403. (a) Executive Orders Nos. 10590 (January 19, 1955), 10722 (August 5, 1957), 10925 (March 6, 1961), 11114 (June 22, 1963), and 11162 (July 28, 1964), are hereby superseded and the President's Committee on Equal Employment Opportunity established by Executive Order No. 10925 is hereby abolished. All records and property in the custody of the Committee shall be transferred to the Civil Service Commission and the Secretary of Labor, as appropriate.

(b) Nothing in this Order shall be deemed to relieve any person of any obligation assumed or imposed under or pursuant to any Executive Order superseded by this Order. All rules, regulations, orders, instructions, designations, and other directives issued by the President's Committee on Equal Employment Opportunity and those issued by the heads of various departments or agencies under or pursuant to any of the Executive orders superseded by this Order, shall, to the extent that they are not inconsistent with this Order, remain in full force and effect unless and until revoked or superseded by appropriate authority. References in such directives to provisions of the superseded orders shall be deemed to be references to the comparable provisions of this Order.

SEC. 404. The General Services Administration shall take appropriate action to revise the standard Govern-

ment contract forms to accord with the provisions of this Order and of the rules and regulations of the Secretary of Labor.

SEC. 405. This Order shall become effective thirty days after the date of this Order.

EX. ORD. NO. 11478. EQUAL EMPLOYMENT OPPORTUNITY IN FEDERAL GOVERNMENT

Ex. Ord. No. 11478, Aug. 8, 1969, 34 F.R. 12985, as amended by Ex. Ord. No. 11590, Apr. 23, 1971, 36 F.R. 7831; Ex. Ord. No. 12106, Dec. 26, 1978, 44 F.R. 1053; Ex. Ord. No. 13087, May 28, 1998, 63 F.R. 30097; Ex. Ord. No. 13152, May 2, 2000, 65 F.R. 26115; Ex. Ord. No. 13672, §1, July 21, 2014, 79 F.R. 42971, provided:

NOW THEREFORE, under and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States, it is ordered as follows:

SECTION 1. It is the policy of the Government of the United States to provide equal opportunity in Federal employment for all persons, to prohibit discrimination in employment because of race, color, religion, sex, national origin, handicap, age, sexual orientation, gender identity, or status as a parent., [sic] and to promote the full realization of equal employment opportunity through a continuing affirmative program in each executive department and agency. This policy of equal opportunity applies to and must be an integral part of every aspect of personnel policy and practice in the employment, development, advancement, and treatment of civilian employees of the Federal Government, to the extent permitted by law.

SEC. 2. The head of each executive department and agency shall establish and maintain an affirmative program of equal employment opportunity for all civilian employees and applicants for employment within his jurisdiction in accordance with the policy set forth in section 1. It is the responsibility of each department and agency head, to the maximum extent possible, to provide sufficient resources to administer such a program in a positive and effective manner; assure that recruitment activities reach all sources of job candidates; utilize to the fullest extent the present skills of each employee; provide the maximum feasible opportunity to employees to enhance their skills so they may perform at their highest potential and advance in accordance with their abilities; provide training and advice to managers and supervisors to assure their understanding and implementation of the policy expressed in this Order; assure participation at the local level with other employers, schools, and public or private groups in cooperative efforts to improve community conditions which affect employability; and provide for a system within the department or agency for periodically evaluating the effectiveness with which the policy of this Order is being carried out.

SEC. 3. The Equal Employment Opportunity Commission shall be responsible for directing and furthering the implementation of the policy of the Government of the United States to provide equal opportunity in Federal employment for all employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) and to prohibit discrimination in employment because of race, color, religion, sex, national origin, handicap, or age.

SEC. 4. The Equal Employment Opportunity Commission, after consultation with all affected departments and agencies, shall issue such rules, regulations, orders, and instructions and request such information from the affected departments and agencies as it deems necessary and and [sic] appropriate to carry out its responsibilities under this Order.

SEC. 5. All departments and agencies shall cooperate with and assist the Equal Employment Opportunity Commission in the performance of its functions under this Order and shall furnish the Commission such reports and information as it may request. The head of each department or agency shall comply with rules, regulations, orders and instructions issued by the Equal Employment Opportunity Commission pursuant to Section 4 of this Order.

SEC. 6. ''Status as a parent'' refers to the status of an individual who, with respect to an individual who is under the age of 18 or who is 18 or older but is incapable of self-care because of a physical or mental disability, is:

(a) a biological parent;
(b) an adoptive parent;
(c) a foster parent;
(d) a stepparent;
(e) a custodian of a legal ward;
(f) in loco parentis over such an individual; or
(g) actively seeking legal custody or adoption of such an individual.

SEC. 7. The Office of Personnel Management shall be authorized to develop guidance on the provisions of this order prohibiting discrimination on the basis of an individual's sexual orientation or status as a parent.

SEC. 8. This Order applies (a) to military departments as defined in section 102 of title 5, United States Code, and executive agencies (other than the General Accounting Office [now Government Accountability Office]) as defined in section 105 of title 5, United States Code, and to the employees thereof (including employees paid from nonappropriated funds), and (b) to those portions of the legislative and judicial branches of the Federal Government and of the Government of the District of Columbia having positions in the competitive service and to the employees in those positions. This Order does not apply to aliens employed outside the limits of the United States.

SEC. 9. Part I of Executive Order No. 11246 of September 24, 1965, and those parts of Executive Order No. 11375 of October 13, 1967, which apply to Federal employment, are hereby superseded.

SEC. 10. This Order shall be applicable to the United States Postal Service and to the Postal Rate Commission established by the Postal Reorganization Act of 1970 [Title 39, Postal Service].

SEC. 11. This Executive Order does not confer any right or benefit enforceable in law or equity against the United States or its representatives.

EXECUTIVE ORDER NO. 12050

Ex. Ord. No. 12050, Apr. 4, 1978, 43 F.R. 14431, as amended by Ex. Ord. No. 12057, May 8, 1978, 43 F.R. 19811; Ex. Ord. No. 12135, May 9, 1979, 44 F.R. 27639; Ex. Ord. No. 12336, Dec. 21, 1981, 46 F.R. 62239, which established a National Advisory Committee for Women, was omitted in view of the revocation of sections 1 to 5 and 7 and 8 by Ex. Ord. No. 12135, May 9, 1979, 44 F.R. 27639 and the revocation of section 6 by Ex. Ord. No. 12336, Dec. 21, 1981, 46 F.R. 62239.

EX. ORD. NO. 12067. COORDINATION OF FEDERAL EQUAL EMPLOYMENT OPPORTUNITY PROGRAMS

Ex. Ord. No. 12067, June 30, 1978, 43 F.R. 28967, as amended by Ex. Ord. No. 12107, Dec. 28, 1978, 44 F.R. 1055, provided:

By virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States, including Section 9 of Reorganization Plan Number 1 of 1978 (43 FR 19807) [set out under section 2000e–4 of this title and in the Appendix to Title 5, Government Organizations and Employees], it is ordered as follows:

1–1. IMPLEMENTATION OF REORGANIZATION PLAN

1–101. The transfer to the Equal Employment Opportunity Commission of all the functions of the Equal Employment Opportunity Coordinating Council, and the termination of that Council, as provided by Section 6 of Reorganization Plan Number 1 of 1978 (43 FR 19807) [set out under section 2000e–4 of this title and in the Appendix to Title 5, Government Organization and Employees] shall be effective on July 1, 1978.

1–2. RESPONSIBILITIES OF EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

1–201. The Equal Employment Opportunity Commission shall provide leadership and coordination to the

efforts of Federal departments and agencies to enforce all Federal statutes, Executive orders, regulations, and policies which require equal employment opportunity without regard to race, color, religion, sex, national origin, age or handicap. It shall strive to maximize effort, promote efficiency, and eliminate conflict, competition, duplication and inconsistency among the operations, functions and jurisdictions of the Federal departments and agencies having responsibility for enforcing such statutes, Executive orders, regulations and policies.

1–202. In carrying out its functions under this order the Equal Employment Opportunity Commission shall consult with and utilize the special expertise of Federal departments and agencies with equal employment opportunity responsibilities. The Equal Employment Opportunity Commission shall cooperate with such departments and agencies in the discharge of their equal employment responsibilities.

1–203. All Federal departments and agencies shall cooperate with and assist the Equal Employment Opportunity Commission in the performance of its functions under this order and shall furnish the Commission such reports and information as it may request.

1–3. SPECIFIC RESPONSIBILITIES

1–301. To implement its responsibilities under Section 1–2, the Equal Employment Opportunity Commission shall, where feasible:

(a) develop uniform standards, guidelines, and policies defining the nature of employment discrimination on the ground of race, color, religion, sex, national origin, age or handicap under all Federal statutes, Executive orders, regulations, and policies which require equal employment opportunity;

(b) develop uniform standards and procedures for investigations and compliance reviews to be conducted by Federal departments and agencies under any Federal statute, Executive order, regulation or policy requiring equal employment opportunity;

(c) develop procedures with the affected agencies, including the use of memoranda of understanding, to minimize duplicative investigations or compliance reviews of particular employers or classes of employers or others covered by Federal statutes, Executive orders, regulations or policies requiring equal employment opportunity;

(d) ensure that Federal departments and agencies develop their own standards and procedures for undertaking enforcement actions when compliance with equal employment opportunity requirements of any Federal statute, Executive order, regulation or policy cannot be secured by voluntary means;

(e) develop uniform record-keeping and reporting requirements concerning employment practices to be utilized by all Federal departments and agencies having equal employment enforcement responsibilities;

(f) provide for the sharing of compliance records, findings, and supporting documentation among Federal departments and agencies responsible for ensuring equal employment opportunity;

(g) develop uniform training programs for the staff of Federal departments and agencies with equal employment opportunity responsibilities;

(h) assist all Federal departments and agencies with equal employment opportunity responsibilities in developing programs to provide appropriate publications and other information for those covered and those protected by Federal equal employment opportunity statutes, Executive orders, regulations, and policies; and

(i) initiate cooperative programs, including the development of memoranda of understanding between agencies, designed to improve the coordination of equal employment opportunity compliance and enforcement.

1–302. The Equal Employment Opportunity Commission shall assist the Office of Personnel Management, or its successor, in establishing uniform job-related qualifications and requirements for job classifications and descriptions for Federal employees involved in enforcing all Federal equal employment opportunity provisions.

1–303. The Equal Employment Opportunity Commission shall issue such rules, regulations, policies, procedures or orders as it deems necessary to carry out its responsibilities under this order. It shall advise and offer to consult with the affected Federal departments and agencies during the development of any proposed rules, regulations, policies, procedures or orders and shall formally submit such proposed issuances to affected departments and agencies at least 15 working days prior to public announcement. The Equal Employment Opportunity Commission shall use its best efforts to reach agreement with the agencies on matters in dispute. Departments and agencies shall comply with all final rules, regulations, policies, procedures or orders of the Equal Employment Opportunity Commission.

1–304. All Federal departments and agencies shall advise and offer to consult with the Equal Employment Opportunity Commission during the development of any proposed rules, regulations, policies, procedures or orders concerning equal employment opportunity. Departments and agencies shall formally submit such proposed issuances to the Equal Employment Opportunity Commission and other interested Federal departments and agencies at least 15 working days prior to public announcement. The Equal Employment Opportunity Commission shall review such proposed rules, regulations, policies, procedures or orders to ensure consistency among the operations of the various Federal departments and agencies. Issuances related to internal management and administration are exempt from this clearance process. Case handling procedures unique to a single program also are exempt, although the Equal Employment Opportunity Commission may review such procedures in order to assure maximum consistency within the Federal equal employment opportunity program.

1–305. Before promulgating significant rules, regulations, policies, procedures or orders involving equal employment opportunity, the Commission and affected departments and agencies shall afford the public an opportunity to comment.

1–306. The Equal Employment Opportunity Commission may make recommendations concerning staff size and resource needs of the Federal departments and agencies having equal employment opportunity responsibilities to the Office of Management and Budget.

1–307. (a) It is the intent of this order that disputes between or among agencies concerning matters covered by this order shall be resolved through good faith efforts of the affected agencies to reach mutual agreement. Use of the dispute resolution mechanism contained in Subsections (b) and (c) of this Section should be resorted to only in extraordinary circumstances.

(b) Whenever a dispute which cannot be resolved through good faith efforts arises between the Equal Employment Opportunity Commission and another Federal department or agency concerning the issuance of an equal employment opportunity rule, regulation, policy, procedure, order or any matter covered by this Order, the Chairman of the Equal Employment Opportunity Commission or the head of the affected department or agency may refer the matter to the Executive Office of the President. Such reference must be in writing and may not be made later than 15 working days following receipt of the initiating agency's notice of intent publicly to announce an equal employment opportunity rule, regulation, policy, procedure or order. If no reference is made within the 15 day period, the decision of the agency which initiated the proposed issuance will become effective.

(c) Following reference of a disputed matter to the Executive Office of the President, the Assistant to the President for Domestic Affairs and Policy (or such other official as the President may designate) shall designate an official within the Executive Office of the President to meet with the affected agencies to resolve the dispute within a reasonable time.

### 1–4. Annual Report

1–401. The Equal Employment Opportunity Commission shall include in the annual report transmitted to the President and the Congress pursuant to Section 715 of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e–14), a statement of the progress that has been made in achieving the purpose of this order. The Equal Employment Opportunity Commission shall provide Federal departments and agencies an opportunity to comment on the report prior to formal submission.

### 1–5. General Provisions

1–501. Nothing in this order shall relieve or lessen the responsibilities or obligations imposed upon any person or entity by Federal equal employment law, Executive order, regulation or order.

1–502. Nothing in this order shall limit the Attorney General's role as legal adviser to the Executive Branch.

JIMMY CARTER.

EX. ORD. NO. 12086. CONSOLIDATION OF CONTRACT COMPLIANCE FUNCTIONS FOR EQUAL EMPLOYMENT OPPORTUNITY

Ex. Ord. No. 12086, Oct. 5, 1978, 43 F.R. 46501, as amended by Ex. Ord. No. 12608, Sept. 9, 1987, 52 F.R. 34617, provided:

By the authority vested in me as President by the Constitution and statutes of the United States of America, including Section 202 of the Budget and Accounting Procedures Act of 1950 (31 U.S.C. 581c) [31 U.S.C. 1531], in order to provide for the transfer to the Department of Labor of certain contract compliance functions relating to equal employment opportunity, it is hereby ordered as follows:

### 1–1. Transfer of Functions

1–101. The functions concerned with being primarily responsible for the enforcement of the equal employment opportunity provisions under Parts II and III of Executive Order. No. 11246, as amended [set out as a note above], are transferred or reassigned to the Secretary of Labor from the following agencies:

(a) Department of the Treasury.
(b) Department of Defense.
(c) Department of the Interior.
(d) Department of Commerce.
(e) Department of Health and Human Services.
(f) Department of Housing and Urban Development.
(g) Department of Transportation.
(h) Department of Energy.
(i) Environmental Protection Agency.
(j) General Services Administration.
(k) Small Business Administration.

1–102. The records, property, personnel and positions, and unexpended balances of appropriations or funds related to the functions transferred or reassigned by this Order, that are available and necessary to finance or discharge those functions, are transferred to the Secretary of Labor.

1–103. The Director of the Office of Management and Budget shall make such determinations, issue such orders, and take all actions necessary or appropriate to effectuate the transfers or reassignments provided by this Order, including the transfer of funds, records, property, and personnel.

### 1–2. Conforming Amendments to Executive Order No. 11246

1–201(a). In order to reflect the transfer of enforcement responsibility to the Secretary of Labor, Section 201 of Executive Order No. 11246, as amended to read:

"SEC. 201. The Secretary of Labor shall be responsible for the administration and enforcement of Parts II and III of this Order. The Secretary shall adopt such rules and regulations and issue such orders as are deemed necessary and appropriate to achieve the purposes of Parts II and III of this Order.".

(b) Paragraph (7) of the contract clauses specified in Section 202 of Executive Order No. 11246, as amended, is amended to read:

"(7) The contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: *Provided, however,* that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States.".

1–202. In subsection (c) of Section 203 of Executive Order No. 11246, as amended, delete "contracting agency" in the proviso and substitute "Secretary of Labor" therefor.

1–203. In both the beginning and end of subsection (d) of Section 203 of Executive Order No. 11246, as amended, delete "contracting agency or the" in the phrase "contracting agency or the Secretary".

1–204. Section 205 of Executive Order No. 11246, as amended, is amended by deleting the last two sentences, which dealt with agency designation of compliance officers, and revising the rest of that Section to read:

"SEC. 205. The Secretary of Labor shall be responsible for securing compliance by all Government contractors and subcontractors with this Order and any implementing rules or regulations. All contracting agencies shall comply with the terms of this Order and any implementing rules, regulations, or orders of the Secretary of Labor. Contracting agencies shall cooperate with the Secretary of Labor and shall furnish such information and assistance as the Secretary may require.".

1–205. In order to delete references to the contracting agencies conducting investigations, Section 206 of Executive Order No. 11246, as amended, is amended to read:

"SEC. 206. (a) The Secretary of Labor may investigate the employment practices of any Government contractor or subcontractor to determine whether or not the contractual provisions specified in Section 202 of this Order have been violated. Such investigation shall be conducted in accordance with the procedures established by the Secretary of Labor.".

"(b) The Secretary of Labor may receive and investigate complaints by employees or prospective employees of a Government contractor or subcontractor which allege discrimination contrary to the contractual provisions specified in Section 202 of this Order.".

1–206. In Section 207 of Executive Order No. 11246, as amended, delete "contracting agencies, other" in the first sentence.

1–207. The introductory clause in Section 209(a) of Executive Order No. 11246, as amended, is amended by deleting "or the appropriate contracting agency" from "In accordance with such rules, regulations, or orders as the Secretary of Labor may issue or adopt, the Secretary or the appropriate contracting agency may:".

1–208. In paragraph (5) of Section 209(a) of Executive Order No. 11246, as amended, insert at the beginning the phrase "After consulting with the contracting agency, direct the contracting agency to", and at the end of paragraph (5) delete "contracting agency" and substitute therefor "Secretary of Labor" so that paragraph (5) is amended to read:

"(5) After consulting with the contracting agency, direct the contracting agency to cancel, terminate, suspend, or cause to be cancelled, terminated, or suspended, any contract, or any portion or portions thereof, for failure of the contractor or subcontractor to comply with equal employment opportunity provisions of the contract. Contracts may be cancelled, termi-

nated, or suspended absolutely or continuance of contracts may be conditioned upon a program for future compliance approved by the Secretary of Labor.''.

1–209. In order to reflect the transfer from the agencies to the Secretary of Labor of the enforcement functions, substitute ''Secretary of Labor'' for ''each contracting agency'' in Section 209(b) of Executive Order No. 11246, as amended, so that Section 209(b) is amended to read:

''(b) Pursuant to rules and regulations prescribed by the Secretary of Labor, the Secretary shall make reasonable efforts, within a reasonable time limitation, to secure compliance with the contract provisions of this Order by methods of conference, conciliation, mediation, and persuasion before proceedings shall be instituted under subsection (a)(2) of this Section, or before a contract shall be cancelled or terminated in whole or in part under subsection (a)(5) of this Section.''.

1–210. In order to reflect the responsibility of the contracting agencies for prompt compliance with the directions of the Secretary of Labor, Sections 210 and 211 of Executive Order No. 11246, as amended, are amended to read:

''SEC. 210. Whenever the Secretary of Labor makes a determination under Section 209, the Secretary shall promptly notify the appropriate agency. The agency shall take the action directed by the Secretary and shall report the results of the action it has taken to the Secretary of Labor within such time as the Secretary shall specify. If the contracting agency fails to take the action directed within thirty days, the Secretary may take the action directly.''.

''SEC. 211. If the Secretary of Labor shall so direct, contracting agencies shall not enter into contracts with any bidder or prospective contractor unless the bidder or prospective contractor has satisfactorily complied with the provisions of this Order or submits a program for compliance acceptable to the Secretary of Labor.''.

1–211. Section 212 of Executive Order No. 11246, as amended, is amended to read:

''SEC. 212. When a contract has been cancelled or terminated under Section 209(a)(5) or a contractor has been debarred from further Government contracts under Section 209(a)(6) of this Order, because of noncompliance with the contract provisions specified in Section 202 of this Order, the Secretary of Labor shall promptly notify the Comptroller General of the United States.''.

1–212. In order to reflect the transfer of enforcement responsibility to the Secretary of Labor, references to the administering department or agency are deleted in clauses (1), (2), and (3) of Section 301 of Executive Order No. 11246, as amended, and those clauses are amended to read:

''(1) to assist and cooperate actively with the Secretary of Labor in obtaining the compliance of contractors and subcontractors with those contract provisions and with the rules, regulations and relevant orders of the Secretary, (2) to obtain and to furnish to the Secretary of Labor such information as the Secretary may require for the supervision of such compliance, (3) to carry out sanctions and penalties for violation of such obligations imposed upon contractors and subcontractors by the Secretary of Labor pursuant to Part II, Subpart D, of this Order,''.

1–213. In order to reflect the transfer from the agencies to the Secretary of Labor of the enforcement functions ''Secretary of Labor'' shall be substituted for ''administering department or agency'' in Section 303 of Executive Order No. 11246, as amended, and Section 303 is amended to read:

''SEC. 303(a). The Secretary of Labor shall be responsible for obtaining the compliance of such applicants with their undertakings under this Order. Each administering department and agency is directed to cooperate with the Secretary of Labor and to furnish the Secretary such information and assistance as the Secretary may require in the performance of the Secretary's functions under this Order.''.

''(b) In the event an applicant fails and refuses to comply with the applicant's undertakings pursuant to this Order, the Secretary of Labor may, after consulting with the administering department or agency, take any or all of the following actions: (1) direct any administering department or agency to cancel, terminate, or suspend in whole or in part the agreement, contract or other arrangement with such applicant with respect to which the failure or refusal occurred; (2) direct any administering department or agency to refrain from extending any further assistance to the applicant under the program with respect to which the failure or refusal occurred until satisfactory assurance of future compliance has been received by the Secretary of Labor from such applicant; and (3) refer the case to the Department of Justice or the Equal Employment Opportunity Commission for appropriate law enforcement or other proceedings.''.

''(c) In no case shall action be taken with respect to an applicant pursuant to clause (1) or (2) of subsection (b) without notice and opportunity for hearing.''.

1–214. Section 401 of Executive Order No. 11246, as amended, is amended to read:

''SEC. 401. The Secretary of Labor may delegate to any officer, agency, or employee in the Executive branch of the Government, any function or duty of the Secretary under Parts II and III of this Order.''.

### 1–3. GENERAL PROVISIONS

1–301. The transfers or reassignments provided by Section 1–1 of this Order shall take effect at such time or times as the Director of the Office of Management and Budget shall determine. The Director shall ensure that all such transfers or reassignments take effect within 60 days.

1–302. The conforming amendments provided by Section 1–2 of this Order shall take effect on October 8, 1978; except that, with respect to those agencies identified in Section 1–101 of this Order, the conforming amendments shall be effective on the effective date of the transfer or reassignment of functions as specified pursuant to Section 1–301 of this Order.

#### EXECUTIVE ORDER NO. 12135

Ex. Ord. No. 12135, May 9, 1979, 44 F.R. 27639, which established the President's Advisory Committee for Women, was revoked by Ex. Ord. No. 12336, Dec. 21, 1981, 46 F.R. 62239, set out below.

#### EX. ORD. NO. 12336. TASK FORCE ON LEGAL EQUITY FOR WOMEN

Ex. Ord. No. 12336, Dec. 21, 1981, 46 F.R. 62239, as amended by Ex. Ord. No. 12355, Apr. 1, 1982, 47 F.R. 14479, provided:

By the authority vested in me as President by the Constitution of the United States of America, and in order to provide for the systematic elimination of regulatory and procedural barriers which have unfairly precluded women from receiving equal treatment from Federal activities, it is hereby ordered as follows:

SECTION 1. *Establishment.* (a) There is established the Task Force on Legal Equity for Women.

(b) The Task Force members shall be appointed by the President from among nominees by the heads of the following Executive agencies, each of which shall have one representative on the Task Force.

(1) Department of State.
(2) Department of The Treasury.
(3) Department of Defense.
(4) Department of Justice.
(5) Department of The Interior.
(6) Department of Agriculture.
(7) Department of Commerce.
(8) Department of Labor.
(9) Department of Health and Human Services.
(10) Department of Housing and Urban Development.
(11) Department of Transportation.
(12) Department of Energy.
(13) Department of Education.

(14) Agency for International Development.

(15) Veterans Administration [now Department of Veterans Affairs].

(16) Office of Management and Budget.

(17) International Communication Agency.

(18) Office of Personnel Management.

(19) Environmental Protection Agency.

(20) ACTION [now Corporation for National and Community Service].

(21) Small Business Administration.

(c) The President shall designate one of the members to chair the Task Force. Other agencies may be invited to participate in the functions of the Task Force.

SEC. 2. *Functions.* (a) The members of the Task Force shall be responsible for coordinating and facilitating in their respective agencies, under the direction of the head of their agency, the implementation of changes ordered by the President in sex-discriminatory Federal regulations, policies, and practices.

(b) The Task Force shall periodically report to the President on the progress made throughout the Government in implementing the President's directives.

(c) The Attorney General shall complete the review of Federal laws, regulations, policies, and practices which contain language that unjustifiably differentiates, or which effectively discriminates, on the basis of sex. The Attorney General or his designee shall, on a quarterly basis, report his findings to the President through the Cabinet Council on Legal Policy.

SEC. 3. *Administration.* (a) The head of each Executive agency shall, to the extent permitted by law, provide the Task Force with such information and advice as the Task Force may identify as being useful to fulfill its functions.

(b) The agency with its representative chairing the Task Force shall, to the extent permitted by law, provide the Task Force with such administrative support as may be necessary for the effective performance of its functions.

(c) The head of each agency represented on the Task Force shall, to the extent permitted by law, furnish its representative such administrative support as is necessary and appropriate.

SEC. 4. *General Provisions.* (a) Section 1–101(h) of Executive Order No. 12258, as amended, is revoked.

(b) Executive Order No. 12135 is revoked.

(c) Section 6 of Executive Order No. 12050, as amended, is revoked.

RONALD REAGAN.

[The International Communication Agency was redesignated the United States Information Agency, see section 303 of Pub. L. 97–241, title III, Aug. 24, 1982, 96 Stat. 291, set out as a note under section 1461 of Title 22, Foreign Relations and Intercourse. For abolition of United States Information Agency (other than Broadcasting Board of Governors and International Broadcasting Bureau), transfer of functions, and treatment of references thereto, see sections 6531, 6532, and 6551 of Title 22.]

EX. ORD. NO. 13171. HISPANIC EMPLOYMENT IN THE
FEDERAL GOVERNMENT

Ex. Ord. No. 13171, Oct. 12, 2000, 65 F.R. 61251, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to improve the representation of Hispanics in Federal employment, within merit system principles and consistent with the application of appropriate veterans' preference criteria, to achieve a Federal workforce drawn from all segments of society, it is hereby ordered as follows:

SECTION 1. *Policy.* It is the policy of the executive branch to recruit qualified individuals from appropriate sources in an effort to achieve a workforce drawn from all segments of society. Pursuant to this policy, this Administration notes that Hispanics remain underrepresented in the Federal workforce: they make up only 6.4 percent of the Federal civilian work-

force, roughly half of their total representation in the civilian labor force. This Executive Order, therefore, affirms ongoing policies and recommends additional policies to eliminate the underrepresentation [sic] of Hispanics in the Federal workforce.

SEC. 2. *Responsibilities of Executive Departments and Agencies.* The head of each executive department and agency (agency) shall establish and maintain a program for the recruitment and career development of Hispanics in Federal employment. In its program, each agency shall:

(a) provide a plan for recruiting Hispanics that creates a fully diverse workforce for the agency in the 21st century;

(b) assess and eliminate any systemic barriers to the effective recruitment and consideration of Hispanics, including but not limited to:

(1) broadening the area of consideration to include applicants from all appropriate sources;

(2) ensuring that selection factors are appropriate and achieve the broadest consideration of applicants and do not impose barriers to selection based on nonmerit factors; and

(3) considering the appointment of Hispanic Federal executives to rating, selection, performance review, and executive resources panels and boards;

(c) improve outreach efforts to include organizations outside the Federal Government in order to increase the number of Hispanic candidates in the selection pool for the Senior Executive Service;

(d) promote participation of Hispanic employees in management, leadership, and career development programs;

(e) ensure that performance plans for senior executives, managers, and supervisors include specific language related to significant accomplishments on diversity recruitment and career development and that accountability is predicated on those plans;

(f) establish appropriate agency advisory councils that include Hispanic Employment Program Managers;

(g) implement the goals of the Government-wide Hispanic Employment Initiatives issued by the Office of Personnel Management (OPM) in September 1997 (Nine-Point Plan), and the Report to the President's Management Council on Hispanic Employment in the Federal Government of March 1999;

(h) ensure that managers and supervisors receive periodic training in diversity management in order to carry out their responsibilities to maintain a diverse workforce; and

(i) reflect a continuing priority for eliminating Hispanic underrepresentation in the Federal workforce and incorporate actions under this order as strategies for achieving workforce diversity goals in the agency's Government Performance and Results Act (GPRA) Annual Performance Plan.

SEC. 3. *Cooperation.* All efforts taken by heads of agencies under sections 1 and 2 of this order shall, as appropriate, further partnerships and cooperation among Federal, public, and private sector employers, and appropriate Hispanic organizations whenever such partnerships and cooperation are possible and would promote the Federal employment of qualified individuals. In developing the long-term comprehensive strategies required by section 2 of this order, agencies shall, as appropriate, consult with and seek information and advice from experts in the areas of special targeted recruitment and diversity in employment.

SEC. 4. *Responsibilities of the Office of Personnel Management.* The Office of Personnel Management is required by law and regulations to undertake a Government-wide minority recruitment effort. Pursuant to that on-going effort and in implementation of this order, the Director of OPM shall:

(a) provide Federal human resources management policy guidance to address Hispanic underrepresentation where it occurs;

(b) take the lead in promoting diversity to executive agencies for such actions as deemed appropriate to promote equal employment opportunity;

(c) within 180 days from the date of this order, pre-scribe such regulations as may be necessary to carry out the purposes of this order;

(d) within 60 days from the date of this order, estab-lish an Interagency Task Force, chaired by the Direc-tor and composed of agency officials at the Deputy Sec-retary level, or the equivalent. This Task Force shall meet semi-annually to:

(1) review best practices in strategic human re-sources management planning, including alignment with agency GPRA plans;

(2) assess overall executive branch progress in com-plying with the requirements of this order;

(3) provide advice on ways to increase Hispanic community involvement; and

(4) recommend any further actions, as appropriate, in eliminating the underrepresentation of Hispanics in the Federal workforce where it occurs; and

(e) issue an annual report with findings and recom-mendations to the President on the progress made by agencies on matters related to this order. The first an-nual report shall be issued no later than 1 year from the date of this order.

SEC. 5. *Judicial Review.* This order is intended only to improve the internal management of the executive branch. It does not create any right or benefit, sub-stantive or procedural, enforceable in law or equity ex-cept as may be identified in existing laws and regula-tions, by a party against the United States, its agen-cies, its officers or employees, or any other person.

WILLIAM J. CLINTON.

EX. ORD. NO. 13506. ESTABLISHING A WHITE HOUSE COUNCIL ON WOMEN AND GIRLS

Ex. Ord. No. 13506, Mar. 11, 2009, 74 F.R. 11271, pro-vided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby order as follows:

SECTION 1. *Policy.* Over the past generation, our soci-ety has made tremendous progress in eradicating bar-riers to women's success. A record number of women are attending college and graduate school. Women make up a growing share of our workforce, and more women are corporate executives and business owners than ever before, helping boost the U.S. economy and foster U.S. competitiveness around the world. Today, women are serving at the highest levels of all branches of our Government.

Despite this progress, certain inequalities continue to persist. On average, American women continue to earn only about 78 cents for every dollar men make, and women are still significantly underrepresented in the science, engineering, and technology fields. Far too many women lack health insurance, and many are un-able to take time off to care for a new baby or an ailing family member. Violence against women and girls re-mains a global epidemic. The challenge of ensuring equal educational opportunities for women and girls endures. As the current economic crisis has swept across our Nation, women have been seriously affected.

These issues do not concern just women. When jobs do not offer family leave, that affects men who wish to help care for their families. When women earn less than men for the same work, that affects families who have to work harder to make ends meet. When our daughters do not have the same educational and career opportuni-ties as our sons, that affects entire communities, our economy, and our future as a Nation.

The purpose of this order is to establish a coordinated Federal response to issues that particularly impact the lives of women and girls and to ensure that Federal programs and policies address and take into account the distinctive concerns of women and girls, including women of color and those with disabilities.

SEC. 2. *White House Council on Women and Girls.* There is established within the Executive Office of the Presi-dent a White House Council on Women and Girls (Coun-cil).

(a) *Membership of the Council.* The Council shall con-sist of the following members:

(1) the Senior Advisor and Assistant to the Presi-dent for Intergovernmental Affairs and Public Liai-son, who shall serve as Chair of the Council;

(2) the Secretary of State;

(3) the Secretary of the Treasury;

(4) the Secretary of Defense;

(5) the Attorney General;

(6) the Secretary of the Interior;

(7) the Secretary of Agriculture;

(8) the Secretary of Commerce;

(9) the Secretary of Labor;

(10) the Secretary of Health and Human Services;

(11) the Secretary of Housing and Urban Develop-ment;

(12) the Secretary of Transportation;

(13) the Secretary of Energy;

(14) the Secretary of Education;

(15) the Secretary of Veterans Affairs;

(16) the Secretary of Homeland Security;

(17) the Representative of the United States of America to the United Nations;

(18) the United States Trade Representative;

(19) the Director of the Office of Management and Budget;

(20) the Administrator of the Environmental Pro-tection Agency;

(21) the Chair of the Council of Economic Advisers;

(22) the Director of the Office of Personnel Manage-ment;

(23) the Administrator of the Small Business Ad-ministration;

(24) the Assistant to the President and Director of the Domestic Policy Council;

(25) the Assistant to the President for Economic Policy and Director of the National Economic Coun-cil; and

(26) the heads of such other executive branch de-partments, agencies, and offices as the President may, from time to time, designate.

A member of the Council may designate, to perform the Council functions of the member, a senior-level of-ficial who is a part of the member's department, agen-cy, or office, and who is a full-time officer or employee of the Federal Government. At the direction of the Chair, the Council may establish subgroups consisting exclusively of Council members or their designees under this section, as appropriate.

(b) *Administration of the Council.* The Department of Commerce shall provide funding and administrative support for the Council to the extent permitted by law and within existing appropriations. The Chair shall convene regular meetings of the Council, determine its agenda, and direct its work. The Chair shall designate an Executive Director of the Council, who shall coordi-nate the work of the Council and head any staff as-signed to the Council.

SEC. 3. *Mission and Functions of the Council.* The Coun-cil shall work across executive departments and agen-cies to provide a coordinated Federal response to issues that have a distinct impact on the lives of women and girls, including assisting women-owned businesses to compete internationally and working to increase the participation of women in the science, engineering, and technology workforce, and to ensure that Federal pro-grams and policies adequately take those impacts into account. The Council shall be responsible for providing recommendations to the President on the effects of pending legislation and executive branch policy propos-als; for suggesting changes to Federal programs or poli-cies to address issues of special importance to women and girls; for reviewing and recommending changes to policies that have a distinct impact on women in the Federal workforce; and for assisting in the develop-ment of legislative and policy proposals of special im-portance to women and girls. The functions of the Council are advisory only.

SEC. 4. *Outreach.* Consistent with the objectives set out in this order, the Council, in accordance with appli-

cable law, in addition to regular meetings, shall conduct outreach with representatives of nonprofit organizations, State and local government agencies, elected officials, and other interested persons that will assist with the Council's development of a detailed set of recommendations.

SEC. 5. *Federal Interagency Plan.* The Council shall, within 150 days of the date of this order, develop and submit to the President a Federal interagency plan with recommendations for interagency action consistent with the goals of this order. The Federal interagency plan shall include an assessment by each member executive department, agency, or office of the status and scope of its efforts to further the progress and advancement of women and girls. Such an assessment shall include a report on the status of any offices or programs that have been created to develop, implement, or monitor targeted initiatives concerning women or girls. The Federal interagency plan shall also include recommendations for issues, programs, or initiatives that should be further evaluated or studied by the Council. The Council shall review and update the Federal interagency plan periodically, as appropriate, and shall present to the President any updated recommendations or findings.

SEC. 6. *General Provisions.* (a) The heads of executive departments and agencies shall assist and provide information to the Council, consistent with applicable law, as may be necessary to carry out the functions of the Council. Each executive department and agency shall bear its own expense for participating in the Council.

(b) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted by law to an executive department, agency, or the head thereof; or

(ii) functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(c) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA.

EX. ORD. NO. 13583. ESTABLISHING A COORDINATED GOVERNMENT-WIDE INITIATIVE TO PROMOTE DIVERSITY AND INCLUSION IN THE FEDERAL WORKFORCE

Ex. Ord. No. 13583, Aug. 18, 2011, 76 F.R. 52847, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to promote the Federal workplace as a model of equal opportunity, diversity, and inclusion, it is hereby ordered as follows:

SECTION 1. *Policy.* Our Nation derives strength from the diversity of its population and from its commitment to equal opportunity for all. We are at our best when we draw on the talents of all parts of our society, and our greatest accomplishments are achieved when diverse perspectives are brought to bear to overcome our greatest challenges.

A commitment to equal opportunity, diversity, and inclusion is critical for the Federal Government as an employer. By law, the Federal Government's recruitment policies should "endeavor to achieve a work force from all segments of society." (5 U.S.C. 2301(b)(1)). As the Nation's largest employer, the Federal Government has a special obligation to lead by example. Attaining a diverse, qualified workforce is one of the cornerstones of the merit-based civil service.

Prior Executive Orders, including but not limited to those listed below, have taken a number of steps to address the leadership role and obligations of the Federal Government as an employer. For example, Executive

Order 13171 of October 12, 2000 (Hispanic Employment in the Federal Government), directed executive departments and agencies to implement programs for recruitment and career development of Hispanic employees and established a mechanism for identifying best practices in doing so. Executive Order 13518 of November 9, 2009 (Employment of Veterans in the Federal Government), required the establishment of a Veterans Employment Initiative. Executive Order 13548 of July 26, 2010 (Increasing Federal Employment of Individuals with Disabilities), and its related predecessors, Executive Order 13163 of July 26, 2000 (Increasing the Opportunity for Individuals With Disabilities to be Employed in the Federal Government), and Executive Order 13078 of March 13, 1998 (Increasing Employment of Adults With Disabilities), sought to tap the skills of the millions of Americans living with disabilities.

To realize more fully the goal of using the talents of all segments of society, the Federal Government must continue to challenge itself to enhance its ability to recruit, hire, promote, and retain a more diverse workforce. Further, the Federal Government must create a culture that encourages collaboration, flexibility, and fairness to enable individuals to participate to their full potential.

Wherever possible, the Federal Government must also seek to consolidate compliance efforts established through related or overlapping statutory mandates, directions from Executive Orders, and regulatory requirements. By this order, I am directing executive departments and agencies (agencies) to develop and implement a more comprehensive, integrated, and strategic focus on diversity and inclusion as a key component of their human resources strategies. This approach should include a continuing effort to identify and adopt best practices, implemented in an integrated manner, to promote diversity and remove barriers to equal employment opportunity, consistent with merit system principles and applicable law.

SEC. 2. *Government-Wide Diversity and Inclusion Initiative and Strategic Plan.* The Director of the Office of Personnel Management (OPM) and the Deputy Director for Management of the Office of Management and Budget (OMB), in coordination with the President's Management Council (PMC) and the Chair of the Equal Employment Opportunity Commission (EEOC), shall:

(a) establish a coordinated Government-wide initiative to promote diversity and inclusion in the Federal workforce;

(b) within 90 days of the date of this order:

(i) develop and issue a Government-wide Diversity and Inclusion Strategic Plan (Government-wide Plan), to be updated as appropriate and at a minimum every 4 years, focusing on workforce diversity, workplace inclusion, and agency accountability and leadership. The Government-wide Plan shall highlight comprehensive strategies for agencies to identify and remove barriers to equal employment opportunity that may exist in the Federal Government's recruitment, hiring, promotion, retention, professional development, and training policies and practices;

(ii) review applicable directives to agencies related to the development or submission of agency human capital and other workforce plans and reports in connection with recruitment, hiring, promotion, retention, professional development, and training policies and practices, and develop a strategy for consolidating such agency plans and reports where appropriate and permitted by law; and

(iii) provide guidance to agencies concerning formulation of agency-specific Diversity and Inclusion Strategic Plans prepared pursuant to section 3(b) of this order;

(c) identify appropriate practices to improve the effectiveness of each agency's efforts to recruit, hire, promote, retain, develop, and train a diverse and inclusive workforce, consistent with merit system principles and applicable law; and

(d) establish a system for reporting regularly on agencies' progress in implementing their agency-spe-

cific Diversity and Inclusion Strategic Plans and in meeting the objectives of this order.

SEC. 3. *Responsibilities of Executive Departments and Agencies.* All agencies shall implement the Government-wide Plan prepared pursuant to section 2 of this order, and such other related guidance as issued from time to time by the Director of OPM and Deputy Director for Management of OMB. In addition, the head of each executive department and agency referred to under subsections (1) and (2) of section 901(b) of title 31, United States Code, shall:

(a) designate the agency's Chief Human Capital Officer or be responsible for enhancing employment and promotion opportunities within the agency, in collaboration with the agency's Director of Equal Employment Opportunity and Director of Diversity and Inclusion, if any, and consistent with law and merit system principles, including development and implementation of the agency-specific Diversity and Inclusion Strategic Plan;

(b) within 120 days of the issuance of the Government-wide Plan or its update under section 2(b)(i) of this order, develop and submit for review to the Director of OPM and the Deputy Director for Management of OMB an agency-specific Diversity and Inclusion Strategic Plan for recruiting, hiring, training, developing, advancing, promoting, and retaining a diverse workforce consistent with applicable law, the Government-wide Plan, merit system principles, the agency's overall strategic plan, its human capital plan prepared pursuant to Part 250 of title 5 of the Code of Federal Regulations, and other applicable workforce planning strategies and initiatives;

(c) implement the agency-specific Diversity and Inclusion Strategic Plan after incorporating it into the agency's human capital plan; and

(d) provide information as specified in the reporting requirements developed under section 2(d).

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) authority granted to a department or agency or the head thereof, including the authority granted to EEOC by other Executive Orders (including Executive Order 12067) or any agency's authority to establish an independent Diversity and Inclusion Office; or

(ii) functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

BARACK OBAMA.

EX. ORD. NO. 13665. NON-RETALIATION FOR DISCLOSURE OF COMPENSATION INFORMATION

Ex. Ord. No. 13665, Apr. 8, 2014, 79 F.R. 20749, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act [of 1949], 40 U.S.C. 101 *et seq.*, and in order to take further steps to promote economy and efficiency in Federal Government procurement, it is hereby ordered as follows:

SECTION 1. *Policy.* This order is designed to promote economy and efficiency in Federal Government procurement. It is the policy of the executive branch to enforce vigorously the civil rights laws of the United States, including those laws that prohibit discriminatory practices with respect to compensation. Federal contractors that employ such practices are subject to enforcement action, increasing the risk of disruption, delay, and increased expense in Federal contracting. Compensation discrimination also can lead to labor disputes that are burdensome and costly.

When employees are prohibited from inquiring about, disclosing, or discussing their compensation with fellow workers, compensation discrimination is much more difficult to discover and remediate, and more likely to persist. Such prohibitions (either express or tacit) also restrict the amount of information available to participants in the Federal contracting labor pool, which tends to diminish market efficiency and decrease the likelihood that the most qualified and productive workers are hired at the market efficient price. Ensuring that employees of Federal contractors may discuss their compensation without fear of adverse action will enhance the ability of Federal contractors and their employees to detect and remediate unlawful discriminatory practices, which will contribute to a more efficient market in Federal contracting.

SEC. 2. [Amended Ex. Ord. No. 11246, set out above.]

SEC. 3. *Regulations.* Within 160 days of the date of this order, the Secretary of Labor shall propose regulations to implement the requirements of this order.

SEC. 4. *Severability.* If any provision of this order, or the application of such provision or amendment to any person or circumstance, is held to be invalid, the remainder of this order and the application of the provisions of such to any person or circumstances shall not be affected thereby.

SEC. 5. *General Provisions.* (a) Nothing in this order shall be construed to limit the rights of an employee or applicant for employment provided under any provision of law. It also shall not be construed to prevent a Federal contractor covered by this order from pursuing a defense, as long as the defense is not based on a rule, policy, practice, agreement, or other instrument that prohibits employees or applicants from discussing or disclosing their compensation or the compensation of other employees or applicants, subject to paragraph (3) of section 202 of Executive Order 11246, as added by this order.

(b) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to a department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(c) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

SEC. 6. *Effective Date.* This order shall become effective immediately, and shall apply to contracts entered into on or after the effective date of rules promulgated by the Department of Labor under section 3 of this order.

BARACK OBAMA.

EX. ORD. NO. 13672. FURTHER AMENDMENTS TO EXECUTIVE ORDER 11478, EQUAL EMPLOYMENT OPPORTUNITY IN THE FEDERAL GOVERNMENT, AND EXECUTIVE ORDER 11246, EQUAL EMPLOYMENT OPPORTUNITY

Ex. Ord. No. 13672, July 21, 2014, 79 F.R. 42971, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, including 40 U.S.C. 121, and in order to provide for a uniform policy for the Federal Government to prohibit discrimination and take further steps to promote economy and efficiency in Federal Government procurement by prohibiting discrimination based on sexual orientation and gender identity, it is hereby ordered as follows:

SECTION 1. [Amended Ex. Ord. No. 11478, set out above.]

SEC. 2. [Amended Ex. Ord. No. 11246, set out above.]

SEC. 3. *Regulations.* Within 90 days of the date of this order, the Secretary of Labor shall prepare regulations to implement the requirements of section 2 of this order.

SEC. 4. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an agency or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

SEC. 5. *Effective Date.* This order shall become effective immediately, and section 2 of this order shall apply to contracts entered into on or after the effective date of the rules promulgated by the Department of Labor under section 3 of this order.

BARACK OBAMA.

ENHANCED COLLECTION OF RELEVANT DATA AND
STATISTICS RELATING TO WOMEN

Memorandum of President of the United States, Mar. 4, 2011, 76 F.R. 12823, provided:

Memorandum for the Heads of Executive Departments and Agencies

I am proud to work with the White House Council on Women and Girls, the Office of Management and Budget, and the Department of Commerce on this week's release of *Women in America,* a report detailing the status of American women in the areas of families and income, health, employment, education, and violence and crime. This report provides a snapshot of the status of American women today, serving as a valuable resource for Government officials, academics, members of nonprofit, nongovernmental, and news organizations, and others.

My Administration is committed to ensuring that Federal programs achieve policy goals in the most cost-effective manner. The *Women in America* report, together with the accompanying website collection of relevant data, will assist Government officials in crafting policies in light of available statistical evidence. It will also assist the work of the nongovernmental sector, including journalists, public policy analysts, and academic researchers, by providing data that allow greater understanding of policies and programs.

Preparation of this report revealed the vast data resources of the Federal statistical agencies. It also revealed some gaps in data collection. Gathering and analyzing additional data to fill in the gaps could help policymakers gather a more accurate and comprehensive view of the status and needs of American women.

Accordingly, I hereby request the heads of executive departments and agencies, where possible within existing collections of data and in light of budgetary constraints, to identify and to seek to fill in gaps in statistics and improve survey methodology relating to women wherever appropriate, including in the broad areas covered by the *Women in America* report: families and income, health, employment, education, and violence and crime.

Examples of some of the efforts that could be undertaken by departments and agencies with respect to the gathering or design of comprehensive data related to women include the following:

(a) Maternal Mortality. I encourage the National Center for Health Statistics (NCHS) to continue to work with States and other registration areas to complete the expeditious adoption of the most current standards for the collection of information on vital events, as well as the transition to electronic reporting systems. Maternal mortality is an important indicator of women's health both internationally and nationally. In the United States, maternal mortality statistics are based upon the information recorded on death certificates and collected by State and local vital records offices. The NCHS compiles the data across the 50 States and other registration areas. Due to concerns about data quality in the ascertainment of maternal mortal-

ity statistics, the 2003 revision of the standard death certificate introduced improved standards for collecting data. Until all 50 States and registration areas adopt the new data standards, formulating a national-level maternal mortality ratio remains difficult.

(b) Women in Leadership in Corporate America. Women participate in every sector of the workforce. Their current role in corporate leadership is an important indicator of their progress. I encourage the Chair of the Securities and Exchange Commission to seek to supplement the information it already collects by seeking to collect, among other data, information on the presence of women in governance positions in corporations, in order to shed further light on the role of women in corporate America.

(c) Women in Leadership in Public Service. I encourage the Corporation for National and Community Service to include statistics about the role of women in diverse aspects of public service within its planned work on measuring civic engagement.

This memorandum shall be carried out to the extent permitted by law, consistent with the legal authorities of executive departments and agencies and subject to the availability of appropriations. Nothing in this memorandum shall be construed to impair or otherwise affect the authority granted by law to a department or agency, or the head thereof; or the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

The Director of the Office of Management and Budget is hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## § 2000e–1. Exemption

### (a) Inapplicability of subchapter to certain aliens and employees of religious entities

This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

### (b) Compliance with statute as violative of foreign law

It shall not be unlawful under section 2000e–2 or 2000e–3 of this title for an employer (or a corporation controlled by an employer), labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining (including on-the-job training programs) to take any action otherwise prohibited by such section, with respect to an employee in a workplace in a foreign country if compliance with such section would cause such employer (or such corporation), such organization, such agency, or such committee to violate the law of the foreign country in which such workplace is located.

### (c) Control of corporation incorporated in foreign country

(1) If an employer controls a corporation whose place of incorporation is a foreign country, any practice prohibited by section 2000e–2 or

2000e–3 of this title engaged in by such corporation shall be presumed to be engaged in by such employer.

(2) Sections 2000e–2 and 2000e–3 of this title shall not apply with respect to the foreign operations of an employer that is a foreign person not controlled by an American employer.

(3) For purposes of this subsection, the determination of whether an employer controls a corporation shall be based on—

(A) the interrelation of operations;

(B) the common management;

(C) the centralized control of labor relations; and

(D) the common ownership or financial control,

of the employer and the corporation.

(Pub. L. 88–352, title VII, §702, July 2, 1964, 78 Stat. 255; Pub. L. 92–261, §3, Mar. 24, 1972, 86 Stat. 103; Pub. L. 102–166, title I, §109(b)(1), Nov. 21, 1991, 105 Stat. 1077.)

AMENDMENTS

1991—Pub. L. 102–166 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

1972—Pub. L. 92–261 reenacted section catchline without change and amended text generally. Prior to amendment, text read as follows: "This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–166 inapplicable to conduct occurring before Nov. 21, 1991, see section 109(c) of Pub. L. 102–166, set out as a note under section 2000e of this title.

## § 2000e–2. Unlawful employment practices

### (a) Employer practices

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

### (b) Employment agency practices

It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

### (c) Labor organization practices

It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

### (d) Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

### (e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

**(f) Members of Communist Party or Communist-action or Communist-front organizations**

As used in this subchapter, the phrase "unlawful employment practice" shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor-management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950 [50 U.S.C. 781 et seq.].

**(g) National security**

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if—

(1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

(2) such individual has not fulfilled or has ceased to fulfill that requirement.

**(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions**

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29.

**(i) Businesses or enterprises extending preferential treatment to Indians**

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

**(j) Preferential treatment not to be granted on account of existing number or percentage imbalance**

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

**(k) Burden of proof in disparate impact cases**

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decision-making process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

(C) The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

(2) A demonstration that an employment practice is required by business necessity may not be

used as a defense against a claim of intentional discrimination under this subchapter.

(3) Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act [21 U.S.C. 801 et seq.] or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

**(l) Prohibition of discriminatory use of test scores**

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices**

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders**

(1)(A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

(B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws—

(i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had—

(I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

(II) a reasonable opportunity to present objections to such judgment or order; or

(ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

(2) Nothing in this subsection shall be construed to—

(A) alter the standards for intervention under rule 24 of the Federal Rules of Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

(B) apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by the Federal Government;

(C) prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

(D) authorize or permit the denial to any person of the due process of law required by the Constitution.

(3) Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to section 1404 of title 28.

(Pub. L. 88–352, title VII, §703, July 2, 1964, 78 Stat. 255; Pub. L. 92–261, §8(a), (b), Mar. 24, 1972, 86 Stat. 109; Pub. L. 102–166, title I, §§105(a), 106, 107(a), 108, Nov. 21, 1991, 105 Stat. 1074–1076.)

REFERENCES IN TEXT

The Subversive Activities Control Act of 1950, referred to in subsec. (f), is title I (§§1–32) of act Sept. 23, 1950, ch. 1024, 64 Stat. 987, which is classified principally to subchapter I (§781 et seq.) of chapter 23 of Title 50, War and National Defense. For complete classification of this Act to the Code, see Tables.

The Controlled Substances Act, referred to in subsec. (k)(3), is title II of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1242, which is classified principally to subchapter I (§801 et seq.) of chapter 13 of Title 21, Food and Drugs. For complete classification of this Act to the Code, see Short Title note set out under section 801 of Title 21 and Tables.

The Federal Rules of Civil Procedure, referred to in subsec. (n)(2)(A), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

1991—Subsec. (k). Pub. L. 102–166, §105(a), added subsec. (k).

Subsec. (l). Pub. L. 102–166, §106, added subsec. (l).

Subsec. (m). Pub. L. 102–166, §107(a), added subsec. (m).

Subsec. (n). Pub. L. 102–166, §108, added subsec. (n).

1972—Subsec. (a)(2). Pub. L. 92–261, §8(a), inserted "or applicants for employment" after "his employees".

Subsec. (c)(2). Pub. L. 92–261, §8(b), inserted "or applicants for membership" after "membership".

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

§ 2000e–3    TITLE 42—THE PUBLIC HEALTH AND WELFARE    Page 4532

SUBVERSIVE ACTIVITIES CONTROL BOARD

Subversive Activities Control Board established by act Sept. 23, 1950, ch. 1024, § 12, 64 Stat. 977, and ceased to operate on June 30, 1973.

## § 2000e–3. Other unlawful employment practices

**(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

**(b) Printing or publication of notices or advertisements indicating prohibited preference, limitation, specification, or discrimination; occupational qualification exception**

It shall be an unlawful employment practice for an employer, labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classification or referral for employment by such an employment agency, or relating to admission to, or employment in, any program established to provide apprenticeship or other training by such a joint labor-management committee, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin, except that such a notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment.

(Pub. L. 88–352, title VII, § 704, July 2, 1964, 78 Stat. 257; Pub. L. 92–261, § 8(c), Mar. 24, 1972, 86 Stat. 109.)

AMENDMENTS

1972—Subsec. (a). Pub. L. 92–261, § 8(c)(1), inserted provision making it an unlawful employment practice for a joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against the specified individuals.

Subsec. (b). Pub. L. 92–261, § 8(c)(2), inserted provisions making prohibitions applicable to joint labor-management committees controlling apprenticeship or other training or retraining, including on-the-job training programs, and notices or advertisements of such joint labor-management committees relating to admission to, or employment in, any program established to provide apprenticeship or other training.

## § 2000e–4. Equal Employment Opportunity Commission

**(a) Creation; composition; political representation; appointment; term; vacancies; Chairman and Vice Chairman; duties of Chairman; appointment of personnel; compensation of personnel**

There is hereby created a Commission to be known as the Equal Employment Opportunity Commission, which shall be composed of five members, not more than three of whom shall be members of the same political party. Members of the Commission shall be appointed by the President by and with the advice and consent of the Senate for a term of five years. Any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed, and all members of the Commission shall continue to serve until their successors are appointed and qualified, except that no such member of the Commission shall continue to serve (1) for more than sixty days when the Congress is in session unless a nomination to fill such vacancy shall have been submitted to the Senate, or (2) after the adjournment sine die of the session of the Senate in which such nomination was submitted. The President shall designate one member to serve as Chairman of the Commission, and one member to serve as Vice Chairman. The Chairman shall be responsible on behalf of the Commission for the administrative operations of the Commission, and, except as provided in subsection (b) of this section, shall appoint, in accordance with the provisions of title 5 governing appointments in the competitive service, such officers, agents, attorneys, administrative law judges, and employees as he deems necessary to assist it in the performance of its functions and to fix their compensation in accordance with the provisions of chapter 51 and subchapter III of chapter 53 of title 5, relating to classification and General Schedule pay rates: *Provided*, That assignment, removal, and compensation of administrative law judges shall be in accordance with sections 3105, 3344, 5372, and 7521 of title 5.

**(b) General Counsel; appointment; term; duties; representation by attorneys and Attorney General**

(1) There shall be a General Counsel of the Commission appointed by the President, by and with the advice and consent of the Senate, for a term of four years. The General Counsel shall have responsibility for the conduct of litigation as provided in sections 2000e–5 and 2000e–6 of this title. The General Counsel shall have such other duties as the Commission may prescribe or as may be provided by law and shall concur with the Chairman of the Commission on the appointment and supervision of regional attorneys. The General Counsel of the Commission on the effective date of this Act shall continue in such position and perform the functions specified in this subsection until a successor is appointed and qualified.

(2) Attorneys appointed under this section may, at the direction of the Commission, appear for and represent the Commission in any case in court, provided that the Attorney General shall

conduct all litigation to which the Commission is a party in the Supreme Court pursuant to this subchapter.

**(c) Exercise of powers during vacancy; quorum**

A vacancy in the Commission shall not impair the right of the remaining members to exercise all the powers of the Commission and three members thereof shall constitute a quorum.

**(d) Seal; judicial notice**

The Commission shall have an official seal which shall be judicially noticed.

**(e) Reports to Congress and the President**

The Commission shall at the close of each fiscal year report to the Congress and to the President concerning the action it has taken and the moneys it has disbursed. It shall make such further reports on the cause of and means of eliminating discrimination and such recommendations for further legislation as may appear desirable.

**(f) Principal and other offices**

The principal office of the Commission shall be in or near the District of Columbia, but it may meet or exercise any or all its powers at any other place. The Commission may establish such regional or State offices as it deems necessary to accomplish the purpose of this subchapter.

**(g) Powers of Commission**

The Commission shall have power—

(1) to cooperate with and, with their consent, utilize regional, State, local, and other agencies, both public and private, and individuals;

(2) to pay to witnesses whose depositions are taken or who are summoned before the Commission or any of its agents the same witness and mileage fees as are paid to witnesses in the courts of the United States;

(3) to furnish to persons subject to this subchapter such technical assistance as they may request to further their compliance with this subchapter or an order issued thereunder;

(4) upon the request of (i) any employer, whose employees or some of them, or (ii) any labor organization, whose members or some of them, refuse or threaten to refuse to cooperate in effectuating the provisions of this subchapter, to assist in such effectuation by conciliation or such other remedial action as is provided by this subchapter;

(5) to make such technical studies as are appropriate to effectuate the purposes and policies of this subchapter and to make the results of such studies available to the public;

(6) to intervene in a civil action brought under section 2000e–5 of this title by an aggrieved party against a respondent other than a government, governmental agency or political subdivision.

**(h) Cooperation with other departments and agencies in performance of educational or promotional activities; outreach activities**

(1) The Commission shall, in any of its educational or promotional activities, cooperate with other departments and agencies in the performance of such educational and promotional activities.

(2) In exercising its powers under this subchapter, the Commission shall carry out educational and outreach activities (including dissemination of information in languages other than English) targeted to—

(A) individuals who historically have been victims of employment discrimination and have not been equitably served by the Commission; and

(B) individuals on whose behalf the Commission has authority to enforce any other law prohibiting employment discrimination,

concerning rights and obligations under this subchapter or such law, as the case may be.

**(i) Personnel subject to political activity restrictions**

All officers, agents, attorneys, and employees of the Commission shall be subject to the provisions of section 7324[1] of title 5, notwithstanding any exemption contained in such section.

**(j) Technical Assistance Training Institute**

(1) The Commission shall establish a Technical Assistance Training Institute, through which the Commission shall provide technical assistance and training regarding the laws and regulations enforced by the Commission.

(2) An employer or other entity covered under this subchapter shall not be excused from compliance with the requirements of this subchapter because of any failure to receive technical assistance under this subsection.

(3) There are authorized to be appropriated to carry out this subsection such sums as may be necessary for fiscal year 1992.

**(k) EEOC Education, Technical Assistance, and Training Revolving Fund**

(1) There is hereby established in the Treasury of the United States a revolving fund to be known as the "EEOC Education, Technical Assistance, and Training Revolving Fund" (hereinafter in this subsection referred to as the "Fund") and to pay the cost (including administrative and personnel expenses) of providing education, technical assistance, and training relating to laws administered by the Commission. Monies in the Fund shall be available without fiscal year limitation to the Commission for such purposes.

(2)(A) The Commission shall charge fees in accordance with the provisions of this paragraph to offset the costs of education, technical assistance, and training provided with monies in the Fund. Such fees for any education, technical assistance, or training—

(i) shall be imposed on a uniform basis on persons and entities receiving such education, assistance, or training,

(ii) shall not exceed the cost of providing such education, assistance, and training, and

(iii) with respect to each person or entity receiving such education, assistance, or training, shall bear a reasonable relationship to the cost of providing such education, assistance, or training to such person or entity.

(B) Fees received under subparagraph (A) shall be deposited in the Fund by the Commission.

---

[1] See References in Text note below.

(C) The Commission shall include in each report made under subsection (e) of this section information with respect to the operation of the Fund, including information, presented in the aggregate, relating to—

(i) the number of persons and entities to which the Commission provided education, technical assistance, or training with monies in the Fund, in the fiscal year for which such report is prepared,

(ii) the cost to the Commission to provide such education, technical assistance, or training to such persons and entities, and

(iii) the amount of any fees received by the Commission from such education, technical assistance, or training.

(3) The Secretary of the Treasury shall invest the portion of the Fund not required to satisfy current expenditures from the Fund, as determined by the Commission, in obligations of the United States or obligations guaranteed as to principal by the United States. Investment proceeds shall be deposited in the Fund.

(4) There is hereby transferred to the Fund $1,000,000 from the Salaries and Expenses appropriation of the Commission.

(Pub. L. 88–352, title VII, §705, July 2, 1964, 78 Stat. 258; Pub. L. 92–261, §8(d)–(f), Mar. 24, 1972, 86 Stat. 109, 110; Pub. L. 93–608, §3(1), Jan. 2, 1975, 88 Stat. 1972; Pub. L. 95–251, §2(a)(11), Mar. 27, 1978, 92 Stat. 183; Pub. L. 102–166, title I, §§110(a), 111, Nov. 21, 1991, 105 Stat. 1078; Pub. L. 102–411, §2, Oct. 14, 1992, 106 Stat. 2102; Pub. L. 104–66, title II, §2031, Dec. 21, 1995, 109 Stat. 728.)

REFERENCES IN TEXT

The General Schedule, referred to in subsec. (a), is set out under section 5332 of Title 5.

The effective date of this Act, referred to in subsec. (b)(1), probably means the date of enactment of Pub. L. 92–261, which was approved Mar. 24, 1972.

Section 7324 of title 5, referred to in subsec. (i), which related to Executive agency employees or District of Columbia government employees influencing elections or taking part in political campaigns, was omitted in the general revision of subchapter III of chapter 73 of Title 5 by Pub. L. 103–94, §2(a), Oct. 6, 1993, 107 Stat. 1003, which enacted a new section 7324, relating to prohibition of political activities while on duty. See section 7323 of Title 5.

CODIFICATION

In subsec. (a), reference to section ‘‘5372’’ of title 5 substituted for reference to section ‘‘5362’’ on authority of Pub. L. 95–454, §801(a)(3)(A)(ii), Oct. 13, 1978, 92 Stat. 1221, which redesignated sections 5361 through 5365 of title 5 as sections 5371 through 5375.

In subsec. (i), ‘‘section 7324 of title 5’’ substituted for ‘‘section 9 of the Act of August 2, 1939, as amended (the Hatch Act)’’ on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees. Prior to the enactment of Title 5, section 9 of the Act of August 2, 1939, as amended, was classified to section 118i of Title 5.

AMENDMENTS

1995—Subsec. (k)(2)(C). Pub. L. 104–66 substituted ‘‘including information, presented in the aggregate, relating to’’ for ‘‘including’’ in introductory provisions, ‘‘the number of persons and entities’’ for ‘‘the identity of each person or entity’’ in cl. (i), ‘‘such persons and entities’’ for ‘‘such person or entity’’ in cl. (ii), and

‘‘fees’’ for ‘‘fee’’ and ‘‘such persons and entities’’ for ‘‘such person or entity’’ in cl. (iii).

1992—Subsec. (k). Pub. L. 102–411 added subsec. (k).

1991—Subsec. (h). Pub. L. 102–166, §111, designated existing provisions as par. (1) and added par. (2).

Subsec. (j). Pub. L. 102–166, §110(a), added subsec. (j).

1978—Subsec. (a). Pub. L. 95–251 substituted ‘‘administrative law judges’’ for ‘‘hearing examiners’’ wherever appearing.

1975—Subsec. (e). Pub. L. 93–608 struck out reporting requirement of names, salaries, and duties of all individuals in employ of Commission.

1972—Subsec. (a). Pub. L. 92–261, §8(d), struck out provisions setting forth length of terms of original members of Commission and provisions authorizing Vice Chairman to act as Chairman in certain circumstances, inserted provisions relating to continuation in office of all members of Commission, and substituted provisions requiring appointment of officers, etc., in accordance with provisions of title 5, fixing compensation of such officers, etc., in accordance with provisions of chapter 51 and subchapter III of chapter 53 of title 5, relating to classification and General Schedule pay rates, and requiring assignment, removal, and compensation of hearing examiners in accordance with specified sections, for provisions requiring appointment of officers, etc., in accordance with civil service laws, and fixing compensation of such officers, etc., in accordance with the Classification Act of 1949, as amended.

Subsecs. (b) to (e). Pub. L. 92–261, §8(e), added subsec. (b), struck out subsec. (e) which amended sections 2204 and 2205 of former Title 5, Executive Departments and Government Officers and Employees, and redesignated existing subsecs. (b), (c), and (d) as (c), (d), and (e), respectively.

Subsec. (g)(6). Pub. L. 92–261, §8(f), substituted provisions which authorized Commission to intervene in a civil action brought under section 2000e–5 of this title where respondent is other than a government, governmental agency, or political subdivision for provisions which authorized Commission to refer matters to Attorney General with recommendations to intervene or institute civil actions.

Subsecs. (h) to (j). Pub. L. 92–261, §8(e)(2), (3), struck out subsec. (h) which provided for legal representation for Commission, and redesignated subsecs. (i) and (j) as (h) and (i), respectively.

EFFECTIVE DATE OF 1991 AMENDMENT

Pub. L. 102–166, title I, §110(b), Nov. 21, 1991, 105 Stat. 1078, provided that: ‘‘The amendment made by this section [amending this section] shall take effect on the date of the enactment of this Act [Nov. 21, 1991].’’

Amendment by section 111 of Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which a report required under subsec. (e) of this section is listed in item 20 on page 165), see section 3003 of Pub. L. 104–66, as amended, and section 1(a)(4) [div. A, §1402(1)] of Pub. L. 106–554, set out as notes under section 1113 of Title 31, Money and Finance.

REORGANIZATION PLAN NO. 1 OF 1978 SUPERSEDED BY CIVIL SERVICE REFORM ACT OF 1978

Pub. L. 95–454, title IX, §905, Oct. 13, 1978, 92 Stat. 1224, provided in part that any provision in Reorganization Plan No. 1 of 1978 [set out below] inconsistent with any provision of that Act [see Tables for classification] was superseded thereby.

REORGANIZATION PLAN NO. 1 OF 1978

43 F.R. 19807, 92 Stat. 3781

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress as-

sembled, February 23, 1978, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code.

### EQUAL EMPLOYMENT OPPORTUNITY

#### SECTION 1. TRANSFER OF EQUAL PAY ENFORCEMENT FUNCTIONS

All functions related to enforcing or administering Section 6(d) of the Fair Labor Standards Act, as amended, (29 U.S.C. 206(d)) are hereby transferred to the Equal Employment Opportunity Commission. Such functions include, but shall not be limited to, the functions relating to equal pay administration and enforcement now vested in the Secretary of Labor, the Administrator of the Wage and Hour Division of the Department of Labor, and the Civil Service Commission pursuant to Sections 4(d)(1); 4(f); 9; 11(a), (b), and (c); 16(b) and (c) and 17 of the Fair Labor Standards Act, as amended, (29 U.S.C. 204(d)(1); 204(f); 209; 211(a), (b), and (c); 216(b) and (c) and 217) and Section 10(b)(1) of the Portal-to-Portal Act of 1947, as amended, (29 U.S.C. 259).

#### SEC. 2. TRANSFER OF AGE DISCRIMINATION ENFORCEMENT FUNCTIONS

All functions vested in the Secretary of Labor or in the Civil Service Commission pursuant to Sections 2, 4, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the Age Discrimination in Employment Act of 1967, as amended, (29 U.S.C. 621, 623, 626, 627, 628, 629, 630, 631, 632, 633, and 633a) are hereby transferred to the Equal Employment Opportunity Commission. All functions related to age discrimination administration and enforcement pursuant to Sections 6 and 16 of the Age Discrimination in Employment Act of 1967, as amended, (29 U.S.C. 625 and 634) are hereby transferred to the Equal Employment Opportunity Commission.

#### SEC. 3. TRANSFER OF EQUAL OPPORTUNITY IN FEDERAL EMPLOYMENT ENFORCEMENT FUNCTIONS

(a) All equal opportunity in Federal employment enforcement and related functions vested in the Civil Service Commission pursuant to Section 717(b) and (c) of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–16(b) and (c)), are hereby transferred to the Equal Employment Opportunity Commission.

(b) The Equal Employment Opportunity Commission may delegate to the Civil Service Commission or its successor the function of making a preliminary determination on the issue of discrimination whenever, as a part of a complaint or appeal before the Civil Service Commission on other grounds, a Federal employee alleges a violation of Section 717 of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–16) provided that the Equal Employment Opportunity Commission retains the function of making the final determination concerning such issue of discrimination.

#### SEC. 4. TRANSFER OF FEDERAL EMPLOYMENT OF HANDICAPPED INDIVIDUALS ENFORCEMENT FUNCTIONS

All Federal employment of handicapped individuals enforcement functions and related functions vested in the Civil Service Commission pursuant to Section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791) are hereby transferred to the Equal Employment Opportunity Commission. The function of being co-chairman of the Interagency Committee on Handicapped Employees now vested in the Chairman of the Civil Service Commission pursuant to Section 501 is hereby transferred to the Chairman of the Equal Employment Opportunity Commission.

#### SEC. 5. TRANSFER OF PUBLIC SECTOR 707 FUNCTIONS

Any function of the Equal Employment Opportunity Commission concerning initiation of litigation with respect to State or local government, or political subdivisions under Section 707 of Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–6) and all necessary functions related thereto, including investiga-

tion, findings, notice and an opportunity to resolve the matter without contested litigation, are hereby transferred to the Attorney General, to be exercised by him in accordance with procedures consistent with said Title VII. The Attorney General is authorized to delegate any function under Section 707 of said Title VII to any officer or employee of the Department of Justice.

#### SEC. 6. TRANSFER OF FUNCTIONS AND ABOLITION OF THE EQUAL EMPLOYMENT OPPORTUNITY COORDINATING COUNCIL

All functions of the Equal Employment Opportunity Coordinating Council, which was established pursuant to Section 715 of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–14), are hereby transferred to the Equal Employment Opportunity Commission. The Equal Employment Opportunity Coordinating Council is hereby abolished.

#### SEC. 7. SAVINGS PROVISION

Administrative proceedings including administrative appeals from the acts of an executive agency (as defined by Section 105 of Title 5 of the United States Code) commenced or being conducted by or against such executive agency will not abate by reason of the taking effect of this Plan. Consistent with the provisions of this Plan, all such proceedings shall continue before the Equal Employment Opportunity Commission otherwise unaffected by the transfers provided by this Plan. Consistent with the provisions of this Plan, the Equal Employment Opportunity Commission shall accept appeals from those executive agency actions which occurred prior to the effective date of this Plan in accordance with law and regulations in effect on such effective date. Nothing herein shall affect any right of any person to judicial review under applicable law.

#### SEC. 8. INCIDENTAL TRANSFERS

So much of the personnel, property, records and unexpended balances of appropriations, allocations and other funds employed, used, held, available, or to be made available in connection with the functions transferred under this Plan, as the Director of the Office of Management and Budget shall determine, shall be transferred to the appropriate department, agency, or component at such time or times as the Director of the Office of Management and Budget shall provide, except that no such unexpended balances transferred shall be used for purposes other than those for which the appropriation was originally made. The Director of the Office of Management and Budget shall provide for terminating the affairs of the Council abolished herein and for such further measures and dispositions as such Director deems necessary to effectuate the purposes of this Reorganization Plan.

#### SEC. 9. EFFECTIVE DATE

This Reorganization Plan shall become effective at such time or times, on or before October 1, 1979, as the President shall specify, but not sooner than the earliest time allowable under Section 906 of Title 5 of the United States Code.

[Pursuant to Ex. Ord. No. 12106, Dec. 26, 1978, 44 F.R. 1053, the transfer to the Equal Employment Opportunity Commission of certain functions of the Civil Service Commission relating to enforcement of equal employment opportunity programs as provided by sections 1 to 4 of this Reorg. Plan is effective Jan. 1, 1979.]

[Pursuant to Ex. Ord. No. 12144, June 22, 1979, 44 F.R. 37193, sections 1 and 2 of this Reorg. Plan are effective July 1, 1979, except for transfer of functions already effective Jan. 1, 1979, under Ex. Ord. No. 12106 above.]

[Pursuant to Ex. Ord. No. 12068, June 30, 1978, 43 F.R. 28971, section 5 of this Reorg. Plan is effective July 1, 1978.]

[Pursuant to Ex. Ord. No. 12067, June 30, 1978, 43 F.R. 28967, section 6 of this Reorg. Plan is effective July 1, 1978.]

#### MESSAGE OF THE PRESIDENT

To the Congress of the United States:

I am submitting to you today Reorganization Plan No. 1 of 1978. This Plan makes the Equal Employment Opportunity Commission the principal Federal agency in fair employment enforcement. Together with actions I shall take by Executive Order, it consolidates Federal equal employment opportunity activities and lays, for the first time, the foundation of a unified, coherent Federal structure to combat job discrimination in all its forms.

In 1940 President Roosevelt issued the first Executive Order forbidding discrimination in employment by the Federal government. Since that time the Congress, the courts and the Executive Branch—spurred by the courage and sacrifice of many people and organizations—have taken historic steps to extend equal employment opportunity protection throughout the private as well as public sector. But each new prohibition against discrimination unfortunately has brought with it a further dispersal of Federal equal employment opportunity responsibility. This fragmentation of authority among a number of Federal agencies has meant confusion and ineffective enforcement for employees, regulatory duplication and needless expense for employers.

Fair employment is too vital for haphazard enforcement. My Administration will aggressively enforce our civil rights laws. Although discrimination in any area has severe consequences, limiting economic opportunity affects access to education, housing and health care. I, therefore, ask you to join with me to reorganize administration of the civil rights laws and to begin that effort by reorganizing the enforcement of those laws which ensure an equal opportunity to a job.

Eighteen government units now exercise important responsibilities under statutes, Executive Orders and regulations relating to equal employment opportunity:

*The Equal Employment Opportunity Commission (EEOC)* enforces Title VII of the Civil Rights Act of 1964, [section 2000e et seq. of this title] which bans employment discrimination based on race, national origin, sex or religion. The EEOC acts on individual complaints and also initiates private sector cases involving a "pattern or practice" of discrimination.

*The Department of Labor* and 11 other agencies enforce Executive Order 11246 [set out as a note under section 2000e of this title]. This prohibits discrimination in employment on the basis of race, national origin, sex, or religion and requires affirmative action by government contractors. While the Department now coordinates enforcement of this "contract compliance" program, it is actually administered by eleven other departments and agencies. The Department also administers those statutes requiring contractors to take affirmative action to employ handicapped people, disabled veterans and Vietnam veterans.

In addition, the Labor Department enforces the Equal Pay Act of 1963 [section 206(d) of Title 29, Labor], which prohibits employers from paying unequal wages based on sex, and the Age Discrimination in Employment Act of 1967 [section 621 et seq. of Title 29], which forbids age discrimination against persons between the ages of 40 and 65.

*The Department of Justice* litigates Title VII cases involving public sector employers—State and local governments. The Department also represents the Federal government in lawsuits against Federal contractors and grant recipients who are in violation of Federal nondiscrimination prohibitions.

*The Civil Service Commission (CSC)* enforces Title VII and all other nondiscrimination and affirmative action requirements for Federal employment. The CSC rules on complaints filed by individuals and monitors affirmative action plans submitted annually by other Federal agencies.

*The Equal Employment Opportunity Coordinating Council* includes representatives from EEOC, Labor, Justice, CSC and the Civil Rights Commission. It is charged with coordinating the Federal equal employment opportunity enforcement effort and with eliminating overlap and inconsistent standards.

In addition to these major government units, other agencies enforce various equal employment opportunity requirements which apply to specific grant programs. The Department of the Treasury, for example, administers the anti-discrimination prohibitions applicable to recipients of revenue sharing funds.

These programs have had only limited success. Some of the past deficiencies include:
—inconsistent standards of compliance;
—duplicative, inconsistent paperwork requirements and investigative efforts;
—conflicts within agencies between their program responsibilities and their responsibility to enforce the civil rights laws;
—confusion on the part of workers about how and where to seek redress;
—lack of accountability.

I am proposing today a series of steps to bring coherence to the equal employment enforcement effort. These steps, to be accomplished by the Reorganization Plan and Executive Orders, constitute an important step toward consolidation of equal employment opportunity enforcement. They will be implemented over the next two years, so that the agencies involved may continue their internal reform.

Its experience and broad scope make the EEOC suitable for the role of principal Federal agency in fair employment enforcement. Located in the Executive Branch and responsible to the President, the EEOC has developed considerable expertise in the field of employment discrimination since Congress created it by the Civil Rights Act of 1964 [section 2000e–4 of this title]. The Commission has played a pioneer role in defining both employment discrimination and its appropriate remedies.

While it has had management problems in past administrations, the EEOC's new leadership is making substantial progress in correcting them. In the last seven months the Commission has redesigned its internal structures and adopted proven management techniques. Early experience with these procedures indicates a high degree of success in reducing and expediting new cases. At my direction, the Office of Management and Budget is actively assisting the EEOC to ensure that these reforms continue.

The Reorganization Plan I am submitting will accomplish the following:

On July 1, 1978, abolish the Equal Employment Opportunity Coordinating Council (42 U.S.C. 2000e–14) and transfer its duties to the EEOC (no positions or funds shifted).

On October 1, 1978, shift enforcement of equal employment opportunity for Federal employees from the CSC to the EEOC (100 positions and $6.5 million shifted).

On July 1, 1979, shift responsibility for enforcing both the Equal Pay Act and the Age Discrimination in Employment Act from the Labor Department to the EEOC (198 positions and $5.3 million shifted for Equal Pay; 119 positions and $3.5 million for Age Discrimination).

Clarify the Attorney General's authority to initiate "pattern or practice" suits under Title VII in the public sector.

In addition, I will issue an Executive Order on October 1, 1978, to consolidate the contract compliance program—now the responsibility of Labor and eleven "compliance agencies"—into the Labor Department (1,517 positions and $33.1 million shifted).

These proposed transfers and consolidations reduce from fifteen to three the number of Federal agencies having important equal employment opportunity responsibilities under Title VII of the Civil Rights Act of 1964 and Federal contract compliance provisions.

Each element of my Plan is important to the success of the entire proposal.

By abolishing the Equal Employment Opportunity Coordinating Council and transferring its responsibilities to the EEOC, this plan places the Commission at the center of equal employment opportunity enforcement. With these new responsibilities, the EEOC can give coherence and direction to the government's efforts by developing strong uniform enforcement standards to apply throughout the government: standardized

data collection procedures, joint training programs, programs to ensure the sharing of enforcement related data among agencies, and methods and priorities for complaint and compliance reviews. Such direction has been absent in the Equal Employment Opportunity Coordinating Council.

It should be stressed, however, that affected agencies will be consulted before EEOC takes any action. When the Plan has been approved, I intend to issue an Executive Order which will provide for consultation, as well as a procedure for reviewing major disputed issues within the Executive Office of the President. The Attorney General's responsibility to advise the Executive Branch on legal issues will also be preserved.

Transfer of the Civil Service Commission's equal employment opportunity responsibilities to EEOC is needed to ensure that: (1) Federal employees have the same rights and remedies as those in the private sector and in State and local government; (2) Federal agencies meet the same standards as are required of other employers; and (3) potential conflicts between an agency's equal employment opportunity and personnel management functions are minimized. The Federal government must not fall below the standard of performance it expects of private employers.

The Civil Service Commission has in the past been lethargic in enforcing fair employment requirements within the Federal government. While the Chairman and other Commissioners I have appointed have already demonstrated their personal commitment to expanding equal employment opportunity, responsibility for ensuring fair employment for Federal employees should rest ultimately with the EEOC.

We must ensure that the transfer in no way undermines the important objectives of the comprehensive civil service reorganization which will be submitted to Congress in the near future. When the two plans take effect, I will direct the EEOC and the CSC to coordinate their procedures to prevent any duplication and overlap.

The Equal Pay Act now administered by the Labor Department, prohibits employers from paying unequal wages based on sex. Title VII of the Civil Rights Act, which is enforced by EEOC, contains a broader ban on sex discrimination. The transfer of Equal Pay responsibility from the Labor Department to the EEOC will minimize overlap and centralize enforcement of statutory prohibitions against sex discrimination in employment.

The transfer will strengthen efforts to combat sex discrimination. Such efforts would be enhanced still further by passage of the legislation pending before you, which I support, that would prohibit employers from excluding women disabled by pregnancy from participating in disability programs.

There is now virtually complete overlap in the employers, labor organizations, and employment agencies covered by Title VII and by the Age Discrimination in Employment Act. This overlap is burdensome to employers and confusing to victims of discrimination. The proposed transfer of the age discrimination program from the Labor Department to the EEOC will eliminate the duplication.

The Plan I am proposing will not affect the Attorney General's responsibility to enforce Title VII against State or local governments or to represent the Federal government in suits against Federal contractors and grant recipients. In 1972, the Congress determined that the Attorney General should be involved in suits against State and local governments. This proposal reinforces that judgment and clarifies the Attorney General's authority to initiate litigation against State or local governments engaged in a "pattern or practice" of discrimination. This in no way diminishes the EEOC's existing authority to investigate complaints filed against State or local governments and, where appropriate, to refer them to the Attorney General. The Justice Department and the EEOC will cooperate so that the Department sues on valid referrals, as well as on its own "pattern or practice" cases.

A critical element of my proposals will be accomplished by Executive Order rather than by the Reorganization Plan. This involves consolidation in the Labor Department of the responsibility to ensure that Federal contractors comply with Executive Order 11246. Consolidation will achieve the following: promote consistent standards, procedures, and reporting requirements; remove contractors from the jurisdiction of multiple agencies; prevent an agency's equal employment objectives from being outweighed by its procurement and construction objectives; and produce more effective law enforcement through unification of planning, training and sanctions. By 1981, after I have had an opportunity to review the manner in which both the EEOC and the Labor Department are exercising their new responsibilities, I will determine whether further action is appropriate.

Finally, the responsibility for enforcing grant-related equal employment provisions will remain with the agencies administering the grant programs. With the EEOC acting as coordinator of Federal equal employment programs, we will be able to bring overlap and duplication to a minimum. We will be able, for example, to see that a university's employment practices are not subject to duplicative investigations under both Title IX of the Education Amendments of 1972 [section 1681 et seq. of Title 20, Education] and the contract compliance program. Because of the similarities between the Executive Order program and those statutes requiring Federal contractors to take affirmative action to employ handicapped individuals and disabled and Vietnam veterans, I have determined that enforcement of these statues should remain in the Labor Department.

Each of the changes set forth in the Reorganization Plan accompanying this message is necessary to accomplish one or more of the purposes set forth in Section 901(a) of Title 5 of the United States Code. I have taken care to determine that all functions abolished by the Plan are done only under the statutory authority provided by Section 903(b) of Title 5 of the United States Code.

I do not anticipate that the reorganizations contained in this Plan will result in any significant change in expenditures. They will result in a more efficient and manageable enforcement program.

The Plan I am submitting is moderate and measured. It gives the Equal Employment Opportunity Commission—an agency dedicated solely to this purpose—the primary Federal responsibility in the area of job discrimination, but it is designed to give this agency sufficient time to absorb its new responsibilities. This reorganization will produce consistent agency standards, as well as increased accountability. Combined with the intense commitment of those charged with these responsibilities, it will become possible for us to accelerate this nation's progress in ensuring equal job opportunities for all our people.

JIMMY CARTER.

THE WHITE HOUSE, February 23, 1978.

Ex. Ord. No. 12106. Transfer of Certain Equal Employment Enforcement Functions

Ex. Ord. No. 12106, Dec. 26, 1978, 44 F.R. 1053, provided: By the authority vested in me as President of the United States of America by Section 9 of Reorganization Plan No. 1 of 1978 (43 FR 19807) [set out above], in order to effectuate the transfer of certain functions relating to the enforcement of equal employment programs, and in order to make certain technical amendments in other Orders to reflect this transfer of functions, it is hereby ordered as follows:

1–101. The transfer to the Equal Employment Opportunity Commission of certain functions of the Civil Service Commission, relating to enforcement of equal employment opportunity programs as provided by Sections 1, 2, 3 and 4 of Reorganization Plan No. 1 of 1978 (43 FR 19807) shall be effective on January 1, 1979.

1–102. Executive Order No. 11478, as amended [set out as a note under section 2000e of this title], is further

amended by deleting the preamble, by substituting ''national origin, handicap, or age'' for ''or national origin'' in the first sentence of Section 1, and revising Sections 3, 4, and 5 to read as follows:

''SEC. 3. The Equal Employment Opportunity Commission shall be responsible for directing and furthering the implementation of the policy of the Government of the United States to provide equal opportunity in Federal employment for all employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) and to prohibit discrimination in employment because of race, color, religion, sex, national origin, handicap, or age.

''SEC. 4. The Equal Employment Opportunity Commission, after consultation with all affected departments and agencies, shall issue such rules, regulations, orders, and instructions and request such information from the affected departments and agencies as it deems necessary and appropriate to carry out this Order.

''SEC. 5. All departments and agencies shall cooperate with and assist the Equal Employment Opportunity Commission in the performance of its functions under this Order and shall furnish the Commission such reports and information as it may request. The head of each department or agency shall comply with rules, regulations, orders and instructions issued by the Equal Employment Opportunity Commission pursuant to Section 4 of this Order.''

1–103. Executive Order No. 11022, as amended [set out as a note under section 3001 of this title], is further amended by revising Section 1(b) to read as follows:

''(b) The Council shall be composed of the Secretary of Health, Education, and Welfare [now Health and Human Services], who shall be Chairman, the Secretary of the Treasury, the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Labor, the Secretary of Housing and Urban Development, the Secretary of Transportation, the Administrator of Veterans Affairs, the Director of the Office of Personnel Management, the Director of the Community Services Administration, and the Chairman of the Equal Employment Opportunity Commission.''

1–104. Executive Order No. 11480 of September 9, 1969 [set out as a note under section 791 of Title 29, Labor], is amended by deleting ''and the Chairman of the United States Civil Service Commission'' in Section 4 and substituting therefor ''Director of the Office of Personnel Management, and the Chairman of the Equal Employment Opportunity Commission''.

1–105. Executive Order No. 11830 of January 9, 1975 [set out as a note under section 791 of Title 29, Labor], is amended by deleting Section 2 and revising Section 1 to read as follows:

''In accord with Section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791) and Section 4 of Reorganization Plan No. 1 of 1978 (43 FR 19808) the Interagency Committee on Handicapped Employees is enlarged and composed of the following, or their designees whose positions are Executive level IV or higher:

''(1) Secretary of Defense.

''(2) Secretary of Labor.

''(3) Secretary of Health, Education, and Welfare [now Health and Human Services], Co-Chairman.

''(4) Director of the Office of Personnel Management.

''(5) Administrator of Veterans Affairs.

''(6) Administrator of General Services.

''(7) Chairman of the Federal Communications Commission.

''(8) Chairman of the Equal Employment Opportunity Commission, Co-Chairman.

''(9) Such other members as the President may designate.''

1–106. This Order shall be effective on January 1, 1979.

JIMMY CARTER.

EX. ORD. NO. 12144. TRANSFER OF CERTAIN EQUAL PAY AND AGE DISCRIMINATION IN EMPLOYMENT ENFORCEMENT FUNCTIONS

Ex. Ord. No. 12144, June 22, 1979, 44 F.R. 37193, provided:

By the authority vested in me as President of the United States of America by the Constitution and laws of the United States, including Section 9 of Reorganization Plan No. 1 of 1978 (43 FR 19807) [set out above], in order to effectuate the transfer of certain functions relating to the enforcement of equal pay and age discrimination in employment programs from the Department of Labor to the Equal Employment Opportunity Commission, it is hereby ordered as follows:

1–101. Sections 1 and 2 of Reorganization Plan No. 1 of 1978 (43 FR 19807) [set out as a note above] shall become effective on July 1, 1979, with the exception of the transfer of functions from the Civil Service Commission, already effective January 1, 1979 (Executive Order No. 12106 [set out above]).

1–102. The records, property, personnel and positions, and unexpended balances of appropriations or funds, available or to be made available, which relate to the functions transferred as provided in this Order are hereby transferred from the Department of Labor to the Equal Employment Opportunity Commission.

1–103. The Director of the Office of Management and Budget shall make such determinations, issue such Orders, and take all actions necessary or appropriate to effectuate the transfers provided in this Order, including the transfer of funds, records, property, and personnel.

1–104. This Order shall be effective July 1, 1979.

JIMMY CARTER.

## § 2000e–5. Enforcement provisions

### (a) Power of Commission to prevent unlawful employment practices

The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 2000e–2 or 2000e–3 of this title.

### (b) Charges by persons aggrieved or member of Commission of unlawful employment practices by employers, etc.; filing; allegations; notice to respondent; contents of notice; investigation by Commission; contents of charges; prohibition on disclosure of charges; determination of reasonable cause; conference, conciliation, and persuasion for elimination of unlawful practices; prohibition on disclosure of informal endeavors to end unlawful practices; use of evidence in subsequent proceedings; penalties for disclosure of information; time for determination of reasonable cause

Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the ''respondent'') within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge

is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d) of this section. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection (c) or (d) of this section, from the date upon which the Commission is authorized to take action with respect to the charge.

**(c) State or local enforcement proceedings; notification of State or local authority; time for filing charges with Commission; commencement of proceedings**

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a)[1] of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

**(d) State or local enforcement proceedings; notification of State or local authority; time for action on charges by Commission**

In the case of any charge filed by a member of the Commission alleging an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local

law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days (provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged.

**(e) Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency; seniority system**

(1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

(2) For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this subchapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

(3)(A) For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

(B) In addition to any relief authorized by section 1981a of this title, liability may accrue and an aggrieved person may obtain relief as provided in subsection (g)(1), including recovery of back pay for up to two years preceding the filing

---

[1] So in original. Probably should be subsection ''(b)''.

of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

**(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master**

(1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) of this section, is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, per-

mit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsection (c) or (d) of this section or further efforts of the Commission to obtain voluntary compliance.

(2) Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. It shall be the duty of a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to be in every way expedited.

(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

(4) It shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

(5) It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure.

**(g) Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders**

(1) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

(2)(A) No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

(B) On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

**(h) Provisions of chapter 6 of title 29 not applicable to civil actions for prevention of unlawful practices**

The provisions of chapter 6 of title 29 shall not apply with respect to civil actions brought under this section.

**(i) Proceedings by Commission to compel compliance with judicial orders**

In any case in which an employer, employment agency, or labor organization fails to comply with an order of a court issued in a civil action brought under this section, the Commission may commence proceedings to compel compliance with such order.

**(j) Appeals**

Any civil action brought under this section and any proceedings brought under subsection (i) of this section shall be subject to appeal as provided in sections 1291 and 1292, title 28.

**(k) Attorney's fee; liability of Commission and United States for costs**

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

(Pub. L. 88–352, title VII, §706, July 2, 1964, 78 Stat. 259; Pub. L. 92–261, §4, Mar. 24, 1972, 86 Stat. 104; Pub. L. 102–166, title I, §§107(b), 112, 113(b), Nov. 21, 1991, 105 Stat. 1075, 1078, 1079; Pub. L. 111–2, §3, Jan. 29, 2009, 123 Stat. 5.)

REFERENCES IN TEXT

This Act, referred to in subsec. (f)(2), means Pub. L. 88–352, July 2, 1964, 78 Stat. 241, known as the Civil Rights Act of 1964, which is classified principally to subchapters II to IX of this chapter (§2000a et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

Rules 65 and 53 of the Federal Rules of Civil Procedure, referred to in subsec. (f)(2), (5), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

Chapter 6 (§101 et seq.) of title 29, referred to in subsec. (h), is a reference to act Mar. 23, 1932, ch. 90, 47 Stat. 70, popularly known as the Norris-LaGuardia Act. For complete classification of this Act to the Code, see Tables.

AMENDMENTS

2009—Subsec. (e)(3). Pub. L. 111–2 added par. (3).

1991—Subsec. (e). Pub. L. 102–166, §112, designated existing provisions as par. (1) and added par. (2).

Subsec. (g). Pub. L. 102–166, §107(b), designated existing provisions as pars. (1) and (2)(A) and added par. (2)(B).

Subsec. (k). Pub. L. 102–166, §113(b), inserted ''(including expert fees)'' after ''attorney's fee''.

1972—Subsec. (a). Pub. L. 92–261, §4(a), added subsec. (a). Former subsec. (a) redesignated (b) and amended generally.

Subsec. (b). Pub. L. 92–261, §4(a), redesignated former subsec. (a) as (b), modified the procedure for the filing and consideration of charges by the Commission, subjected to coverage unlawful employment practices of joint labor-management committees controlling apprenticeship or other training or retraining, including on-the-job training programs, required the Commission to accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law in its determination of reasonable cause, and inserted provision setting forth the time period, after charges have been filed, allowed to the Commission to determine reasonable cause. Former subsec. (b) redesignated (c).

Subsecs. (c), (d). Pub. L. 92–261, §4(a), redesignated former subsecs. (b) and (c) as (c) and (d), respectively. Former subsec. (d) redesignated (e).

Subsec. (e). Pub. L. 92–261, §4(a), redesignated former subsec. (d) as (e), extended from ninety to one hundred and eighty days after the occurrence of the alleged unlawful employment practice the time for filing charges under this section and from two hundred and ten to three hundred days the time for filing such charges where the person aggrieved initially instituted proceedings with a State or local agency, and inserted requirement that notice of the charge be served on the respondent within ten days after filing. Former subsec. (e) redesignated (f)(1).

Subsec. (f). Pub. L. 92–261, §4(a), redesignated former subsec. (e) as par. (1), substituted provisions setting forth the procedure for civil actions where the Commission was unable to secure from the respondents a conciliation agreement to prevent further unlawful em-

ployment practices for provisions setting forth the procedure for civil actions where the Commission was unable to obtain voluntary compliance with this subchapter and inserted provisions setting forth the procedure for civil action where the respondent is a government, governmental agency, or political subdivision and the Commission could not secure a conciliation agreement, added par. (2), redesignated former subsec. (f) as par. (3), substituted ''aggrieved person'' for ''plaintiff'', and added pars. (4) and (5).

Subsec. (g). Pub. L. 92–261, § 4(a), inserted provisions which authorized the court to order affirmative action not limited solely to the enumerated affirmative acts and such other equitable relief as deemed appropriate, and provisions which set forth the accrual date for back pay.

Subsecs. (i), (j). Pub. L. 92–261, § 4(b)(1), (2), substituted ''this section'' for ''subsection (e) of this section''.

EFFECTIVE DATE OF 2009 AMENDMENT

Pub. L. 111–2, § 6, Jan. 29, 2009, 123 Stat. 7, provided that: ''This Act [amending this section and section 2000e–16 of this title and sections 626, 633a, and 794a of Title 29, Labor, and enacting provisions set out as notes under this section and section 2000a of this title], and the amendments made by this Act, take effect as if enacted on May 28, 2007 and apply to all claims of discrimination in compensation under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 et seq.), title I and section 503 of the Americans with Disabilities Act of 1990 [42 U.S.C. 12111 et seq., 12203], and sections 501 and 504 of the Rehabilitation Act of 1973 [29 U.S.C. 791, 794], that are pending on or after that date.''

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

EFFECTIVE DATE OF 1972 AMENDMENT

Pub. L. 92–261, § 14, Mar. 24, 1972, 86 Stat. 113, provided that: ''The amendments made by this Act to section 706 of the Civil Rights Act of 1964 [this section] shall be applicable with respect to charges pending with the Commission on the date of enactment of this Act [Mar. 24, 1972] and all charges filed thereafter.''

FINDINGS

Pub. L. 111–2, § 2, Jan. 29, 2009, 123 Stat. 5, provided that: ''Congress finds the following:

''(1) The Supreme Court in Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007), significantly impairs statutory protections against discrimination in compensation that Congress established and that have been bedrock principles of American law for decades. The Ledbetter decision undermines those statutory protections by unduly restricting the time period in which victims of discrimination can challenge and recover for discriminatory compensation decisions or other practices, contrary to the intent of Congress.

''(2) The limitation imposed by the Court on the filing of discriminatory compensation claims ignores the reality of wage discrimination and is at odds with the robust application of the civil rights laws that Congress intended.

''(3) With regard to any charge of discrimination under any law, nothing in this Act [amending this section and section 2000e–16 of this title and sections 626, 633a, and 794a of Title 29, Labor, and enacting provisions set out as notes under this section and section 2000a of this title] is intended to preclude or limit an aggrieved person's right to introduce evidence of an unlawful employment practice that has occurred outside the time for filing a charge of discrimination.

''(4) Nothing in this Act is intended to change current law treatment of when pension distributions are considered paid.''

APPLICATION TO OTHER LAWS

Pub. L. 111–2, § 5(a), (b), Jan. 29, 2009, 123 Stat. 6, provided that:

''(a) AMERICANS WITH DISABILITIES ACT OF 1990.—The amendments made by section 3 [amending this section] shall apply to claims of discrimination in compensation brought under title I and section 503 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq., 12203), pursuant to section 107(a) of such Act (42 U.S.C. 12117(a)), which adopts the powers, remedies, and procedures set forth in section 706 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–5).

''(b) REHABILITATION ACT OF 1973.—The amendments made by section 3 shall apply to claims of discrimination in compensation brought under sections 501 and 504 of the Rehabilitation Act of 1973 (29 U.S.C. 791, 794), pursuant to—

''(1) sections 501(g) and 504(d) of such Act (29 U.S.C. 791(g) [now 29 U.S.C. 791(f)], 794(d)), respectively, which adopt the standards applied under title I of the Americans with Disabilities Act of 1990 [42 U.S.C. 12111 et seq.] for determining whether a violation has occurred in a complaint alleging employment discrimination; and

''(2) paragraphs (1) and (2) of section 505(a) of such Act (29 U.S.C. 794a(a)) (as amended by subsection (c)).''

## § 2000e–6. Civil actions by the Attorney General

### (a) Complaint

Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

### (b) Jurisdiction; three-judge district court for cases of general public importance: hearing, determination, and review of action, review by Supreme Court; single judge district court: hearing, determination, expedition of action

The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, and in any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the

case is pending. Upon receipt of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

**(c) Transfer of functions, etc., to Commission; effective date; prerequisite to transfer; execution of functions by Commission**

Effective two years after March 24, 1972, the functions of the Attorney General under this section shall be transferred to the Commission, together with such personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available, or to be made available in connection with such functions unless the President submits, and neither House of Congress vetoes, a reorganization plan pursuant to chapter 9 of title 5, inconsistent with the provisions of this subsection. The Commission shall carry out such functions in accordance with subsections (d) and (e) of this section.

**(d) Transfer of functions, etc., not to affect suits commenced pursuant to this section prior to date of transfer**

Upon the transfer of functions provided for in subsection (c) of this section, in all suits commenced pursuant to this section prior to the date of such transfer, proceedings shall continue without abatement, all court orders and decrees shall remain in effect, and the Commission shall be substituted as a party for the United States of America, the Attorney General, or the Acting Attorney General, as appropriate.

**(e) Investigation and action by Commission pursuant to filing of charge of discrimination; procedure**

Subsequent to March 24, 1972, the Commission shall have authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission. All such actions shall be conducted in accordance with the procedures set forth in section 2000e–5 of this title.

(Pub. L. 88–352, title VII, §707, July 2, 1964, 78 Stat. 261; Pub. L. 92–261, §5, Mar. 24, 1972, 86 Stat. 107.)

AMENDMENTS

1972—Subsecs. (c) to (e). Pub. L. 92–261 added subsecs. (c) to (e).

TRANSFER OF FUNCTIONS

Any function of the Equal Employment Opportunity Commission concerning initiation of litigation with respect to State or local government, or political subdivisions under this section, and all necessary functions related thereto, including investigation, findings, notice and an opportunity to resolve the matter without contested litigation, were transferred to the Attorney General, to be exercised by him in accordance with procedures consistent with this subchapter, and with the Attorney General authorized to delegate any function under this section to any officer or employee of the Department of Justice, by Reorg. Plan No. 1 of 1978, §5, 43 F.R. 19807, 92 Stat. 3781, set out as a note under section 2000e–4 of this title.

EX. ORD. NO. 12068. TRANSFER OF CERTAIN FUNCTIONS TO ATTORNEY GENERAL

Ex. Ord. No. 12068, June 30, 1978, 43 F.R. 28971, provided:

By virtue of the authority vested in me as President of the United States by the Constitution and laws of the United States, including Section 9 of Reorganization Plan Number 1 of 1978 (43 FR 19807) [set out as a note under section 2000e–4 of this title], in order to clarify the Attorney General's authority to initiate public sector litigation under Section 707 of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e–6), it is ordered as follows:

1–1. SECTION 707 FUNCTIONS OF THE ATTORNEY GENERAL

1–101. Section 5 of Reorganization Plan Number 1 of 1978 (43 FR 19807) [set out as a note under section 2000e–4 of this title] shall become effective on July 1, 1978.

1–102. The functions transferred to the Attorney General by Section 5 of Reorganization Plan Number 1 of 1978 [set out as a note under section 2000e–4 of this title] shall, consistent with Section 707 of Title VII of the Civil Rights Act of 1964, as amended [this section], be performed in accordance with Department of Justice procedures heretofore followed under Section 707.

JIMMY CARTER.

**§ 2000e–7. Effect on State laws**

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.

(Pub. L. 88–352, title VII, §708, July 2, 1964, 78 Stat. 262.)

**§ 2000e–8. Investigations**

**(a) Examination and copying of evidence related to unlawful employment practices**

In connection with any investigation of a charge filed under section 2000e–5 of this title,

the Commission or its designated representative shall at all reasonable times have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation.

**(b) Cooperation with State and local agencies administering State fair employment practices laws; participation in and contribution to research and other projects; utilization of services; payment in advance or reimbursement; agreements and rescission of agreements**

The Commission may cooperate with State and local agencies charged with the administration of State fair employment practices laws and, with the consent of such agencies, may, for the purpose of carrying out its functions and duties under this subchapter and within the limitation of funds appropriated specifically for such purpose, engage in and contribute to the cost of research and other projects of mutual interest undertaken by such agencies, and utilize the services of such agencies and their employees, and, notwithstanding any other provision of law, pay by advance or reimbursement such agencies and their employees for services rendered to assist the Commission in carrying out this subchapter. In furtherance of such cooperative efforts, the Commission may enter into written agreements with such State or local agencies and such agreements may include provisions under which the Commission shall refrain from processing a charge in any cases or class of cases specified in such agreements or under which the Commission shall relieve any person or class of persons in such State or locality from requirements imposed under this section. The Commission shall rescind any such agreement whenever it determines that the agreement no longer serves the interest of effective enforcement of this subchapter.

**(c) Execution, retention, and preservation of records; reports to Commission; training program records; appropriate relief from regulation or order for undue hardship; procedure for exemption; judicial action to compel compliance**

Every employer, employment agency, and labor organization subject to this subchapter shall (1) make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, (2) preserve such records for such periods, and (3) make such reports therefrom as the Commission shall prescribe by regulation or order, after public hearing, as reasonable, necessary, or appropriate for the enforcement of this subchapter or the regulations or orders thereunder. The Commission shall, by regulation, require each employer, labor organization, and joint labor-management committee subject to this subchapter which controls an apprenticeship or other training program to maintain such records as are reasonably necessary to carry out the purposes of this subchapter, including, but not limited to, a list of applicants who wish to participate in such program, including the chronological order in which applications were

received, and to furnish to the Commission upon request, a detailed description of the manner in which persons are selected to participate in the apprenticeship or other training program. Any employer, employment agency, labor organization, or joint labor-management committee which believes that the application to it of any regulation or order issued under this section would result in undue hardship may apply to the Commission for an exemption from the application of such regulation or order, and, if such application for an exemption is denied, bring a civil action in the United States district court for the district where such records are kept. If the Commission or the court, as the case may be, finds that the application of the regulation or order to the employer, employment agency, or labor organization in question would impose an undue hardship, the Commission or the court, as the case may be, may grant appropriate relief. If any person required to comply with the provisions of this subsection fails or refuses to do so, the United States district court for the district in which such person is found, resides, or transacts business, shall, upon application of the Commission, or the Attorney General in a case involving a government, governmental agency or political subdivision, have jurisdiction to issue to such person an order requiring him to comply.

**(d) Consultation and coordination between Commission and interested State and Federal agencies in prescribing recordkeeping and reporting requirements; availability of information furnished pursuant to recordkeeping and reporting requirements; conditions on availability**

In prescribing requirements pursuant to subsection (c) of this section, the Commission shall consult with other interested State and Federal agencies and shall endeavor to coordinate its requirements with those adopted by such agencies. The Commission shall furnish upon request and without cost to any State or local agency charged with the administration of a fair employment practice law information obtained pursuant to subsection (c) of this section from any employer, employment agency, labor organization, or joint labor-management committee subject to the jurisdiction of such agency. Such information shall be furnished on condition that it not be made public by the recipient agency prior to the institution of a proceeding under State or local law involving such information. If this condition is violated by a recipient agency, the Commission may decline to honor subsequent requests pursuant to this subsection.

**(e) Prohibited disclosures; penalties**

It shall be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty, of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year.

Appeal: 17-1967   Doc: 12   Filed: 10/12/2017   Pg: 94 of 122

(Pub. L. 88–352, title VII, §709, July 2, 1964, 78 Stat. 262; Pub. L. 92–261, §6, Mar. 24, 1972, 86 Stat. 107.)

#### AMENDMENTS

1972—Subsec. (b). Pub. L. 92–261 inserted provisions authorizing the Commission to engage in and contribute to the cost of research and other projects undertaken by State and local agencies and provisions authorizing the Commission to make advance payments to State and local agencies and their employees for services rendered to the Commission, and struck out provisions relating to agreements between the Commission and State and local agencies prohibiting private civil actions under section 2000e–5 of this title in specified cases.

Subsec. (c). Pub. L. 92–261 struck out "Except as provided in subsection (d) of this section," before "every employer, employment agency, and labor organization subject to this subchapter shall (1)", required the party seeking an exemption to bring an action in the district court only after the Commission denied the application for the exemption, and inserted provision which authorized the Commission, or the Attorney General in a case involving a government, etc., to apply for a court order compelling compliance with the recordkeeping and reporting obligations set out in this subsection.

Subsec. (d). Pub. L. 92–261 substituted provisions requiring consultation and coordination between Federal and State agencies in prescribing recordkeeping and reporting requirements pursuant to subsec. (c) of this section, and authorizing the Commission to furnish information obtained pursuant to subsec. (c) of this section to interested State and local agencies, for provisions exempting from recordkeeping and reporting requirements employers, etc., required to keep records and make reports under State or local fair employment practice laws, except for the maintenance of notations by such employers, etc., which reflect the differences in coverage or enforcement between State or local laws and the provisions of this subchapter, and dispensing with recordkeeping and reporting requirements where the employer reports under some Executive Order prescribing fair employment practices for Government contractors or subcontractors.

#### § 2000e–9. Conduct of hearings and investigations pursuant to section 161 of title 29

For the purpose of all hearings and investigations conducted by the Commission or its duly authorized agents or agencies, section 161 of title 29 shall apply.

(Pub. L. 88–352, title VII, §710, July 2, 1964, 78 Stat. 264; Pub. L. 92–261, §7, Mar. 24, 1972, 86 Stat. 109.)

#### AMENDMENTS

1972—Pub. L. 92–261 substituted provisions making applicable section 161 of title 29 to all hearings and investigations conducted by the Commission or its authorized agents or agencies, for provisions enumerating the investigatory powers of the Commission and the procedure for their enforcement.

#### § 2000e–10. Posting of notices; penalties

(a) Every employer, employment agency, and labor organization, as the case may be, shall post and keep posted in conspicuous places upon its premises where notices to employees, applicants for employment, and members are customarily posted a notice to be prepared or approved by the Commission setting forth excerpts from, or summaries of, the pertinent provisions of this subchapter and information pertinent to the filing of a complaint.

(b) A willful violation of this section shall be punishable by a fine of not more than $100 for each separate offense.

(Pub. L. 88–352, title VII, §711, July 2, 1964, 78 Stat. 265.)

#### § 2000e–11. Veterans' special rights or preference

Nothing contained in this subchapter shall be construed to repeal or modify any Federal, State, territorial, or local law creating special rights or preference for veterans.

(Pub. L. 88–352, title VII, §712, July 2, 1964, 78 Stat. 265.)

#### § 2000e–12. Regulations; conformity of regulations with administrative procedure provisions; reliance on interpretations and instructions of Commission

(a) The Commission shall have authority from time to time to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter. Regulations issued under this section shall be in conformity with the standards and limitations of subchapter II of chapter 5 of title 5.

(b) In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission, or (2) the failure of such person to publish and file any information required by any provision of this subchapter if he pleads and proves that he failed to publish and file such information in good faith, in conformity with the instructions of the Commission issued under this subchapter regarding the filing of such information. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that (A) after such act or omission, such interpretation or opinion is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect, or (B) after publishing or filing the description and annual reports, such publication or filing is determined by judicial authority not to be in conformity with the requirements of this subchapter.

(Pub. L. 88–352, title VII, §713, July 2, 1964, 78 Stat. 265.)

#### CODIFICATION

In subsec. (a), "subchapter II of chapter 5 of title 5" substituted for "the Administrative Procedure Act" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

#### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION GUIDELINES ON RELIGIOUS HARASSMENT

Pub. L. 112–55, div. B, title V, §506, Nov. 18, 2011, 125 Stat. 631, provided that: "During the current fiscal year and in each fiscal year thereafter, none of the funds made available in this or any other Act may be used to implement, administer, or enforce any guidelines of the Equal Employment Opportunity Commission covering harassment based on religion, when it is made known

to the Federal entity or official to which such funds are made available that such guidelines do not differ in any respect from the proposed guidelines published by the Commission on October 1, 1993 (58 Fed. Reg. 51266)."

Similar provisions were contained in the following prior appropriation acts:

Pub. L. 111–117, div. B, title V, § 506, Dec. 16, 2009, 123 Stat. 3150.

Pub. L. 111–8, div. B, title V, § 506, Mar. 11, 2009, 123 Stat. 595.

Pub. L. 103–317, title VI, § 610, Aug. 26, 1994, 108 Stat. 1774, provided that:

"(a) FINDINGS.—The Congress finds that—

"(1) the liberties protected by our Constitution include religious liberty protected by the first amendment;

"(2) citizens of the United States profess the beliefs of almost every conceivable religion;

"(3) Congress has historically protected religious expression even from governmental action not intended to be hostile to religion;

"(4) the Supreme Court has written that 'the free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires';

"(5) the Supreme Court has firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the content of the ideas is offensive to some;

"(6) Congress enacted the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.] to restate and make clear again our intent and position that religious liberty is and should forever be granted protection from unwarranted and unjustified government intrusions and burdens;

"(7) the Equal Employment Opportunity Commission has written proposed guidelines to title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.], published in the Federal Register on October 1, 1993, that expand the definition of religious harassment beyond established legal standards set forth by the Supreme Court, and that may result in the infringement of religious liberty;

"(8) such guidelines do not appropriately resolve issues related to religious liberty and religious expression in the workplace;

"(9) properly drawn guidelines for the determination of religious harassment should provide appropriate guidance to employers and employees and assist in the continued preservation of religious liberty as guaranteed by the first amendment;

"(10) the Commission states in its proposed guidelines that it retains wholly separate guidelines for the determination of sexual harassment because the Commission believes that sexual harassment raises issues about human interaction that are to some extent unique; and

"(11) the subject of religious harassment also raises issues about human interaction that are to some extent unique in comparison to other harassment.

"(b) CATEGORY OF RELIGIOUS HARASSMENT IN PROPOSED GUIDELINES.—For purposes of issuing final regulations under title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.] in connection with the proposed guidelines published by the Equal Employment Opportunity Commission on October 1, 1993 (58 Fed. Reg. 51266), the Chairperson of the Equal Employment Opportunity Commission shall ensure that—

"(1) the category of religion shall be withdrawn from the proposed guidelines at this time;

"(2) any new guidelines for the determination of religious harassment shall be drafted so as to make explicitly clear that symbols or expressions of religious belief consistent with the first amendment and the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.] are not to be restricted and do not constitute proof of harassment;

"(3) the Commission shall hold public hearings on such new proposed guidelines; and

"(4) the Commission shall receive additional public comment before issuing similar new regulations."

## § 2000e–13. Application to personnel of Commission of sections 111 and 1114 of title 18; punishment for violation of section 1114 of title 18

The provisions of sections 111 and 1114, title 18, shall apply to officers, agents, and employees of the Commission in the performance of their official duties. Notwithstanding the provisions of sections 111 and 1114 of title 18, whoever in violation of the provisions of section 1114 of such title kills a person while engaged in or on account of the performance of his official functions under this Act shall be punished by imprisonment for any term of years or for life.

(Pub. L. 88–352, title VII, § 714, July 2, 1964, 78 Stat. 265; Pub. L. 92–261, § 8(g), Mar. 24, 1972, 86 Stat. 110.)

### REFERENCES IN TEXT

This Act, referred to in text, means Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended, known as the Civil Rights Act of 1964, which is classified principally to subchapters II to IX of this chapter (§ 2000a et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

### AMENDMENTS

1972—Pub. L. 92–261 inserted provisions which made section 1114 of title 18 applicable to officers, etc., of the Commission and set forth punishment for violation of such section 1114.

## § 2000e–14. Equal Employment Opportunity Coordinating Council; establishment; composition; duties; report to President and Congress

The Equal Employment Opportunity Commission shall have the responsibility for developing and implementing agreements, policies and practices designed to maximize effort, promote efficiency, and eliminate conflict, competition, duplication and inconsistency among the operations, functions and jurisdictions of the various departments, agencies and branches of the Federal Government responsible for the implementation and enforcement of equal employment opportunity legislation, orders, and policies. On or before October 1 of each year, the Equal Employment Opportunity Commission shall transmit to the President and to the Congress a report of its activities, together with such recommendations for legislative or administrative changes as it concludes are desirable to further promote the purposes of this section.

(Pub. L. 88–352, title VII, § 715, July 2, 1964, 78 Stat. 265; Pub. L. 92–261, § 10, Mar. 24, 1972, 86 Stat. 111; Pub. L. 94–273, § 3(24), Apr. 21, 1976, 90 Stat. 377; 1978 Reorg. Plan No. 1, § 6, eff. July 1, 1978, 43 F.R. 19807, 92 Stat. 3781.)

### CODIFICATION

The first sentence of this section, which read "There shall be established an Equal Employment Opportunity Coordinating Council (hereinafter referred to in this section as the Council) composed of the Secretary of Labor, the Chairman of the Equal Employment Opportunity Commission, the Attorney General, the Chairman of the United States Civil Service Commission, and the Chairman of the United States Civil Rights Commission, or their respective delegates" was omit-

ted pursuant to Reorg. Plan No. 1 of 1978, §6, 43 F.R. 19807, 92 Stat. 3781, set out as a note under section 2000e–4 of this title, which abolished the Equal Employment Opportunity Coordinating Council, effective July 1, 1978, as provided by section 1–101 of Ex. Ord. No. 12067, June 30, 1978, 43 F.R. 28967, set out as a note under section 2000e of this title. See Transfer of Functions note below.

### AMENDMENTS

1976—Pub. L. 94–273 substituted ''October'' for ''July''.

1972—Pub. L. 92–261 substituted provisions which established the Equal Employment Opportunity Coordinating Council and set forth the composition, powers, and duties of the Council for provisions which directed the Secretary of Labor to make a report to the Congress not later than June 30, 1965 concerning discrimination in employment because of age.

### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions in this section relating to transmittal of a report and recommendations to Congress, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and item 19 on page 165 of House Document No. 103–7.

### TRANSFER OF FUNCTIONS

''Equal Employment Opportunity Commission'' substituted in text for ''Council'', meaning Equal Employment Opportunity Coordinating Council, pursuant to Reorg. Plan. No. 1 of 1978, §6, 43 F.R. 19807, 92 Stat. 3781, set out as a note under section 2000e–4 of this title, which abolished Equal Employment Opportunity Coordinating Council and transferred its functions to Equal Employment Opportunity Commission, effective July 1, 1978, as provided by section 1–101 of Ex. Ord. No. 12067, June 30, 1978, 43 F.R. 28967, set out as a note under section 2000e of this title.

### SUBMISSION OF SPECIFIC LEGISLATIVE RECOMMENDATIONS TO CONGRESS BY JANUARY 1, 1967, TO IMPLEMENT REPORT ON AGE DISCRIMINATION

Pub. L. 89–601, title VI, §606, Sept. 23, 1966, 80 Stat. 845, directed the Secretary of Labor to submit to the Congress not later than Jan. 1, 1967 his specific legislative recommendations for implementing the conclusions and recommendations contained in his report on age discrimination in employment made pursuant to provisions of this section prior to its amendment in 1972.

## § 2000e–15. Presidential conferences; acquaintance of leadership with provisions for employment rights and obligations; plans for fair administration; membership

The President shall, as soon as feasible after July 2, 1964, convene one or more conferences for the purpose of enabling the leaders of groups whose members will be affected by this subchapter to become familiar with the rights afforded and obligations imposed by its provisions, and for the purpose of making plans which will result in the fair and effective administration of this subchapter when all of its provisions become effective. The President shall invite the participation in such conference or conferences of (1) the members of the President's Committee on Equal Employment Opportunity, (2) the members of the Commission on Civil Rights, (3) representatives of State and local agencies engaged in furthering equal employment opportunity, (4) representatives of private agencies engaged in furthering equal employment opportunity, and (5) representatives of employers,

labor organizations, and employment agencies who will be subject to this subchapter.

(Pub. L. 88–352, title VII, §716(c), July 2, 1964, 78 Stat. 266.)

### EXECUTIVE ORDER NO. 11197

Ex. Ord. No. 11197, eff. Feb. 5, 1965, 30 F.R. 1721, which established the President's Council on Equal Opportunity, was revoked by Ex. Ord. No. 11247, eff. Sept. 24, 1965, 30 F.R. 12327, formerly set out as a note under section 2000d–1 of this title.

## § 2000e–16. Employment by Federal Government

**(a) Discriminatory practices prohibited; employees or applicants for employment subject to coverage**

All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Regulatory Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Publishing Office, the Government Accountability Office, and the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin.

**(b) Equal Employment Opportunity Commission; enforcement powers; issuance of rules, regulations, etc.; annual review and approval of national and regional equal employment opportunity plans; review and evaluation of equal employment opportunity programs and publication of progress reports; consultations with interested parties; compliance with rules, regulations, etc.; contents of national and regional equal employment opportunity plans; authority of Librarian of Congress**

Except as otherwise provided in this subsection, the Equal Employment Opportunity Commission shall have authority to enforce the provisions of subsection (a) of this section through appropriate remedies, including reinstatement or hiring of employees with or without back pay, as will effectuate the policies of this section, and shall issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section. The Equal Employment Opportunity Commission shall—

(1) be responsible for the annual review and approval of a national and regional equal employment opportunity plan which each department and agency and each appropriate unit referred to in subsection (a) of this section shall submit in order to maintain an affirmative program of equal employment opportunity for all such employees and applicants for employment;

(2) be responsible for the review and evaluation of the operation of all agency equal em-

ployment opportunity programs, periodically obtaining and publishing (on at least a semi-annual basis) progress reports from each such department, agency, or unit; and

(3) consult with and solicit the recommendations of interested individuals, groups, and organizations relating to equal employment opportunity.

The head of each such department, agency, or unit shall comply with such rules, regulations, orders, and instructions which shall include a provision that an employee or applicant for employment shall be notified of any final action taken on any complaint of discrimination filed by him thereunder. The plan submitted by each department, agency, and unit shall include, but not be limited to—

(1) provision for the establishment of training and education programs designed to provide a maximum opportunity for employees to advance so as to perform at their highest potential; and

(2) a description of the qualifications in terms of training and experience relating to equal employment opportunity for the principal and operating officials of each such department, agency, or unit responsible for carrying out the equal employment opportunity program and of the allocation of personnel and resources proposed by such department, agency, or unit to carry out its equal employment opportunity program.

With respect to employment in the Library of Congress, authorities granted in this subsection to the Equal Employment Opportunity Commission shall be exercised by the Librarian of Congress.

**(c) Civil action by employee or applicant for employment for redress of grievances; time for bringing of action; head of department, agency, or unit as defendant**

Within 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

**(d) Section 2000e–5(f) through (k) of this title applicable to civil actions**

The provisions of section 2000e–5(f) through (k) of this title, as applicable, shall govern civil ac-

tions brought hereunder, and the same interest to compensate for delay in payment shall be available as in cases involving nonpublic parties.. [1]

**(e) Government agency or official not relieved of responsibility to assure nondiscrimination in employment or equal employment opportunity**

Nothing contained in this Act shall relieve any Government agency or official of its or his primary responsibility to assure nondiscrimination in employment as required by the Constitution and statutes or of its or his responsibilities under Executive Order 11478 relating to equal employment opportunity in the Federal Government.

**(f) Section 2000e–5(e)(3) of this title applicable to compensation discrimination**

Section 2000e–5(e)(3) of this title shall apply to complaints of discrimination in compensation under this section.

(Pub. L. 88–352, title VII, §717, as added Pub. L. 92–261, §11, Mar. 24, 1972, 86 Stat. 111; amended 1978 Reorg. Plan No. 1, §3, eff. Jan. 1, 1979, 43 F.R. 19807, 92 Stat. 3781; Pub. L. 96–191, §8(g), Feb. 15, 1980, 94 Stat. 34; Pub. L. 102–166, title I, §114, Nov. 21, 1991, 105 Stat. 1079; Pub. L. 104–1, title II, §201(c)(1), Jan. 23, 1995, 109 Stat. 8; Pub. L. 105–220, title III, §341(a), Aug. 7, 1998, 112 Stat. 1092; Pub. L. 108–271, §8(b), July 7, 2004, 118 Stat. 814; Pub. L. 109–435, title VI, §604(f), Dec. 20, 2006, 120 Stat. 3242; Pub. L. 111–2, §5(c)(2), Jan. 29, 2009, 123 Stat. 7; Pub. L. 113–235, div. H, title I, §1301(b), Dec. 16, 2014, 128 Stat. 2537.)

REFERENCES IN TEXT

This Act, referred to in subsec. (e), means Pub. L. 88–352, July 2, 1964, 78 Stat. 241, known as the Civil Rights Act of 1964, which is classified principally to subchapters II to IX of this chapter (§2000a et seq.). For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

Executive Order 11478, as amended, referred to in subsecs. (c) and (e), is set out as a note under section 2000e of this title.

AMENDMENTS

2009—Subsec. (f). Pub. L. 111–2 added subsec. (f).

2006—Subsec. (a). Pub. L. 109–435 substituted ''Postal Regulatory Commission'' for ''Postal Rate Commission''.

2004—Subsec. (a). Pub. L. 108–271 substituted ''Government Accountability Office'' for ''General Accounting Office''.

1998—Subsec. (a). Pub. L. 105–220 inserted ''in the Smithsonian Institution,'' before ''and in the Government Printing Office,''.

1995—Subsec. (a). Pub. L. 104–1 substituted ''units of the judicial branch'' for ''units of the legislative and judicial branches'' and inserted ''Government Printing Office, the General Accounting Office, and the'' before ''Library of Congress''.

1991—Subsec. (c). Pub. L. 102–166, §114(1), substituted ''90 days'' for ''thirty days''.

Subsec. (d). Pub. L. 102–166, §114(2), inserted before the period '', and the same interest to compensate for delay in payment shall be available as in cases involving nonpublic parties.''

1980—Subsec. (a). Pub. L. 96–191 struck out ''(other than the General Accounting Office)'' after ''in executive agencies''.

[1] So in original.

Page 4549          TITLE 42—THE PUBLIC HEALTH AND WELFARE          § 2000e–16

CHANGE OF NAME

''Government Publishing Office'' substituted for ''Government Printing Office'' in subsec. (a) on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

EFFECTIVE DATE OF 2009 AMENDMENT

Amendment by Pub. L. 111–2 effective as if enacted May 28, 2007, and applicable to certain claims of discrimination in compensation pending on or after that date, see section 6 of Pub. L. 111–2, set out as a note under section 2000e–5 of this title.

EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–220 effective Aug. 7, 1998, and applicable to and may be raised in any administrative or judicial claim or action brought before Aug. 7, 1998, but pending on such date, and any administrative or judicial claim or action brought after such date regardless of whether the claim or action arose prior to such date, if the claim or action was brought within the applicable statute of limitations, see section 341(d) of Pub. L. 105–220, formerly set out as a note under section 633a of Title 29, Labor.

EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–1 effective 1 year after Jan. 23, 1995, see section 1311(d) of Title 2, The Congress.

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–191 effective Oct. 1, 1980, see section 10(a) of Pub. L. 96–191.

TRANSFER OF FUNCTIONS

''Equal Employment Opportunity Commission'' substituted for ''Civil Service Commission'' in subsecs. (b) and (c) pursuant to Reorg. Plan No. 1 of 1978, §3, 43 F.R. 19807, 92 Stat. 3781, set out as a note under section 2000e–4 of this title, which transferred all equal opportunity in Federal employment enforcement and related functions vested in Civil Service Commission by subsecs. (b) and (c) of this section to Equal Employment Opportunity Commission, with certain authority delegable to Director of Office of Personnel Management, effective Jan. 1, 1979, as provided by section 1–101 of Ex. Ord. No. 12106, Dec. 28, 1978, 44 F.R. 1053, set out as a note under section 2000e–4 of this title.

EX. ORD. NO. 13145. TO PROHIBIT DISCRIMINATION IN FEDERAL EMPLOYMENT BASED ON GENETIC INFORMATION

Ex. Ord. No. 13145, Feb. 8, 2000, 65 F.R. 6877, provided:
By the authority vested in me as President of the United States by the Constitution and the laws of the United States of America, it is ordered as follows:

SECTION 1. Nondiscrimination in Federal Employment on the Basis of Protected Genetic Information.

1–101. It is the policy of the Government of the United States to provide equal employment opportunity in Federal employment for all qualified persons and to prohibit discrimination against employees based on protected genetic information, or information about a request for or the receipt of genetic services. This policy of equal opportunity applies to every aspect of Federal employment.

1–102. The head of each Executive department and agency shall extend the policy set forth in section 1101 to all its employees covered by section 717 of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e–16).

1–103. Executive departments and agencies shall carry out the provisions of this order to the extent permitted by law and consistent with their statutory and regulatory authorities, and their enforcement mechanisms. The Equal Employment Opportunity Commission shall be responsible for coordinating the policy of the Government of the United States to prohibit discrimination against employees in Federal employment based on protected genetic information, or information about a request for or the receipt of genetic services.

SEC. 2. Requirements Applicable to Employing Departments and Agencies.

1–201. Definitions.
(a) The term ''employee'' shall include an employee, applicant for employment, or former employee covered by section 717 of the Civil Rights Act of 1964, as amended (42 U.S.C. 2000e–16).

(b) Genetic monitoring means the periodic examination of employees to evaluate acquired modifications to their genetic material, such as chromosomal damage or evidence of increased occurrence of mutations, that may have developed in the course of employment due to exposure to toxic substances in the workplace, in order to identify, evaluate, respond to the effects of, or control adverse environmental exposures in the workplace.

(c) Genetic services means health services, including genetic tests, provided to obtain, assess, or interpret genetic information for diagnostic or therapeutic purposes, or for genetic education or counseling.

(d) Genetic test means the analysis of human DNA, RNA, chromosomes, proteins, or certain metabolites in order to detect disease-related genotypes or mutations. Tests for metabolites fall within the definition of ''genetic tests'' when an excess or deficiency of the metabolites indicates the presence of a mutation or mutations. The conducting of metabolic tests by a department or agency that are not intended to reveal the presence of a mutation shall not be considered a violation of this order, regardless of the results of the tests. Test results revealing a mutation shall, however, be subject to the provisions of this order.

(e) Protected genetic information.
(1) In general, protected genetic information means:
(A) information about an individual's genetic tests;
(B) information about the genetic tests of an individual's family members; or
(C) information about the occurrence of a disease, or medical condition or disorder in family members of the individual.
(2) Information about an individual's current health status (including information about sex, age, physical exams, and chemical, blood, or urine analyses) is not protected genetic information unless it is described in subparagraph (1).

1–202. In discharging their responsibilities under this order, departments and agencies shall implement the following nondiscrimination requirements.
(a) The employing department or agency shall not discharge, fail or refuse to hire, or otherwise discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of that employee, because of protected genetic information with respect to the employee, or because of information about a request for or the receipt of genetic services by such employee.

(b) The employing department or agency shall not limit, segregate, or classify employees in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect that employee's status, because of protected genetic information with respect to the employee or because of information about a request for or the receipt of genetic services by such employee.

(c) The employing department or agency shall not request, require, collect, or purchase protected genetic information with respect to an employee, or information about a request for or the receipt of genetic services by such employee.

(d) The employing department or agency shall not disclose protected genetic information with respect

to an employee, or information about a request for or the receipt of genetic services by an employee except:

(1) to the employee who is the subject of the information, at his or her request;

(2) to an occupational or other health researcher, if the research conducted complies with the regulations and protections provided for under part 46 of title 45, of the Code of Federal Regulations;

(3) if required by a Federal statute, congressional subpoena, or an order issued by a court of competent jurisdiction, except that if the subpoena or court order was secured without the knowledge of the individual to whom the information refers, the employer shall provide the individual with adequate notice to challenge the subpoena or court order, unless the subpoena or court order also imposes confidentiality requirements; or

(4) to executive branch officials investigating compliance with this order, if the information is relevant to the investigation.

(e) The employing department or agency shall not maintain protected genetic information or information about a request for or the receipt of genetic services in general personnel files; such information shall be treated as confidential medical records and kept separate from personnel files.

*SEC. 3. Exceptions.*

1–301. The following exceptions shall apply to the nondiscrimination requirements set forth in section 1202.

(a) The employing department or agency may request or require information defined in section 1–201(e)(1)(C) with respect to an applicant who has been given a conditional offer of employment or to an employee if:

(1) the request or requirement is consistent with the Rehabilitation Act [of 1973, 29 U.S.C. 701 et seq.] and other applicable law;

(2) the information obtained is to be used exclusively to assess whether further medical evaluation is needed to diagnose a current disease, or medical condition or disorder, or under the terms of section 1–301(b) of this order;

(3) such current disease, or medical condition or disorder could prevent the applicant or employee from performing the essential functions of the position held or desired; and

(4) the information defined in section 1–201(e)(1)(C) of this order will not be disclosed to persons other than medical personnel involved in or responsible for assessing whether further medical evaluation is needed to diagnose a current disease, or medical condition or disorder, or under the terms of section 1–301(b) of this order.

(b) The employing department or agency may request, collect, or purchase protected genetic information with respect to an employee, or any information about a request for or receipt of genetic services by such employee if:

(1) the employee uses genetic or health care services provided by the employer (other than use pursuant to section 1–301(a) of this order);

(2) the employee who uses the genetic or health care services has provided prior knowing, voluntary, and written authorization to the employer to collect protected genetic information;

(3) the person who performs the genetic or health care services does not disclose protected genetic information to anyone except to the employee who uses the services for treatment of the individual; pursuant to section 1–202(d) of this order; for program evaluation or assessment; for compiling and analyzing information in anticipation of or for use in a civil or criminal legal proceeding; or, for payment or accounting purposes, to verify that the service was performed (but in such cases the genetic information itself cannot be disclosed);

(4) such information is not used in violation of sections 1–202(a) or 1–202(b) of this order.

(c) The employing department or agency may collect protected genetic information with respect to an employee if the requirements of part 46 of title 45 of the Code of Federal Regulations are met.

(d) Genetic monitoring of biological effects of toxic substances in the workplace shall be permitted if all of the following conditions are met:

(1) the employee has provided prior, knowing, voluntary, and written authorization;

(2) the employee is notified when the results of the monitoring are available and, at that time, the employer makes any protected genetic information that may have been acquired during the monitoring available to the employee and informs the employee how to obtain such information;

(3) the monitoring conforms to any genetic monitoring regulations that may be promulgated by the Secretary of Labor; and

(4) the employer, excluding any licensed health care professionals that are involved in the genetic monitoring program, receives results of the monitoring only in aggregate terms that do not disclose the identity of specific employees.

(e) This order does not limit the statutory authority of a Federal department or agency to:

(1) promulgate or enforce workplace safety and health laws and regulations;

(2) conduct or sponsor occupational or other health research that is conducted in compliance with regulations at part 46 of title 45, of the Code of Federal Regulations; or

(3) collect protected genetic information as a part of a lawful program, the primary purpose of which is to carry out identification purposes.

*SEC. 4. Miscellaneous.*

1–401. The head of each department and agency shall take appropriate action to disseminate this policy and, to this end, shall designate a high level official responsible for carrying out its responsibilities under this order.

1–402. Nothing in this order shall be construed to:

(a) limit the rights or protections of an individual under the Rehabilitation Act of 1973 (29 U.S.C. 701, et seq.), the Privacy Act of 1974 (5 U.S.C. 552a), or other applicable law; or

(b) require specific benefits for an employee or dependent under the Federal Employees Health Benefits Program or similar program.

1–403. This order clarifies and makes uniform Administration policy and does not create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its officers or employees, or any other person.

WILLIAM J. CLINTON.

## § 2000e–16a. Short title; purpose; definition

**(a) Short title**

Sections 2000e–16a to 2000e–16c of this title may be cited as the "Government Employee Rights Act of 1991".

**(b) Purpose**

The purpose of sections 2000e–16a to 2000e–16c of this title is to provide procedures to protect the rights of certain government employees, with respect to their public employment, to be free of discrimination on the basis of race, color, religion, sex, national origin, age, or disability.

**(c) "Violation" defined**

For purposes of sections 2000e–16a to 2000e–16c of this title, the term "violation" means a practice that violates section 2000e–16b(a) of this title.

(Pub. L. 102–166, title III, § 301, Nov. 21, 1991, 105 Stat. 1088; Pub. L. 103–283, title III, § 312(f)(1), July 22, 1994, 108 Stat. 1446; Pub. L. 104–1, title V, § 504(a)(1), Jan. 23, 1995, 109 Stat. 40.)

References in Text

Sections 2000e–16a to 2000e–16c of this title, referred to in text, was in the original "this title", meaning title III of Pub. L. 102–166, which is classified generally to sections 2000e–16a to 2000e–16c of this title. For complete classification of title III to the Code, see Tables.

Codification

Section was formerly classified to section 1201 of Title 2, The Congress.

Amendments

1995—Pub. L. 104–1 amended section generally, substituting "rights of certain government employees" for "right of Senate and other government employees" in subsec. (b) and striking out definitions of "Senate employee" and "head of employing office" in subsec. (c).

1994—Subsec. (c)(1)(B) to (D). Pub. L. 103–283, which directed the amendment of subsec. (c) by striking out subpar. (B), redesignating subpars. (C) and (D) as (B) and (C), respectively, and striking out "or (B)" after "described in subparagraph (A)" in subpars. (B) and (C), was executed by making the amendment to subsec. (c)(1) to reflect the probable intent of Congress. Prior to amendment, subpar. (B) read as follows: "any employee of the Architect of the Capitol who is assigned to the Senate Restaurants or to the Superintendent of the Senate Office Buildings;".

Effective Date

Section effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as an Effective Date of 1991 Amendment note under section 1981 of this title.

**§ 2000e–16b. Discriminatory practices prohibited**

**(a) Practices**

All personnel actions affecting the Presidential appointees described in section 1219[1] of title 2 or the State employees described in section 2000e–16c of this title shall be made free from any discrimination based on—

(1) race, color, religion, sex, or national origin, within the meaning of section 2000e–16 of this title;

(2) age, within the meaning of section 633a of title 29; or

(3) disability, within the meaning of section 791 of title 29 and sections 12112 to 12114 of this title.

**(b) Remedies**

The remedies referred to in sections 1219(a)(1)[1] of title 2 and 2000e–16c(a) of this title—

(1) may include, in the case of a determination that a violation of subsection (a)(1) or (a)(3) of this section has occurred, such remedies as would be appropriate if awarded under sections 2000e–5(g), 2000e–5(k), and 2000e–16(d) of this title, and such compensatory damages as would be appropriate if awarded under section 1981 or sections 1981a(a) and 1981a(b)(2) of this title;

(2) may include, in the case of a determination that a violation of subsection (a)(2) of this section has occurred, such remedies as would be appropriate if awarded under section 633a(c) of title 29; and

(3) may not include punitive damages.

(Pub. L. 102–166, title III, § 302, Nov. 21, 1991, 105 Stat. 1088; Pub. L. 104–1, title V, § 504(a)(1), Jan. 23, 1995, 109 Stat. 40.)

---

[1] See References in Text note below.

References in Text

Section 1219 of title 2, referred to in text, was repealed by Pub. L. 104–331, § 5(a), Oct. 26, 1996, 110 Stat. 4072.

Codification

Section was formerly classified to section 1202 of Title 2, The Congress.

Amendments

1994—Pub. L. 104–1 amended section generally. Prior to amendment, text read as follows: "All personnel actions affecting employees of the Senate shall be made free from any discrimination based on—

"(1) race, color, religion, sex, or national origin, within the meaning of section 2000e–16 of this title;

"(2) age, within the meaning of section 633a of title 29; or

"(3) handicap or disability, within the meaning of section 791 of title 29 and sections 12112 to 12114 of this title."

Effective Date

Section effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as an Effective Date of 1991 Amendment note under section 1981 of this title.

**§ 2000e–16c. Coverage of previously exempt State employees**

**(a) Application**

The rights, protections, and remedies provided pursuant to section 2000e–16b of this title shall apply with respect to employment of any individual chosen or appointed, by a person elected to public office in any State or political subdivision of any State by the qualified voters thereof—

(1) to be a member of the elected official's personal staff;

(2) to serve the elected official on the policymaking level; or

(3) to serve the elected official as an immediate advisor with respect to the exercise of the constitutional or legal powers of the office.

**(b) Enforcement by administrative action**

**(1) In general**

Any individual referred to in subsection (a) of this section may file a complaint alleging a violation, not later than 180 days after the occurrence of the alleged violation, with the Equal Employment Opportunity Commission, which, in accordance with the principles and procedures set forth in sections 554 through 557 of title 5, shall determine whether a violation has occurred and shall set forth its determination in a final order. If the Equal Employment Opportunity Commission determines that a violation has occurred, the final order shall also provide for appropriate relief.

**(2) Referral to State and local authorities**

**(A) Application**

Section 2000e–5(d) of this title shall apply with respect to any proceeding under this section.

**(B) Definition**

For purposes of the application described in subparagraph (A), the term "any charge filed by a member of the Commission alleg-

ing an unlawful employment practice'' means a complaint filed under this section.

**(c) Judicial review**

Any party aggrieved by a final order under subsection (b) of this section may obtain a review of such order under chapter 158 of title 28. For the purpose of this review, the Equal Employment Opportunity Commission shall be an ''agency'' as that term is used in chapter 158 of title 28.

**(d) Standard of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law and interpret constitutional and statutory provisions. The court shall set aside a final order under subsection (b) of this section if it is determined that the order was—

(1) arbitrary, capricious, an abuse of discretion, or otherwise not consistent with law;

(2) not made consistent with required procedures; or

(3) unsupported by substantial evidence.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**(e) Attorney's fees**

If the individual referred to in subsection (a) of this section is the prevailing party in a proceeding under this subsection,[1] attorney's fees may be allowed by the court in accordance with the standards prescribed under section 2000e–5(k) of this title.

(Pub. L. 102–166, title III, § 304, formerly § 321, Nov. 21, 1991, 105 Stat. 1097; renumbered § 304 and amended Pub. L. 104–1, title V, § 504(a)(3), (4), Jan. 23, 1995, 109 Stat. 41.)

CODIFICATION

Section was formerly classified to section 1220 of Title 2, The Congress.

PRIOR PROVISIONS

A prior section 304 of Pub. L. 102–166 was classified to section 1204 of Title 2, The Congress, prior to repeal by Pub. L. 104–1.

AMENDMENTS

1995—Subsec. (a). Pub. L. 104–1, § 504(a)(4), struck out ''and 1207(h) of title 2'' before ''shall apply'' in introductory provisions.

EFFECTIVE DATE

Section effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as an Effective Date of 1991 Amendment note under section 1981 of this title.

**§ 2000e–17. Procedure for denial, withholding, termination, or suspension of Government contract subsequent to acceptance by Government of affirmative action plan of employer; time of acceptance of plan**

No Government contract, or portion thereof, with any employer, shall be denied, withheld, terminated, or suspended, by any agency or offi-

cer of the United States under any equal employment opportunity law or order, where such employer has an affirmative action plan which has previously been accepted by the Government for the same facility within the past twelve months without first according such employer full hearing and adjudication under the provisions of section 554 of title 5, and the following pertinent sections: *Provided*, That if such employer has deviated substantially from such previously agreed to affirmative action plan, this section shall not apply: *Provided further*, That for the purposes of this section an affirmative action plan shall be deemed to have been accepted by the Government at the time the appropriate compliance agency has accepted such plan unless within forty-five days thereafter the Office of Federal Contract Compliance has disapproved such plan.

(Pub. L. 88–352, title VII, § 718, as added Pub. L. 92–261, § 13, Mar. 24, 1972, 86 Stat. 113.)

---

[1] So in original.

**2010 Maryland Code**
**STATE GOVERNMENT**
**TITLE 20 - HUMAN RELATIONS**
**Subtitle 1 - Definitions**
**Section 20-101 - Definitions.**

**§ 20-101. Definitions.**


(a)  In general.- In Subtitles 1 through 11 of this title the following words have the meanings indicated.

Revisor's Note.

This subsection is new language added as the standard introductory language to a definition section.

(b)  Commission.- "Commission" means the Commission on Human Relations.

Revisor's Note.

This subsection is new language added to avoid repetition of the full reference to the "Commission on Human Relations".

(c)  Complainant.- "Complainant" means a person that files a complaint alleging a discriminatory act under this title.

Revisor's Note.

This subsection is new language derived without substantive change from former Art. 49B, § 20(c).
The definition of the term "complainant" in former Art. 49B, § 20(c) was

applicable only to former Art. 49B, §§ 19 through 39, which are revised in Subtitle 7 and Subtitle 10, Part II of this title. However, the term "complainant" was also used in former provisions of Article 49B that are revised in other subtitles in this title. In this revision, the definition of "complainant" in former Art. 49B, § 20(c) is made applicable to this title. Accordingly, the reference to a "discriminatory act" is substituted for the former reference to a "discriminatory housing practice". No substantive change is intended.

Defined Terms.

"Discriminatory act"                                    § 20-101

"Person"                                    § 1-101

(d)  Discriminatory act.- "Discriminatory act" means an act prohibited under:

      (1) Subtitle 3 of this title (Discrimination in Places of Public Accommodation);

      (2) Subtitle 4 of this title (Discrimination by Persons Licensed or Regulated by Department of Labor, Licensing, and Regulation);

      (3) Subtitle 5 of this title (Discrimination in Leasing of Commercial Property);

      (4) Subtitle 6 of this title (Discrimination in Employment);

      (5) Subtitle 7 of this title (Discrimination in Housing); or

      (6) Subtitle 8 of this title (Aiding, Abetting, or Attempting Discriminatory Act; Obstructing Compliance).

Revisor's Note.

This subsection is new language added for brevity and consistency throughout this title.

Defined Terms.

"Person"                                    § 1-101

(e)  Respondent.-

      (1) "Respondent" means a person accused in a complaint of a discriminatory act.

      (2) "Respondent" includes a person identified during an investigation of a complaint and joined as an additional or substitute respondent.

Revisor's Note.

This subsection is new language derived without substantive change from former Art. 49B, § 20(s) and, as it related to a description of the respondent, § 10(a).

The definition of the term "respondent" in former Art. 49B, § 20(s)(2), which included "a person identified during an investigation of a complaint and joined as an additional or substitute respondent" was applicable only to former Art. 49B, §§ 19 through 39, which are revised in Subtitle 7 and Subtitle 10, Part II of this title. However, the Commission on Human Relations advises that it is current practice to join additional or substitute respondents identified during the investigation of a complaint alleging any discriminatory act. In this revision, the definition of "respondent" in former Art. 49B, § 20(s)(2) is made applicable to this title. No substantive change is intended.

Defined Terms.

| | |
|---|---|
| "Discriminatory act" | § 20-101 |
| "Includes" | § 1-101 |
| "Person" | § 1-101 |

(f)  Sexual orientation.- "Sexual orientation" means the identification of an individual as to male or female homosexuality, heterosexuality, or bisexuality.

Revisor's Note.

This subsection is new language derived without substantive change from former Art. 49B, §§ 5(a), 15(j), and 20(u).

[An. Code 1957, art. 49B, §§ 5(a), 10(a), 15(j), 20(c), (s), (u); 2009, ch. 120, § 2.]

*Md. STATE GOVERNMENT Code Ann. § 20-606*

Annotated Code of Maryland
Copyright 2017 by Matthew Bender and Company, Inc., a member of the
LexisNexis Group
All rights reserved.

*** Current through chapters effective through August 1, 2017, of the 2017
Regular Session of the Maryland General Assembly. ***

STATE GOVERNMENT
TITLE 20.  HUMAN RELATIONS
SUBTITLE 6.  DISCRIMINATION IN EMPLOYMENT

Md. STATE GOVERNMENT Code Ann. § 20-606  (2017)

§ 20-606. Unlawful employment practices

  (a) Employers. -- An employer may not:

  (1) fail or refuse to hire, discharge, or otherwise discriminate against any
individual with respect to the individual's compensation, terms, conditions, or
privileges of employment because of:

    (i) the individual's race, color, religion, sex, age, national origin, marital status,
sexual orientation, gender identity, genetic information, or disability unrelated in
nature and extent so as to reasonably preclude the performance of the employment;
or

    (ii) the individual's refusal to submit to a genetic test or make available the
results of a genetic test;

  (2) limit, segregate, or classify its employees or applicants for employment in
any way that would deprive or tend to deprive any individual of employment
opportunities or otherwise adversely affect the individual's status as an employee
because of:

    (i) the individual's race, color, religion, sex, age, national origin, marital status,
sexual orientation, gender identity, genetic information, or disability unrelated in
nature and extent so as to reasonably preclude the performance of the employment;

**– Add. 48 –**

or

    (ii) the individual's refusal to submit to a genetic test or make available the results of a genetic test;

    (3) request or require genetic tests or genetic information as a condition of hiring or determining benefits; or

    (4) fail or refuse to make a reasonable accommodation for the known disability of an otherwise qualified employee.

(b) Employment agencies. -- An employment agency may not:

    (1) fail or refuse to refer for employment or otherwise discriminate against any individual because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

    (2) classify or refer for employment any individual on the basis of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

(c) Labor organizations. -- A labor organization may not:

    (1) exclude or expel from its membership, or otherwise discriminate against, any individual because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment;

    (2) limit, segregate, or classify its membership, or classify or fail or refuse to refer for employment any individual, in any way that would deprive or tend to deprive the individual of employment opportunities, limit the individual's employment opportunities, or otherwise adversely affect the individual's status as an employee or as an applicant for employment because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or

    (3) cause or attempt to cause an employer to discriminate against an individual in violation of this section.

(d) Training programs. -- An employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs, including on-the-job training programs, may not discriminate against any individual in admission to, or employment in, any program established to provide apprenticeship or other training or retraining because of the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment.

(e) Notice or advertisement indicating prohibited preference, limitation, specification, or discrimination; bona fide occupational qualification. --

   (1) Except as provided in paragraph (2) of this subsection, an employer, labor organization, or employment agency may not print or cause to be printed or published any notice or advertisement relating to employment by the employer, membership in or any classification or referral for employment by the labor organization, or any classification or referral for employment by the employment agency that indicates any preference, limitation, specification, or discrimination based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, or disability.

   (2) A notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, age, national origin, marital status, or disability if religion, sex, age, national origin, marital status, or disability is a bona fide occupational qualification for employment.

(f) Opposition to unlawful employment practice; participation in enforcement proceeding. -- An employer may not discriminate or retaliate against any of its employees or applicants for employment, an employment agency may not discriminate against any individual, and a labor organization may not discriminate or retaliate against any member or applicant for membership because the individual has:

   (1) opposed any practice prohibited by this subtitle; or

   (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle.

**HISTORY:** An. Code 1957, art. 49B, § 16(a)-(f); 2009, ch. 120, § 2; chs. 299, 300; ch. 366, § 1; 2013, chs. 547, 548; 2014, ch. 474, § 2.

**Federal Rules of Civil Procedure › TITLE VII. JUDGMENT ›**

**Rule 56. Summary Judgment**

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) Time to File a Motion. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) WHEN FACTS ARE UNAVAILABLE TO THE NONMOVANT. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1) defer considering the motion or deny it;

    (2) allow time to obtain affidavits or declarations or to take discovery; or

    (3) issue any other appropriate order.

(e) FAILING TO PROPERLY SUPPORT OR ADDRESS A FACT. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    (1) give an opportunity to properly support or address the fact;

    (2) consider the fact undisputed for purposes of the motion;

    (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

    (4) issue any other appropriate order.

(f) JUDGMENT INDEPENDENT OF THE MOTION. After giving notice and a reasonable time to respond, the court may:

    (1) grant summary judgment for a nonmovant;

    (2) grant the motion on grounds not raised by a party;or

    (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) FAILING TO GRANT ALL THE REQUESTED RELIEF. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.

(h) AFFIDAVIT OR DECLARATION SUBMITTED IN BAD FAITH. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to pay the other party the reasonable expenses, including

**– Add. 52 –**

attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2010, eff. Dec. 1, 2010.)

### NOTES OF ADVISORY COMMITTEE ON RULES—1937

This rule is applicable to all actions, including those against the United States or an officer or agency thereof.

Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact. It has been extensively used in England for more than 50 years and has been adopted in a number of American states. New York, for example, has made great use of it. During the first nine years after its adoption there, the records of New York county alone show 5,600 applications for summary judgments. *Report of the Commission on the Administration of Justice in New York State* (1934), p. 383. See also *Third Annual Report of the Judicial Council of the State of New York* (1937), p. 30.

In England it was first employed only in cases of liquidated claims, but there has been a steady enlargement of the scope of the remedy until it is now used in actions to recover land or chattels and in all other actions at law, for liquidated or unliquidated claims, except for a few designated torts and breach of promise of marriage. *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 3, r. 6; Orders 14, 14A, and 15; see also O. 32, r. 6, authorizing an application for judgment at any time upon admissions. In Michigan (3 Comp.Laws (1929) §14260) and Illinois (Ill.Rev.Stat. (1937) ch. 110, §§181, 259.15, 259.16), it is not limited to liquidated demands. New York (N.Y.R.C.P. (1937) Rule 113; see also Rule 107) has brought so many classes of actions under the operation of the rule that the Commission on Administration of Justice in New York State (1934) recommend that all restrictions be removed and that the remedy be available "in any action" (p. 287). For the history and nature of the summary judgment procedure and citations of state statutes, see Clark and Samenow, *The Summary Judgment* (1929), 38 Yale L.J. 423.

*Note to Subdivision (d).* See Rule 16 (Pre-Trial Procedure; Formulating Issues) and the *Note* thereto.

*Note to Subdivisions (e) and (f).* These are similar to rules in Michigan. Mich.Court Rules Ann. (Searl, 1933) Rule 30.

### NOTES OF ADVISORY COMMITTEE ON RULES—1946 AMENDMENT

*Subdivision (a)*. The amendment allows a claimant to move for a summary judgment at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party. This will normally operate to permit an earlier motion by the claimant than under the original rule, where the phrase "at any time after the pleading in answer thereto has been served" operates to prevent a claimant from moving for summary judgment, even in a case clearly proper for its exercise, until a formal answer has been filed. Thus in *Peoples Bank v. Federal Reserve Bank of San Francisco* (N.D.Cal. 1944) 58 F.Supp. 25, the plaintiff's counter-motion for a summary judgment was stricken as premature, because the defendant had not filed an answer. Since Rule 12(a) allows at least 20 days for an answer, that time plus the 10 days required in Rule 56(c) means that under original Rule 56(a) a minimum period of 30 days necessarily has to elapse in every case before the claimant can be heard on his right to a summary judgment. An extension of time by the court or the service of preliminary motions of any kind will prolong that period even further. In many cases this merely represents unnecessary delay. See *United States v. Adler's Creamery, Inc*. (C.C.A.2d, 1939) 107 F.(2d) 987. The changes are in the interest of more expeditious litigation. The 20-day period, as provided, gives the defendant an opportunity to secure counsel and determine a course of action. But in a case where the defendant himself serves a motion for summary judgment within that time, there is no reason to restrict the plaintiff and the amended rule so provides.

*Subdivision (c)*. The amendment of Rule 56(c), by the addition of the final sentence, resolves a doubt expressed in *Sartor v. Arkansas Natural Gas Corp*. (1944) 321 U.S. 620. See also Commentary, *Summary Judgment as to Damages* (1944) 7 Fed.Rules Serv. 974; *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co*. (C.C.A.2d, 1945) 147 F.(2d) 399, cert. den. (1945) 325 U.S. 861. It makes clear that although the question of recovery depends on the amount of damages, the summary judgment rule is applicable and summary judgment may be granted in a proper case. If the case is not fully adjudicated it may be dealt with as provided in subdivision (d) of Rule 56, and the right to summary recovery determined by a preliminary order, interlocutory in character, and the precise amount of recovery left for trial.

*Subdivision (d)*. Rule 54(a) defines "judgment" as including a decree and "any order from which an appeal lies." Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary "judgment" is not a final judgment, and, therefore, that it is not appealable, unless in the particular case some statute allows an appeal from the interlocutory order involved. The partial summary judgment is merely a

pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact. See *Leonard v. Socony-Vacuum Oil Co.* (C.C.A.7th, 1942) 130 F.(2d) 535; *Biggins v. Oltmer Iron Works* (C.C.A.7th, 1946) 154 F.(2d) 214; 3 *Moore's Federal Practice* (1938). 3190–3192. Since interlocutory appeals are not allowed, except where specifically provided by statute (see 3 *Moore, op. cit. supra*, 3155–3156) this interpretation is in line with that policy, *Leonard v. Socony-Vacuum Oil Co., supra*. See also *Audi Vision Inc., v. RCA Mfg. Co.* (C.C.A.2d, 1943) 136 F.(2d) 621; *Toomey v. Toomey* (App.D.C. 1945) 149 F.(2d) 19; *Biggins v. Oltmer Iron Works, supra; Catlin v. United States* (1945) 324 U.S. 229.

### NOTES OF ADVISORY COMMITTEE ON RULES—1963 AMENDMENT

*Subdivision (c)*. By the amendment "answers to interrogatories" are included among the materials which may be considered on motion for summary judgment. The phrase was inadvertently omitted from the rule, see 3 Barron & Holtzoff, *Federal Practice and Procedure* 159–60 (Wright ed. 1958), and the courts have generally reached by interpretation the result which will hereafter be required by the text of the amended rule. See Annot., 74 A.L.R.2d 984 (1960).

*Subdivision (e)*. The words "answers to interrogatories" are added in the third sentence of this subdivision to conform to the amendment of subdivision (c).

The last two sentences are added to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matters sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are "well-pleaded," and not suppositious, conclusory, or ultimate. See *Frederick Hart & Co., Inc. v. Recordgraph Corp.*, 169 F.2d 580 (3d Cir. 1948); *United States ex rel. Kolton v. Halpern*, 260 F.2d 590 (3d Cir. 1958); *United States ex rel. Nobles v. Ivey Bros. Constr. Co., Inc.*, 191 F.Supp. 383 (D.Del. 1961); *Jamison v. Pennsylvania Salt Mfg. Co.*, 22 F.R.D. 238 (W.D.Pa. 1958); *Bunny Bear, Inc. v. Dennis Mitchell Industries*, 139 F.Supp. 542 (E.D.Pa. 1956); *Levy v. Equitable Life Assur. Society*, 18 F.R.D. 164 (E.D.Pa. 1955).

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permits the pleadings themselves to stand in the way of granting an otherwise justified summary judgment, is incompatible with the basic purpose of the rule. See 6 *Moore's Federal Practice* 2069 (2d ed. 1953); 3 Barron & Holtzoff, supra, §1235.1.

It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment.

The amendment is not intended to derogate from the solemnity of the pleadings. Rather it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary.

Nor is the amendment designed to affect the ordinary standards applicable to the summary judgment motion. So, for example: Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. And summary judgment may be inappropriate where the party opposing it shows under subdivision (f) that he cannot at the time present facts essential to justify his opposition.

### NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The amendments are technical. No substantive change is intended.

### COMMITTEE NOTES ON RULES—2007 AMENDMENT

The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 56(a) and (b) referred to summary-judgment motions on or against a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment. The list was incomplete. Rule 56 applies to third-party claimants, intervenors, claimants in interpleader, and others. Amended Rule 56(a) and (b) carry forward the present meaning by referring to a party claiming relief and a party against whom relief is sought.

Former Rule 56(c), (d), and (e) stated circumstances in which summary judgment "shall be rendered," the court "shall if practicable" ascertain facts existing without substantial controversy, and "if appropriate, shall" enter summary judgment. In each place "shall" is changed to "should." It is established that although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that there is no genuine issue as to any material fact. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256 –257 (1948). Many lower court decisions are gathered in 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d, §2728. "Should" in amended Rule 56(c) recognizes that courts will seldom exercise the discretion to deny summary judgment when there is no genuine issue as to any material fact. Similarly sparing exercise of this discretion is appropriate under Rule 56(e)(2). Rule 56(d)(1), on the other hand, reflects the more open-ended discretion to decide whether it is practicable to determine what material facts are not genuinely at issue.

Former Rule 56(d) used a variety of different phrases to express the Rule 56(c) standard for summary judgment—that there is no genuine issue as to any material fact. Amended Rule 56(d) adopts terms directly parallel to Rule 56(c).

### COMMITTEE NOTES ON RULES—2009 AMENDMENT

The timing provisions for summary judgment are outmoded. They are consolidated and substantially revised in new subdivision (c)(1). The new rule allows a party to move for summary judgment at any time, even as early as the commencement of the action. If the motion seems premature both subdivision (c)(1) and Rule 6(b) allow the court to extend the time to respond. The rule does set a presumptive deadline at 30 days after the close of all discovery.

The presumptive timing rules are default provisions that may be altered by an order in the case or by local rule. Scheduling orders are likely to supersede the rule provisions in most cases, deferring summary-judgment motions until a stated time or establishing different deadlines. Scheduling orders tailored to the needs of the specific case, perhaps adjusted as it progresses, are likely to work better than default rules. A scheduling order may be adjusted to adopt the parties' agreement on timing, or may require that discovery and motions occur in stages—including separation of expert-witness discovery from other discovery.

Local rules may prove useful when local docket conditions or practices are incompatible with the general Rule 56 timing provisions.

If a motion for summary judgment is filed before a responsive pleading is due from a party affected by the motion, the time for responding to the motion is 21 days after the responsive pleading is due.

### COMMITTEE NOTES ON RULES—2010 AMENDMENT

Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

*Subdivision (a).* Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word — genuine "issue" becomes genuine "dispute." "Dispute" better reflects the focus of a summary-judgment determination. As explained below, "shall" also is restored to the place it held from 1938 to 2007.

The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense. The subdivision caption adopts the common phrase "partial summary judgment" to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion.

"Shall" is restored to express the direction to grant summary judgment. The word "shall" in Rule 56 acquired significance over many decades of use. Rule 56 was amended in 2007 to replace "shall" with "should" as part of the Style Project, acting under a convention that prohibited any use of "shall." Comments on proposals to amend Rule 56, as published in 2008, have shown that neither of the choices available under the Style Project conventions — "must" or "should" — is suitable in light of the case law on whether a district court has discretion to deny summary judgment when there appears to be no genuine dispute as to any material fact. Compare *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case in which there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249 * * * (1948))," with *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Eliminating "shall" created an unacceptable risk of changing the summary-judgment standard. Restoring "shall" avoids the unintended consequences of any other word.

Subdivision (a) also adds a new direction that the court should state on the record the reasons for granting or denying the motion. Most courts recognize this practice. Among other advantages, a statement of reasons can facilitate an appeal or subsequent trial-court proceedings. It is particularly important to state the reasons for granting summary judgment. The form and detail of the statement of reasons are left to the court's discretion.

The statement on denying summary judgment need not address every available reason. But identification of central issues may help the parties to focus further proceedings.

*Subdivision (b).* The timing provisions in former subdivisions (a) and (c) are superseded. Although the rule allows a motion for summary judgment to be filed at the commencement of an action, in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had. Scheduling orders or other pretrial orders can regulate timing to fit the needs of the case.

*Subdivision (c).* Subdivision (c) is new. It establishes a common procedure for several aspects of summary-judgment motions synthesized from similar elements developed in the cases or found in many local rules.

Subdivision (c)(1) addresses the ways to support an assertion that a fact can or cannot be genuinely disputed. It does not address the form for providing the required support. Different courts and judges have adopted different forms including, for example, directions that the support be included in the motion, made part of a separate statement of facts, interpolated in the body of a brief or memorandum, or provided in a separate statement of facts included in a brief or memorandum.

Subdivision (c)(1)(A) describes the familiar record materials commonly relied upon and requires that the movant cite the particular parts of the materials that support its fact positions. Materials that are not yet in the record — including materials referred to in an affidavit or declaration — must be placed in the record. Once materials are in the record, the court may, by order in the case, direct that the

materials be gathered in an appendix, a party may voluntarily submit an appendix, or the parties may submit a joint appendix. The appendix procedure also may be established by local rule. Pointing to a specific location in an appendix satisfies the citation requirement. So too it may be convenient to direct that a party assist the court in locating materials buried in a voluminous record.

Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the absence or presence of a genuine dispute. And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.

Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Subdivision (c)(3) reflects judicial opinions and local rules provisions stating that the court may decide a motion for summary judgment without undertaking an independent search of the record. Nonetheless, the rule also recognizes that a court may consider record materials not called to its attention by the parties.

Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted. The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.

A formal affidavit is no longer required. 28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit.

*Subdivision (d).* Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).

A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion.

*Subdivision (e).* Subdivision (e) addresses questions that arise when a party fails to support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c). As explained below, summary judgment cannot be granted by default even if there is a complete failure to respond to the motion, much less when an attempted response fails to comply with Rule 56(c) requirements. Nor should it be denied by default even if the movant completely fails to reply to a nonmovant's response. Before deciding on other possible action, subdivision (e)(1) recognizes that the court may afford an opportunity to properly support or address the fact. In many circumstances this opportunity will be the court's preferred first step.

Subdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied. This approach reflects the "deemed admitted" provisions in many local rules. The fact is considered undisputed only for purposes of the motion; if summary judgment is denied, a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings. And the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute.

Subdivision (e)(3) recognizes that the court may grant summary judgment only if the motion and supporting materials — including the facts considered undisputed under subdivision (e)(2) — show that the movant is entitled to it. Considering some facts undisputed does not of itself allow summary judgment. If there is a proper response or reply as to some facts, the court cannot grant summary judgment without determining whether those facts can be genuinely disputed. Once the court has determined the set of facts — both those it has chosen to consider undisputed for want of a proper response or reply and any that cannot be genuinely disputed despite a procedurally proper response or reply — it must determine the legal consequences of these facts and permissible inferences from them.

Subdivision (e)(4) recognizes that still other orders may be appropriate. The choice among possible orders should be designed to encourage proper presentation of the record. Many courts take extra care with pro se litigants, advising them of the need to respond and the risk of losing by summary judgment if an adequate response is not filed. And the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.

*Subdivision (f).* Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice. After giving notice and a reasonable time to respond the court may grant summary judgment for the nonmoving party; grant a motion on legal or factual grounds not raised by the parties; or consider summary judgment on its own. In many cases it may prove useful first to invite a motion; the invited motion will automatically trigger the regular procedure of subdivision (c).

*Subdivision (g).* Subdivision (g) applies when the court does not grant all the relief requested by a motion for summary judgment. It becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion. Once that duty is discharged, the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute. The court must take care that this determination does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.

If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

*Subdivision (h).* Subdivision (h) carries forward former subdivision (g) with three changes. Sanctions are made discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions. *See* Cecil & Cort, Federal Judicial Center Memorandum on Federal Rule of Civil Procedure 56 (g) Motions for Sanctions (April 2, 2007). In addition, the rule text is expanded to recognize the need to provide notice and a reasonable time to respond. Finally, authority to impose other appropriate sanctions also is recognized.

*Changes Made After Publication and Comment*

**Subdivision (a):** "[S]hould grant" was changed to "shall grant."

"[T]he movant shows that" was added.

Language about identifying the claim or defense was moved up from subdivision (c)(1) as published.

**Subdivision (b):** The specifications of times to respond and to reply were deleted.

Words referring to an order "in the case" were deleted.

**Subdivision (c):** The detailed "point-counterpoint" provisions published as subdivision (c)(1) and (2) were deleted.

The requirement that the court give notice before granting summary judgment on the basis of record materials not cited by the parties was deleted.

The provision that a party may accept or dispute a fact for purposes of the motion only was deleted.

**Subdivision (e):** The language was revised to reflect elimination of the point-counterpoint procedure from subdivision (c). The new language reaches failure to properly support an assertion of fact in a motion.

**Subdivision (f):** The provision requiring notice before denying summary judgment on grounds not raised by a party was deleted.

**Subdivision (h):** Recognition of the authority to impose other appropriate sanctions was added.

**Other changes:** Many style changes were made to express more clearly the intended meaning of the published proposal.

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. <u>17-1967</u> Caption: <u>Augusta Thomas, Jr. v. Delmarva Power & Light Company</u>

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P.
28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's
Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's
Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or
Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used
only with monospaced type]*

[ X ]   this brief contains <u>10,654 </u>words, excluding the parts of the brief
exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[  ]    this brief uses a monospaced typeface and contains _____lines
of text, excluding the parts of the brief exempted by Fed. R. App. P.
32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
because:
*[14-point font must be used with proportional typeface, such as Times New Roman
or CG Times; 12-point font must be used with monospaced typeface, such as
Courier or Courier New]*

[ X ]   this brief has been prepared in a proportionally spaced typeface using
<u>MS Word 2003 </u>in<u>14 point Times New Roman font</u>; *or*

[  ]    this brief has been prepared in a monospaced typeface using
<u>MS Word 2003 </u>with____characters per inch _____font

October 12, 2017                          */s/ Janice Williams-Jones*_____
                                          Attorney for Appellant

# United States Court of Appeals
## for the Fourth Circuit

*Augusta Thomas, Jr. v. Delmarva Power & Light Company, 17-1697*

## **CERTIFICATE OF SERVICE**

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by LAW OFFICE OF JANICE WILLIAMS-JONES, Attorney for Plaintiff-Appellant to print this document.  I am an employee of Counsel Press.

On **October 12, 2017**, Counsel for Appellants has authorized me to electronically file the foregoing **Brief of Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> CHRISTINE M. BURKE
> SUSANNE HARRIS CARNELL
> LORENGER & CARNELL PLC
> 651 South Washington Street
> Alexandria, Virginia 22314
> (703) 684-1800
> Attorneys for Defendant-Appellee

Additional a paper copy will be mailed to the above counsel on this date.

Unless otherwise noted, the required paper copies have been filed with the Court on the same date via U.S. Express Mail.

October 12, 2017                                    /s/ Robyn Cocho
                                                   Robyn Cocho
                                                   Counsel Press